**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **SHIRLEY JOHNSON**,<br>Personal Representative<br>of the Estate of Elbert Davis,  Sr.<br>8408 Downey Dale Drive<br>Randallstown, Maryland  21133 | * <br> * <br> * |
| and | * |
| **SHIRLEY JOHNSON**,<br>Daughter of Elbert Davis, Sr., deceased<br>8408 Downey Dale Drive<br>Randallstown, Maryland  21133 | * <br> * <br> * |
| and | * |
| **DELORES A. DAVIS**,<br>Daughter of Elbert Davis, Sr., deceased<br>3704 Woodbine Avenue<br>Baltimore, Maryland  21207 | * <br> * <br> * |
| and | * |
| **MARY A. COX**,<br>Daughter of Elbert Davis, Sr., deceased<br>36 Championship Court<br>Owings Mills, Maryland  21117 | * <br> * <br> * |
| and | * |
| **GLORIA A. DAVIS**,<br>Daughter of Elbert Davis, Sr., deceased<br>8408 Downey Dale Drive<br>Randallstown, Maryland  21133 | * <br> * <br> * |
| and | * |
| **ALBERT CAIN**,<br>Son of Elbert Davis, Sr., deceased<br>8408 Downey Dale Drive<br>Randallstown, Maryland  21133 | * <br> * <br> * |
| and | |

CASE NO. _____

1

**ELBERT DAVIS, JR.,**
Son of Elbert Davis, Sr., deceased                    *
8408 Downey Dale Drive
Randallstown, Maryland  21133                         *

and                                                   *

**ANITA CAIN,**                                       *
Administrator of the Estate of
ARTHUR CAIN, deceased,                                *
Son of Elbert Davis, Sr., deceased
12 Jones Street                                       *
Boydton, Virginia  23917
                                                      *

          *Plaintiffs*                                *

and                                                   *

**To The Use of GAIL S. DAVIS,**                      *
Daughter of Elbert Davis, Sr., deceased
9304 Owings Choice Court                              *
Owings Mills, Maryland 21117
                                                      *
and
                                                      *
**To the Use of LEROY DAVIS,**
Son of Elbert Davis, Sr., deceased                    *
3601 Oakmont Avenue
Baltimore, Maryland  21215                            *

and                                                   *

**To The Use of ELBERT LEE DAVIS,**                   *
Son of Elbert Davis, Sr., deceased
8103 Carlson Lane                                     *
Windsor Mill, Maryland  21244
                                                      *

          *Use Plaintiffs*                            *

v.                                                    *

                                                      *

                                                      *

2

**BALTIMORE CITY POLICE DEPARTMENT**   *
    <u>Serve on:</u>
    GARY TUGGLE, Interim Commissioner   *
    601 East Fayette Street
    Baltimore, Maryland 21201   *

and   *

**STATE OF MARYLAND**   *
    <u>Serve on:</u>
    NANCY K. KOPP, Treasurer   *
    Louis L. Goldstein Treasury Building
    80 Calvert Street, Room 109   *
    Annapolis, Maryland 21401
      *

and   *

**THE MAYOR AND CITY COUNCIL**
**OF BALTIMORE**   *
    <u>Serve on:</u>
    ANDRE M. DAVIS, City Solicitor   *
    100 North Holliday Street, Room 101
    Baltimore, Maryland 21202   *

and   *

**WAYNE EARL JENKINS, Individually,**   *
**and in his Official Capacity as Agent**
**of the Baltimore City Police Department**   *
Register Number: 62928-037
Oklahoma City FTC   *
7410 S. MacArthur Boulevard
Oklahoma City, Oklahoma  73169   *

and   *

**RYAN GUINN, Individually,**   *
**and in his Official Capacity as Agent**
**of the Baltimore City Police Department**   *
601 East Fayette Street
Baltimore, Maryland 21201   *

and   *

**ESTATE OF SEAN MATTHEW SUITER**          *
    <u>Serve on:</u>
    NICOLE SUITER, Personal Representative *
    90 Hunter Creek Drive
    York, Pennsylvania 17406          *

                                       *

    *Defendants*
                                       *

*   *   *   *   *   *   *     *   *   *   *   *

## COMPLAINT

Plaintiffs Shirley Johnson, Personal Representative of the Estate of Elbert Davis, Sr., Shirley Johnson, Individually, as daughter of Elbert Davis, Sr., Delores A. Davis, Individually, as daughter of Elbert Davis, Sr., Mary A. Cox, Individually, as daughter of Elbert Davis, Sr., Gloria A. Davis, Individually, as daughter of Elbert Davis, Sr., Albert Cain, Individually, as son of Elbert Davis, Sr., Elbert Davis, Jr., Individually, as son of Elbert Davis, Sr., Anita Cain, Administrator of the Estate of Arthur Cain, son of Elbert Davis, Sr., by their undersigned attorneys, Jonathan A. Azrael, John R. Solter, Jr., Judson H. Lipowitz, and Azrael, Franz, Schwab & Lipowitz, LLC, and to the use of Leroy Davis, Elbert Lee Davis and Gail S. Davis, bring this Complaint against the Baltimore City Police Department, State of Maryland, the Mayor and City Council of Baltimore, Wayne Earl Jenkins, Ryan Guinn and the Estate of Sean Matthew Suiter ("Suiter"). In support thereof, Plaintiffs state as follows:

## INTRODUCTION

1.      On April 28, 2010 Elbert Davis Sr., (the "Decedent") was killed in a motor vehicle accident as a direct result of the illegal stop, pursuit, framing and arrest of Umar Hassan Burley and Brent Andre Matthews and the wrongful acts of Wayne Earl Jenkins ("Jenkins"), Ryan Guinn ("Guinn"), and Sean Suiter ("Suiter") (Jenkins, Guinn and Suiter are collectively referred to as the

"Officers"), while acting under the color of law and in the scope of their employment as officers of the Baltimore City Police Department (hereinafter, "BPD").

2.      The unconstitutional policies, patterns and practices of illegal policing and deficient training, supervision and discipline of the BPD and its officers, all of which began long before the incidents alleged in this Complaint, deprived Decedent of his life and liberty without due process of law, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

3.      On August 10, 2016, the U.S. Department of Justice Civil Rights Division published an Investigation of the BPD ("DOJ Report"), which details a number of the constitutionally offensive policies, practices and customs which proximately caused the deprivations of Decedent's federal rights as alleged herein.  A copy of the DOJ Report is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.      The DOJ Report found "the BPD has engaged in a pattern or practice of conduct that violates the constitutional and federal statutory rights of [Baltimore] City residents, and the [BPD] lacks sufficient systems to minimize these violations."  Id., p. 19.

5.      The DOJ Report also found, "[t]his pattern or practice is rooted in BPD's deficient supervision and oversight of officer activity, leading directly to a broad spectrum of constitutional and statutory violations.  This lack of supervision and oversight includes BPD's failure to use effective and widely-accepted methods to supervise officers, collect and analyze data on officer activity, and classify, investigate and resolve complaints of misconduct.  This pattern or practice is manifested in several ways that violate specific constitutional and statutory provisions: (1) BPD stops, searches and arrests individuals on Baltimore Streets without the reasonable suspicion or probable cause required by the Fourth Amendment; (2) BPD disproportionately stops, searches and arrests African Americans in violation of Title VI and the Safe Streets Act…" Id., p. 21.

6.     Dating back to the late 1990s and the introduction of BPD's "zero tolerance" enforcement strategy, BPD has encouraged its officers to suppress crime through "proactive enforcement" including "street level drug enforcement" and "car stops".  Id., p. 24.

7.     Testimony recently elicited from current and former BPD officers in the case of United States v. Daniel Hersl and Marcus Taylor (Case No. CCB-17-0106) revealed that Jenkins and other BPD officers would routinely drive up to groups of men without any reason and jump out of their vehicles to see if anyone would run.  This practice was undertaken 10-20 times on a slow night and more than 50 times on busier nights.

8.     Illegal stops such as the one at the heart of this Complaint were sufficiently widespread within the BPD to constitute a "custom or usage" of which BPD policymakers had actual or constructive knowledge.

9.     The BPD either intended that these customs or usages continue, or condoned such behavior by demonstrating deliberate indifference to stopping this type of policing by its officers.

10.     This lawsuit seeks redress for the death of Decedent resulting from the wrongful acts of the Officers in accordance with BPD policies, patterns and/or practices, of which BPD supervisors knew or should have known.

## JURISDICTION AND VENUE

11.     Jurisdiction exists in this action pursuant to 28 U.S.C. § 1331, as this action seeks redress for the violation of the Decedent's constitutional and civil rights pursuant to 42 U.S.C. § 1983, for attorney's fees under 42 U.S.C. § 1988(b), a/k/a the Civil Rights Attorney's Fee Awards Act of 1976, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over state law claims.

12.     Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to this Complaint occurred in this judicial district.

13.     On February 6, 2018, Plaintiffs sent Andre M. Davis, Baltimore City Solicitor, notice of Plaintiffs' claims.

14.     On February 7, 2018, Plaintiffs sent Nancy K. Kopp, Treasurer of the State of Maryland, notice of Plaintiffs' claims.

## PARTIES

15.     Plaintiff Shirley Johnson is the Personal Representative of the Estate of Elbert Davis, Sr., deceased.

16.     Plaintiffs Shirley Johnson, Delores A. Davis, Mary A. Cox, Gloria A. Davis, Albert Cain, Elbert Davis, Jr., Arthur Cain (deceased) and Use Plaintiffs Leroy Davis, Elbert Lee Davis, and Gail S. Davis are adult children of the Decedent.

17.     Plaintiffs Shirley Johnson, Mary A. Cox, Gloria A. Davis, and Elbert Davis, Jr., and Use Plaintiffs Gail S. Davis, and Elbert Lee Davis are residents of Baltimore County, Maryland.

18.     Plaintiff Delores Davis, and Use Plaintiff Leroy Davis are residents of Baltimore City, Maryland.

19.     Plaintiff Anita Cain, is the Administrator of the Estate of Arthur Cain, deceased son of Elbert Davis, Sr.  Ms. Cain is a resident of Mecklenburg County, Virginia.

20.     At all times relevant hereto, Defendants Jenkins, Guinn and Suiter were police officers with the BPD, and all are sued in their official and individual capacities, while acting under color of law and within the scope of their employment.

21.     Jenkins is a former member of a special police unit within the BPD known as the Gun Trace Task Force ("GTTF").  Jenkins is currently incarcerated in federal prison for multiple crimes, including crimes related to the events which give rise to this Complaint.

22.     Guinn and Suiter sometimes worked with the GTTF and were working with Jenkins during the events which give rise to this Complaint.

23.     Suiter, who is now deceased, was a police officer with the BPD. He died of a single gunshot wound to the head from his own service weapon the day before he was scheduled to testify before a federal grand jury in connection with an ongoing investigation and prosecution of several former GTTF members, which included Defendant Jenkins, for RICO-related violations consistent with Defendants' illegal stop of Mr. Burley in this matter. Nicole Rochelle Suiter, Personal Representative of the Estate of Sean Matthew Suiter, is being sued in her representative capacity for Defendant Suiter's official and individual actions while acting under color of law and within the scope of his employment during the arrest, collision, death of the Decedent, and subsequent investigation.

24.     BPD is a Maryland state agency that employs or has employed each of the Officers. The BPD is a "person" within the context of 42 U.S.C. 1983. The BPD is an agency of Defendant State of Maryland ("State").  The State is a "person" within the context of 42 U.S.C. 1983.

25.     BPD is a law enforcement agency charged with enforcing the laws of Maryland within the City, training BPD officers to perform their duties in accordance with clearly established constitutional law, implementing policies and procedures to ensure BPD officers perform their duties in accordance with clearly established constitutional law, and supervising/disciplining BPD officers.

26.     The Mayor of Baltimore has the power to appoint and fire the BPD Commissioner.

27.     The Mayor and City Council of Baltimore and the Mayor of Baltimore share budgetary power over the BPD.

**FACTUAL BACKGROUND**

**I. THE ILLEGAL STOP, PURSUIT, AND FATAL CAR CRASH**

28.     On April 28, 2010, Umar Burley was sitting in a vehicle parked in the 3800 block of Parkview Avenue in Baltimore City waiting for his friend, Brent Matthews.

29.     After Brent Matthews entered Burley's vehicle, Jenkins moved his unmarked police vehicle in front of Burley's vehicle at an angle and a second unmarked police car pulled behind Burley's vehicle in an attempt to "box him in."

30.     The Officers did not identify themselves as police, were plain-clothed, driving unmarked vehicles, and began approaching Mr. Burley and Mr. Matthews with their guns drawn.

31.     Burley and Matthews state that they believed they were about to be robbed and Burley fled the scene in his vehicle.

32.     In an attempt to escape the officers, Burley drove down Parkview Avenue and onto Belle Avenue.

33.     The two unmarked cars driven by Jenkins and Suiter pursued Burley at a high rate of speed, as Burley and the police ran five stop signs, endangering the public.

34.     At approximately 11:49 AM, the Decedent was lawfully operating his vehicle, heading eastbound on Gwynn Oak Avenue, near its intersection with Belle Avenue, in Baltimore City, Maryland.

35.     The aforementioned intersection is controlled with four (4) stop signs, with one for each direction of travel.  When the Decedent arrived at the intersection's stop sign for the east bound lane of Gwynn Oak Avenue, he brought his vehicle to a complete stop, and proceeded to enter the intersection when it appeared safe to do so.

36.     Without any warning, while attempting to evade the pursuing Officers, Burley negligently ran the stop sign at the intersection of Belle Avenue and Gwynn Oak Avenue at a high rate of speed, striking Decedent's vehicle with great force.

37.     After the collision, the Decedent was severely injured and trapped in his car with his wife who also suffered serious injuries.

38.     Jenkins, Guinn and Suiter did not render aid to Decedent or call for aid; instead they worked to cover their tracks to justify their unlawful actions.

39.     Decedent died later that day, at approximately 2:34 PM, as a result of the injuries he sustained in the collision.

40.     Following the collision, Jenkins did not find any drugs in Burley's vehicle.

41.     Jenkins and another officer then orchestrated the delivery of approximately thirty-two (32) grams of heroin to the crash scene and planted the drugs in Burley's vehicle to justify the attempted stop and pursuit of Burley and Matthews.

42.     Following the collision, Jenkins, Guinn and Suiter provided false witness statements to investigating officers and fabricated evidence to provide legitimacy to the illegal stop, pursuit and arrest of Burley and Matthews and to exculpate themselves from their wrongful actions.

43.     Jenkins also knowingly authored a false statement of probable cause in an effort to frame Burley and Matthews for crimes they did not commit.

44.     There was no lawful basis for Jenkins, Guinn and Suiter to conclude that Burley or Matthews were involved in any criminal conduct and the actions of these Officers violated not only Burley and Matthew's rights, but also Decedent's constitutional right to life and liberty, resulting in his death.

45.     Based on the false statements/evidence manufactured by the BPD, and despite the fact that he was innocent, on June 10, 2011, Burley plead guilty to possession with intent to distribute heroin in the United States District Court for the District of Maryland. *Id.* Matthews also plead guilty to possession with intent to distribute.

46.     On August 10, 2011, Burley plead guilty to vehicular manslaughter in the Circuit Court for Baltimore City and was sentenced to serve ten years in state prison.

47.     On August 18, 2011, Burley was sentenced to fifteen years in federal prison, to be served concurrently with the state sentence.

48.     On February 3, 2017, Burley completed his sentence in state prison and was transferred to federal prison where he remained until August 31, 2017.

49.     As a result of the DOJ Report and subsequent federal investigations, federal agents uncovered a long-standing pattern and practice of unconstitutional practices and policies that pervaded the GTTF and BPD.

50.     On March 1, 2017, federal agents arrested seven members of BPD's GTTF, including Wayne Jenkins, for racketeering offenses, including robbery, extortion, and distribution of narcotics, overtime fraud, and other crimes.

51.     On August 30, 2017, the eighth member of BPD's GTTF was also arrested for racketeering offenses, including robbery, extortion and other crimes.

52.     During the course of the investigation, federal investigators also discovered that Jenkins knowingly participated in the illegal stop, pursuit, arrest and conviction of Burley on April 28, 2010.

53.     On January 5, 2018, Jenkins plead guilty to many criminal acts, including the illegal stop, pursuit and conspiracy to plant heroin in Burley's vehicle on April 28, 2010.

54.     Jenkins admitted, among other things, that he knowingly concealed, covered up and falsified and made false entries in an official Statement of Probable Cause in the District Court of Maryland for Baltimore City reflecting his actions, and actions of his fellow BPD officers, in relation to the seizure of heroin from an automobile operated by Burley on April 28, 2010, with the intent to impede, obstruct and influence the investigation of the events which lead to the fatal car crash on April 28, 2010 and Burley and Matthews' subsequent arrest and conviction.

55.     Given Jenkins' admission of guilt, on December 18, 2017, the United States District Court for the District of Maryland entered an order vacating the convictions of Burley and Matthews.

56.     Additionally, on April 9, 2018, the Circuit Court for Baltimore City entered an Order Vacating Burley's vehicular manslaughter conviction as it was a result of the illegal stop, pursuit and arrest of Burley and Matthews.

57.     The false statements of Jenkins, Guinn and Suiter, adopted by the BPD, misled not only state and federal agents and prosecutors, but also Decedent's family as they sought justice for the death of their father.

58.     At all times alleged herein, the Officers were acting under the color of state law in the course and scope of their duties as BPD officers by engaging in the conduct set forth above.

59.     At all times alleged herein, the Officers acted for and on behalf of the BPD with the power and authority vested in them as officers, agents, and employees of the BPD and incident to the pursuit of their duties as officers, employees and agents of the BPD.

60.     The Officers' conduct on April 28, 2010, was part of a pattern or practice regularly employed within the BPD in the years preceding the Decedent's death.

61.     For many years before the Officers caused the deadly collision, BPD supervisors and/or policymakers had actual or constructive knowledge of these unlawful practices.

62.     BPD supervisors and/or policymakers either intended that these customs or usages continue, or condoned such behavior by demonstrating deliberate indifference to stopping this type of policing by its officers.

## II.     THE WIDESPREAD BPD PATTERN OR PRACTICE OF ILLEGAL CONDUCT WITHIN THE BPD.

63.     The BPD knew or should have known years ago that officers given broad authority as part of "elite" units to combat violence, guns, and drugs often engaged in a pattern or practice of illegal activities like those that occurred here which lead to Decedent's death.

64.     The BPD turned a blind eye to this pattern and practice of illegal activity, allowing Defendant officers an opportunity they never should have had to engage in the conduct at issue in this case.

### A.     SUBSTANTIALLY SIMILAR ALLEGATIONS TO THOSE IN THIS COMPLAINT STAINED THE GTTF'S PREDECESSORS.

65.     Before the GTTF came into existence, the BPD utilized similar elite units comprised of plain-clothed officers driving unmarked vehicles with wide latitude to investigate and arrest persons suspected of dealing drugs and/or gun violations, including the so-called "flex squads" and Special Enforcement Teams ("SETs").

66.     With regard to the "flex squads," in January 2006, the Baltimore Sun published an article titled "Questions Raised for Years about City 'Flex Squad'."

67.     That article noted, *inter alia*, that:

- The BPD employed "flex squads" in all its districts which, unlike normal officers, had enhanced freedom "to chase down suspected criminals in neighborhoods dominated by drug dealing and violence."

- "Defense attorneys, prosecutors and community members say they have heard for years about allegations of misconduct that included planted drugs and troublesome practices about how suspects were treated and charged."

- "In a warrant police used to search the flex squad office last month, investigators noted that previous allegations against [certain officers] 'have been made as to the planting of controlled dangerous substances on citizens in an effort to knowingly make false arrests.'"

- "The inquiry in the Southwest [district flex squad] has prompted concern about flex squads in other districts – each of the nine has at least one. In a statement, the [BPD] said it was examining 'all practices and procedures' of every district's 'flex' and drug enforcement units."

- "A department spokesman said that internal affairs will soon begin conducting annual evaluations of every officer in those units."

68.     But years later, with "internal charges [still] pending against some officers involved with the flex squad," the City of Baltimore "did an about-face, agreeing to pay the [Southwest district flex] squad's supervisor a six-figure settlement and issuing a rare public apology."

69.     Whatever became of those "internal charges" is not known, but regardless of whatever exoneration certain flex squad officers might have received, the squads themselves were eventually disbanded and the BPD was on notice of the abuse and potential for abuse associated with officers who had the wide latitude to police in a manner similar to that of the flex squad officers.

70.     At around the same time allegations surfaced regarding the flex squads, the Sun also reported on similar allegations leveled at the SETS, whose "officers [were] accused of lying in charging documents, most of which involve drug arrests that result from car stops."

71.     Like the flex squads, SET members normally patrolled the streets plain-clothed and in unmarked vehicles. But whereas the flex squads were managed by each of the nine district commanders, the SETS (there were two: one on the east side and one on the west side of Baltimore) were managed directly by the BPD's Chief of Patrol.

72.     Ultimately, the SETS were disbanded. Indeed, for many years before the instant matter, the BPD was keenly aware of the illegal acts committed by unsupervised police units and

officers, including those of William King and Antonio Murray who received hefty federal sentences for robbing drug dealers, drug trafficking, and gun violations in 2005 — similar to those charges against the GTTF.

73.     The illegal conduct and abuses of the BPD's elite units (flex squads and SETS) was no secret to BPD or its policymakers. As such, the BPD had sufficient notice of the problems that could (and did) arise with employing elite units of plain-clothed officers, driving unmarked vehicles, who had wide latitude to combat drug and gun-related offenses years before Defendants' illegal stop of Burley and Matthews, and the resulting flee and pursuit.

74.     Based on the knowledge that the BPD had prior to the events giving rise to this Complaint, the BPD should have taken sufficient steps to ensure that police tactics such as those would not occur.

75.     However, Defendants failed to do so, thus allowing another elite squad, the GTTF, to do precisely what the flex squads and SETs were accused of and disbanded for years before the events which give rise to this Complaint.

## B.     BPD KNOWINGLY ALLOWED THE GTTF TO CONTINUE THE PRIOR ELITE UNITS' PATTERN OF ILLEGAL CONDUCT.

76.     Like the flex squads and SETS, the GTTF was an elite unit within the BPD with broad authority to roam the city ostensibly looking for drugs and guns.

77.     Although the BPD conducted internal investigations into the former elite units, and had ample opportunity to correct the illegal police tactics, it failed to provide adequate training and/or oversight to ensure that the GTTF did not engage in the same pattern of misconduct.

78.     The recent indictments against the GTTF officers show that the BPD failed to adequately monitor and stop illegal and abusive police tactics.

79.     On February 23, 2017, a number of GTTF officers, including Defendant Jenkins, were indicted by the United States Attorney's Office for the District of Maryland ("USAO") for various RICO offenses ("RICO Indictment").

80.     The RICO Indictment revealed that the GTTF officers engaged in, among other things, the following overt acts:

- Conducting unlawful traffic stops of vehicles and stealing money, property, and narcotics from the vehicle occupants; and

- Preparing false and fraudulent official incident and arrest reports.

81.     Upon information and belief, no investigation was conducted or disciplinary actions were taken against any of the Officers concerning their alleged misconduct.

82.     Jenkins, who had already risen through the BPD ranks, was promoted to officer-in-charge of the GTTF in 2016.

83.     By 2017, Guinn was selected to serve as a training instructor for the BPD's police academy and continues to train other BPD officers to this day.

**C.     BPD ENTERED INTO A CONSENT DECREE WHERE IT ADMITTED  TO A PATTERN OR PRACTICE OF CONDUCT IDENTICAL TO THAT AT ISSUE HERE AND BASED IN PART ON ACTIVITIES THAT OCCURRED IN 2010.**

84.     Following the April 2015 death of Freddie Gray in police custody, Baltimore Mayor Stephanie Rawlings-Blake asked the United States Department of Justice Civil Rights Division, to conduct an investigation of BPD's policies, patterns and practices.

85.     The Civil Rights Division issued the DOJ Report on August 10, 2016.

86.     The DOJ Report presented, in relevant part, the following findings:

- The Civil Rights Division "reviewed hundreds of thousands of pages of documents, including all relevant policies and training manuals used by the [BPD] since 2010; BPD's database of internal affairs files; a random sample of

about 800 case files on non-deadly force incidents; files on all deadly force incidents since 2010" and other data;

- The BPD engaged in a pattern or practice of conduct that violates the United States Constitution and federal law, including stops, searches and arrests without the reasonable suspicion or probable cause required under the Fourth Amendment to the United States Constitution;

- The foregoing pattern or practice is rooted in BPD's deficient supervision and oversight of officer activity and resulted in part from BPDs zero tolerance enforcement strategy, dating back to the early 2000s;

- The BPD failed to take action against officers with a long history of misconduct that is well known to the Department. For example, one officer currently employed by the BPD had received approximately 125 complaints from complaints within the Department and from the community since 2010, and many of these complaints allege serious misconduct. However, the DOJ found that the BPD had sustained only one complaint against the officer for minor misconduct;

- In June 2006, the ACLU of Maryland sued the BPD regarding its illegal arrests of thousands of Baltimore residents. In December 2008, the parties stayed the case and engaged in protracted settlement negotiations. In 2010, that case settled with BPD agreeing to change its policies and procedures and submit to an independent auditor to evaluate its progress toward adopting stop and arrest practices consistent with the United States Constitution;

- The final report of the auditor from 2014 noted that there were no systemic improvements in reporting for those stop and arrest offenses during the monitoring period; and

- Various policies that pre-date the events at issue in the instant complaint demonstrate that BPD failed to adequately equip its officers to police effectively and constitutionally.

87.     On January 12, 2017, the United States filed a complaint in the United States

District Court for the District of Maryland against the BPD. That complaint alleged in relevant

part that:

- In the late 1990s, BPD adopted zero tolerance policing strategies that prioritized officers making large numbers of stops, searches, and arrests for misdemeanor offenses without ensuring robust oversight to hold officers accountable for misconduct and protect the constitutional rights of Baltimore City residents;

- Based on data from 2010 — 2015, BPD engaged in a pattern or practice of conduct that violated the United States Constitution and federal laws. Those

17

violations included unconstitutional stops, searches, and arrests that run afoul of the rights guaranteed to Baltimore's citizens by the Fourth and Fourteenth Amendments to the United States Constitution; and

- BPD's violations of the Constitution and federal law are driven by BPD's systemic deficiencies in policies, training, supervision, and accountability structures. BPD has been aware of these structural challenges for many years but has not taken adequate steps to comply with the Constitution or federal law.

88.    That same day, the United States and the BPD jointly filed a motion asking the court to approve a 227-page consent decree. That decree provides in relevant part that:

- BPD will provide its officers with training on stops, searches, and seizures;

- BPD will ensure that a supervising officer reviews all documentation relating to stops, searches, seizures, and arrests for completeness and adherence to the law and BPD policy; and

- BPD will audit the aforementioned supervisory reviews.

89.    On April 7, 2017, the court granted that motion, entered a slightly-modified version of the consent decree, and stated that it will retain jurisdiction over the decree until it is terminated. As of the filing of this complaint, the decree remains in place.

### D.    THE POLICIES AND "CUSTOM AND USAGE" OF THE BPD.

90.    BPD policymakers, aware of the potential for abuse among elite units like the GTTF since at least the mid-2000s when the Baltimore Sun reported on flex squad and SETs' misconduct and having the final authority to establish and implement policies, permitted and condoned the GTTF's unconstitutional conduct alleged herein by failing to establish and implement training policies designed to curb the abuses carried out by officers assigned to BPD units, like the GTTF.

91.    The illegal stop and pursuit of Burley and Matthews, which caused Decedent's death, was part of a pattern or practice of illegal conduct sufficiently widespread and pervasive

within the BPD that it assumed the quality of a "custom or usage" or pattern or practice of the BPD.

92.     BPD had actual or constructive knowledge of the same as identified above and either intended that the "custom or usage" or pattern or practice continue or was deliberately indifferent to stopping or correcting the same, which resulted in Decedent's death.

93.     BPD policymakers, aware of specific instances of police misconduct acutely similar to that at issue here since at least 2006, and armed with actual knowledge of GTTF officers' misconduct, both before and after the events at issue here took place, failed to adequately supervise and/or discipline their officers, thus allowing for the unconstitutional conduct described herein to occur.

94.     Since at least 2005, the BPD, the City, and the State of Maryland, had repeated notice through, among other things, convictions of their police officers, complaints and suits filed against their police officers, newspaper articles, and notifications from state prosecutors that its officers engaged in a widespread pattern of blatant unconstitutional violations.

95.     BPD condoned the pattern and practice of unlawful policing activities.

III.    **THE DECEDENT WAS KILLED IN AN AUTOMOBILE COLLISION BECAUSE OF DEFENDANT BPD'S ILLEGAL POLICIES AND PRACTICES.**

96.     As set forth herein, the Officers' illegal stop and pursuit of Burley and Matthews, and the death of the Decedent, corresponds with the illegal custom and usage, pattern and practice and/or policies and practices of the BPD that have existed since long before the incidents giving rise to this Complaint.

97.     Specifically, at all times relevant hereto, BPD officers engaged in illegal stops and pursuits, without probable cause, made false arrests, and covered their tracks with fabricated evidence and false statements.

98.     Although there was no reasonable suspicion of criminal activity of Burley and/or Matthews, the Officers illegally stopped, pursued and arrested Burley and Matthews in accordance with BPD's accepted pattern and practice.

99.     The purpose of the illegal stop and pursuit of Mr. Burley and Mr. Matthews was to worsen their legal plight, as was the policy and practice of the flex squads, SETS, GTTF, and other BPD officers, all under the supervision and control of the BPD.

## IV.     DAMAGES

100.    As a direct and proximate result of the joint and several wrongful acts of the Defendants and of their respective agents, servants, employees and/or officers, the Decedent was severely injured and died.

101.    As a direct and proximate result of the joint and several wrongful acts of Defendants and their respective agents, servants, employees and/or officers, prior to his death, Decedent suffered severe physical and emotional pain, including but not limited to, pre-impact fright, serious bodily injuries, and severe conscious pain and suffering and mental anguish and other economic and non-economic damages.

102.    As a direct and proximate result of the joint and several wrongful acts of the Defendants and of their respective agents, servants, employees and/or officers, the Plaintiffs, and Use-Plaintiffs, each sustained extensive damages including, but not limited to, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of parental care, loss of attention, loss of advice, loss of counsel, loss of training, loss of guidance, and loss of services.

## CAUSES OF ACTION

### COUNT I – 42 U.S.C. § 1983
### VIOLATION OF DUE PROCESS
### (AGAINST OFFICER DEFENDANTS)

103.     Each paragraph of this Complaint is incorporated as if fully stated herein.

104.     As described above, the Officers, while acting individually, jointly, and/or in concert, as well as under color of law, and pursuant to custom and usage, pattern and practice and/or policies of the BPD, and within the scope of their employment, illegally stopped and pursued Burley and Matthews, which directly and proximately resulted in the Decedent's untimely and unnecessary death.

105.     This conduct deprived the Decedent of his constitutional right to life and liberty, and deprived Decedent's children the love and affection of their father.

106.     Absent Defendants' misconduct, the Decedent would not have suffered the severe physical and emotional pain and death, and Plaintiffs and Use-Plaintiffs would not have suffered the loss of their father.

107.     The wrongful acts of the Officers described herein directly and proximately resulted in the unjust and wrongful death of the Decedent, thereby depriving him of his life and liberty without due process of law, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

108.     The wrongful acts of the Officers described herein "shocks the conscious" and "violates the decencies of civilized conduct."

109.     The wrongful acts of the Officers described herein were committed maliciously and sadistically with the intent to cause harm to Burley and Matthews and/or to worsen their legal plight.

110.     The wrongful acts of the Officers described herein were undertaken with willful

indifference to the Decedent's clearly established constitutional rights granted under the 14th Amendment.

## COUNT II – 42 U.S.C. § 1983
## MONELL LIABILITY
## (AGAINST THE BALTIMORE CITY POLICE DEPARTMENT,
## THE MAYOR AND CITY COUNCIL OF BALTIMORE,
## AND THE STATE OF MARYLAND)

111.    Each paragraph of this Complaint is incorporated as if fully stated herein.

112.    The Officers' actions were undertaken pursuant to custom and usage and/or policies, patterns and practices of the BPD, the State of Maryland, and/or the City, ratified by policymakers with final policymaking authority.

113.    These policies and practices include, but are not limited to, permitting police officers to illegally stop, pursue and arrest; failing to train or supervise police officers with regard to their constitutional obligations; failing to discipline police officers who engaged in constitutional violations; and permitting the use of fabricated reports and evidence to support unconstitutional stops, among others.

114.    These policies and practices were sufficiently widespread within the BPD to assume the quality of a "custom or usage" of which BPD policymakers had actual or constructive knowledge.

115.    The policies and practices described herein were maintained and implemented by the BPD, under the supervision of the State of Maryland, and/or the City, with deliberate indifference to Decedent's constitutional rights.

116.    The wrongful acts described herein were undertaken with willful indifference to Decedent's clearly established constitutional rights.

117.    As a direct and proximate result of Defendants' conduct, the Decedent suffered severe bodily injuries, conscious pain and suffering and emotional distress, loss of life and loss of liberty, and other damages.

118.    As a direct and proximate result of Defendants' conduct, the Decedent's children have suffered pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of parental care, loss of attention, loss of advice, loss of counsel, loss of training, loss of guidance, and loss of services.

## COUNT III –
## WRONGFUL DEATH
## (AGAINST ALL DEFENDANTS)

119.    Each paragraph of this Complaint is incorporated as if fully stated herein.

120.    Plaintiffs, Shirley Johnson, Individually, as daughter of Elbert Davis, Delores A. Davis, Mary A. Cox, Gloria A. Davis, Albert Cain, Elbert Davis, Jr., and Anita Cain, Administrator of the Estate of Arthur Cain, hereby sue and join this Wrongful Death action against all Defendants pursuant to MD. CODE ANN., CTS. & JUD. PROC. §§ 3-901–3-904.

121.    MD. CODE ANN., CTS. & JUD. PROC. § 3-904(g) provides that a wrongful death claim shall be filed within three years after the death of the injured person. However, Maryland courts have held that "an estoppel based on fraud or fraudulent concealment of the cause of action operates to toll the substantive limitations period in the wrongful death statute." *See Geisz v. Greater Balt. Med. Ctr.*, 313 Md. 301 (1988); *Imbesi v. Carpenter Realty Corp.,* 357 Md. 375 (2000); *Ohio Casualty Ins. Co. v. Hallowell*, 94 Md. App. 444 (1993); *Chang-Williams v. United States*, 965 F. Supp. 2d 673 (2013);  *Bausch v. Philatelic Leasing*, 728 F. Supp. 1201 (1989).

122.    This Complaint is timely filed within three years of Plaintiffs' discovery of the causes of action alleged herein.

123.     Plaintiffs' learned of the Officers' wrongful acts and falsification of evidence upon the filing of the indictment against Jenkins on November 30, 2017.

124.     Defendants fraudulently concealed the misconduct of the Officers by providing false statements, fabricating evidence and falsifying official BPD documents.

125.     Decedent's death was a direct and proximate result of Defendants' wrongful acts and/or indifference as alleged herein.

126.     As a result of the Decedent's death, Plaintiffs, Shirley Johnson, Delores A. Davis, Mary A. Cox, Gloria A. Davis, Albert Cain, Elbert Davis, Jr., and Anita Cain, Administrator of the Estate of Arthur Cain, and the Use Plaintiffs suffered and will continue to suffer sorrow, grief, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of filial care, loss of attention, loss of advice, loss of counsel, loss of training, loss of guidance, and loss of services and support which Decedent could have and would have afforded and rendered had he continued to live.

## COUNT IV –
## SURVIVAL ACTION
## (AGAINST ALL DEFENDANTS)

127.     Each paragraph of this Complaint is incorporated as if fully stated herein.

128.     The Estates and Trusts Article of the Annotated Code of Maryland §7-401(y) provides for actions on behalf of a decedent's estate for conscious pain and suffering, mental anguish, pre-death fright and other damages for which the deceased could have recovered had they survived.

129.     Shirley Johnson, Personal Representatives of the Estate of Elbert Davis, Sr., deceased, hereby is pursuing this survival action and the Estate's claims for the decedent's conscious pain and suffering, mental anguish, pre-death fright, and funeral and burial expenses, medical expenses and other damages permitted by law.

130.    As a direct and proximate result of the wrongful acts and/or indifference of Defendants, the Decedent sustained severe and conscious pain and suffering, mental anguish and horrific pre-death fright and other damages for which he could have recovered had he survived, all without any negligence on his part thereunto contributing.

131.    As a further direct and proximate result of the wrongful acts and/or indifference of Defendants, Decedent incurred monetary loses and expenses including, without limitation, funeral, burial and medical expenses.

**COUNT V –**
**NEGLIGENCE**
**(AGAINST OFFICER DEFENDANTS)**

132.    Each paragraph of this Complaint is incorporated as if fully stated herein.

133.    The Officers owed Decedent a duty to conduct police activities in a lawful manner that complied with the rights afforded citizens under the Constitution.

134.    The Officers owed Decedent a duty to conduct police activities in a manner that did not create an unreasonable risk of injury to Decedent and the citizens of Baltimore.

135.    The Officers breached their duty when they wrongfully stopped, pursued and arrested Burley and Matthews.

136.    As a direct and proximate result of the wrongful acts of Jenkins, Guinn and Suiter, the Decedent sustained severe and conscious pain and suffering, mental anguish and horrific pre-death fright, and other damages, all without any negligence on his part thereunto contributing.

137.    As a further direct and proximate result of the negligence of Jenkins, Guinn and Suiter, the Plaintiffs suffered sorrow, grief, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of filial care, loss of attention, loss of advice, loss of counsel, loss of training, loss of guidance, and loss of services

and support which Decedent could have and would have afforded and rendered had he continued to live.

## COUNT VI –
## RESPONDEAT SUPERIOR
## (AGAINST THE BALTIMORE CITY POLICE DEPARTMENT)

138.    Each paragraph of this Complaint is incorporated as if fully stated herein.

139.    At all times relevant hereto, the Officers were acting within the scope of their employment with the BPD, when they wrongfully stopped, pursued and arrested Burley and Matthews, resulting in the death of Decedent and damages to Plaintiffs.

140.    The BPD is vicariously liable to Plaintiffs under the doctrine of *respondeat superior* for the acts and omissions of the Officers.

## COUNT VII –
## NEGLIGENT HIRING, RETENTION AND/OR SUPERVISION
## (AGAINST THE BALTIMORE CITY POLICE DEPARTMENT,
## THE STATE OF MARYLAND,
## AND THE MAYOR AND CITY COUNCIL OF BALTIMORE)

141.    Each paragraph of this Complaint is incorporated as if fully stated herein.

142.    At all relevant times, the BPD, the State of Maryland, and the Mayor and City Council of Baltimore had a duty to members of the public to not employ someone who posed an unreasonable risk to others.

143.    The BPD, the State of Maryland, and the Mayor and City Council of Baltimore have a duty to use reasonable care to select employees who are competent and fit to perform the duties of officers of the law.

144.    The BPD, the State of Maryland, and the Mayor and City Council of Baltimore breached their duty by failing to take adequate measures in selecting, supervising, retaining and training employees who might foreseeably cause harm or injury to citizens.

145.    The BPD, the State of Maryland, and the Mayor and City Council of Baltimore breached their duty by failing to investigate, discipline and fire officers the BPD knew or reasonably should have known violated the constitutional rights of citizens of Baltimore.

146.    BPD, the State of Maryland, and the Mayor and City Council of Baltimore knew or should have known by the exercise of due diligence and reasonable care that the employees herein were performing illegal acts in the performance of their duties as police officers.

147.    BPD, the State of Maryland, and the Mayor and City Council of Baltimore had actual or constructive knowledge of its officers' wrongful acts.

148.    BPD, the State of Maryland, and the Mayor and City Council of Baltimore breached their duty to use reasonable care to select and retain officers who are competent and fit for the position of officers of the BPD.

149.    This breach caused the Decedent's injuries and death, and caused the Plaintiffs' damages as set forth herein.

**COUNT VIII –
ARTICLE 24 OF THE MARYLAND CONSTITUTION –
DECLARATION OF RIGHTS
(AGAINST ALL DEFENDANTS)**

150.    Each paragraph of this Complaint is incorporated as if fully stated herein.

151.    As described more fully above, Defendants violated Decedent's due process rights.

152.    Decedent's injury and death were a direct and proximate result of the Officers' wrongful acts and BPD's negligence.

153.    As a result of the Decedent's death, Plaintiffs suffered and will continue to suffer sorrow, grief, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of filial care, loss of attention, loss of

advice, loss of counsel, loss of training, loss of guidance, and loss of services and support which Decedent could have and would have afforded and rendered had he continued to live.

### COUNT IX –
### INDEMNIFICATION
### (AGAINST ALL DEFENDANTS)

154.     Each paragraph of this Complaint is incorporated as if fully stated herein.

155.     Under Maryland law, public entities are directed to pay any tort judgment for which their employees are liable within the scope of their employment.

156.     The Officers are or were employees of the BPD, who acted within the scope of their employment, and in accordance with accepted custom and usage when committing the acts described herein.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, the Baltimore City Police Department, State of Maryland, the Mayor and City Council of Baltimore, Wayne Earl Jenkins, Ryan Guinn, and the Estate of Sean Matthew Suiter, and award them:

l.     Compensatory damages in an amount to be determined by a jury, attorneys' fees, pre-judgment and post-judgment interest, and costs against each Defendant;

2.     Punitive damages against each Defendant; and

3.     Any other relief as this Court deems appropriate.

### JURY DEMAND

Plaintiffs Shirley Johnson, Individually and as Personal Representative of the Estate of Elbert Davis, Sr., Delores A. Davis, Mary A. Cox, Gloria A. Davis, Albert Cain, Elbert Davis, Jr., Anita Cain, as Widow and Administrator of the Estate of Arthur Cain, hereby demand a trial by jury pursuant to FED. R. CIV. P. 38(b) on all triable issues.

Respectfully submitted,

_____/s/_____
Jonathan A. Azrael (Bar No. 01630)
jazrael@azraelfranz.com
Judson Lipowitz (Bar No. 05138)
jlipowitz@azraelfranz.com
John R. Solter, Jr. (Bar No. 27483)
jsolter@azraelfranz.com
Azrael, Franz, Schwab & Lipowitz, LLC
101 E. Chesapeake Avenue, 5th Floor
Baltimore, Maryland 21286
410-821-6800
*Attorneys for Plaintiffs*