## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**SHIRLEY JOHNSON**,                          *
Personal Representative
of the Estate of Elbert Davis,  Sr.            *
8408 Downey Dale Drive
Randallstown, Maryland  21133                  *

and                                            *

**SHIRLEY JOHNSON**,                          *          CASE NO. **1:18-cv-02375-ELH**
Personal Representative
of the Estate of Phosa Cain                    *
8408 Downey Dale Drive
Randallstown, Maryland  21133                  *

and                                            *

**SHIRLEY JOHNSON**,                          *
Daughter of Elbert Davis, Sr., deceased
8408 Downey Dale Drive                         *
Randallstown, Maryland  21133
                                               *
and
                                               *
**DELORES A. DAVIS**,
Daughter of Elbert Davis, Sr., deceased        *
3704 Woodbine Avenue
Baltimore, Maryland  21207                      *

and                                            *

**MARY A. COX**,                              *
Daughter of Elbert Davis, Sr., deceased
36 Championship Court                          *
Owings Mills, Maryland  21117
                                               *
and
                                               *
**GLORIA A. DAVIS**,
Daughter of Elbert Davis, Sr., deceased        *
8408 Downey Dale Drive
Randallstown, Maryland  21133                   *

1

and                                              *

**ALBERT CAIN,**                                 *
Son of Elbert Davis, Sr., deceased
8408 Downey Dale Drive                           *
Randallstown, Maryland  21133
                                                 *
and                                              *

**ELBERT DAVIS, JR.,**                           *
Son of Elbert Davis, Sr., deceased
8408 Downey Dale Drive                           *
Randallstown, Maryland  21133
                                                 *
and                                              *

**ANITA CAIN,**                                  *
Administrator of the Estate of
ARTHUR CAIN, deceased,                           *
Son of Elbert Davis, Sr., deceased
12 Jones Street                                  *
Boydton, Virginia  23917
                                                 *
        *Plaintiffs*
                                                 *
and                                              *

**To The Use of GAIL S. DAVIS,**
Daughter of Elbert Davis, Sr., deceased          *
9304 Owings Choice Court
Owings Mills, Maryland 21117                     *

and                                              *

**To the Use of LEROY DAVIS,**                   *
Son of Elbert Davis, Sr., deceased
3601 Oakmont Avenue                              *
Baltimore, Maryland  21215
                                                 *
and                                              *

**To The Use of ELBERT LEE DAVIS,**
Son of Elbert Davis, Sr., deceased               *
8103 Carlson Lane
Windsor Mill, Maryland  21244                    *

    *Use Plaintiffs*                                      \*

v.                                                         \*

**BALTIMORE CITY POLICE DEPARTMENT,** \*
<u>Serve on:</u>
GARY TUGGLE, Interim Commissioner           \*
601 East Fayette Street
Baltimore, Maryland 21201                  \*

and                                                \*

**WAYNE EARL JENKINS,**              \*
Register Number: 62928-037
TUCSON USP                                  \*
9300 South Wilmont Road
Tucson, Arizona 85756                      \*

and                                                \*

**RYAN GUINN,**                         \*
601 East Fayette Street
Baltimore, Maryland 21201                  \*

and                                                  \*

**DEAN PALMERE,**                    \*
1323 Crofton Drive
Bel Air, Maryland 21014                  \*

and                                                  \*

**RICHARD WILLARD**               \*
7810 Clark Road TRLR E30
Jessup, Maryland 20794                  \*

and                                                  \*

**WILLIAM KNOERLEIN**             \*
601 East Fayette Street
Baltimore, Maryland 21201                  \*

and                                                  \*

**MICHAEL FRIES**                          *
601 East Fayette Street
Baltimore, Maryland 21201                  *

and                                        *

**KEITH GLADSTONE**                        *
601 East Fayette Street
Baltimore, Maryland 21201      _____ *

*Defendants*                               *

*      *      *      *      *      *      *      *      *      *      *      *      *

## SECOND AMENDED COMPLAINT

Plaintiffs Shirley Johnson, Personal Representative of the Estate of Elbert Davis, Sr., Shirley Johnson, Personal Representative of the Estate of Phosa Cain, Shirley Johnson, Individually, as daughter of Elbert Davis, Sr., Delores A. Davis, Individually, as daughter of Elbert Davis, Sr., Mary A. Cox, Individually, as daughter of Elbert Davis, Sr., Gloria A. Davis, Individually, as daughter of Elbert Davis, Sr., Albert Cain, Individually, as son of Elbert Davis, Sr., Elbert Davis, Jr., Individually, as son of Elbert Davis, Sr., Anita Cain, Administrator of the Estate of Arthur Cain, son of Elbert Davis, Sr., by their undersigned attorneys, Jonathan A. Azrael, John R. Solter, Jr., Judson H. Lipowitz, and Azrael, Franz, Schwab & Lipowitz, LLC, and to the use of Leroy Davis, Elbert Lee Davis and Gail S. Davis, bring this Second Amended Complaint against the Baltimore Police Department,  Wayne Earl Jenkins, Ryan Guinn, and Dean Palmere, Richard Willard, William Knoerlein, Michael Fries and Keith Gladstone. In support thereof, Plaintiffs state as follows:

## PURPOSE OF AMENDMENTS

This Second Amended Complaint is filed without leave of Court pursuant to FED. RULES CIV. PROC. 15(a)(2+), within twenty-one days (21) of the filings of Motions to Dismiss by the Mayor and City Council of Baltimore and the State of Maryland. The purpose of this Second Amended Complaint is:

4

a.   To add Shirley Johnson, Personal Representative of the Estate of Phosa Cain as a party Plaintiff;

b.   To add Dean Palmere as a party Defendant;

c.   To remove the Mayor and City Council of Baltimore as a party Defendant;

d.   To remove the State of Maryland as a party Defendant;

a.   To remove the Estate of Sean Suiter as a party Defendant; andTo add Richard Willard as a party Defendant;

b.   To add William Knoerlein as a party Defendant;

c.   To add Michael Fries as a party Defendant;

c.d.To add Keith Gladstone as a party Defendant; and

f.   To amend the allegations of the Amended Complaint as shown in the attached comparison

e.   copy of the Second Amended Complaint.

## INTRODUCTION

1.      On April 28, 2010, Elbert Davis Sr., (the "Decedent") was killed and his lifelong partner, Phosa Cain ("Ms. Cain") was seriously injured in a motor vehicle accident.  The accident was a direct result of the illegal stop, pursuit, framing and arrest of Umar Hassan Burley and Brent Andre Matthews, and the wrongful acts of plainclothes officers of the Baltimore Police Department, Wayne Earl Jenkins ("Mr. Jenkins"), and Ryan Guinn ("Mr. Guinn"), and Keith Gladstone ("Mr. Gladstone")  (Mr. Jenkins, and Mr. Guinn, and Mr. Gladstone are hereinafter collectively referred to as the "Officers") while acting under the color of law and in the scope of their employment as officers of the Baltimore Police Department (hereinafter, "BPD").

2.      The unconstitutional policies, patterns and practices of illegal policing of the BPD and its officers, and deficient supervision, discipline, and training of plainclothes units by the BPD

and BPD supervisors including Dean Palmere ("Mr. Palmere"), William Knoerlein ("Mr. Knoerlein"), Michael Fries ("Mr. Fries"), and Richard Willard ("Mr. Willard"), all of which began well before the incidents alleged in this Complaint, deprived Decedent and Ms. Cain their life and liberty without due process of law in violation of the Due Process Clause of the Fourteenth (14th) Amendment to the United States Constitution.

3.    On August 10, 2016, the U.S. Department of Justice Civil Rights Division published an investigation of the BPD ("DOJ Report") which detailed a number of the constitutionally offensive policies, practices and customs that proximately caused the deprivations of Decedent's federal rights as alleged herein.  A copy of the DOJ Report is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.    The DOJ Report found "the BPD has engaged in a pattern or practice of conduct that violates the constitutional and federal statutory rights of [Baltimore] City residents, and the [BPD] lacks sufficient systems to minimize these violations."

5.    The DOJ Report further found that "[t]his pattern or practice is rooted in BPD's deficient supervision and oversight of officer activity, leading directly to a broad spectrum of constitutional and statutory violations.  This lack of supervision and oversight includes BPD's failure to use effective and widely-accepted methods to supervise officers, collect and analyze data on officer activity, and classify, investigate and resolve complaints of misconduct.  This pattern or practice is manifested in several ways that violate specific constitutional and statutory provisions: (1) BPD stops, searches and arrests individuals on Baltimore streets without the reasonable suspicion or probable cause required by the Fourth (4th) Amendment; and (2) BPD disproportionately stops, searches and arrests African Americans in violation of Title VI and the Safe Streets Act…"

6.      Dating back to the late 1990s and the introduction of BPD's "zero tolerance" enforcement strategy, BPD has encouraged its officers to suppress crime through "proactive enforcement" including "street level drug enforcement" and "car stops

7.      In *United States v. Daniel Hersl and Marcus Taylor* (Case No. CCB-17-0106), current and former BPD officers recently revealed that Mr. Jenkins and other BPD officers would routinely drive up to groups of men without reason, jump out of their vehicles and see if any of the men would run.  This practice was undertaken 10-20 times on a slow night and more than 50 times on busier nights.

8.      The illegal police conduct at the heart of this Complaint was part of a longstanding, flagrant and persistent pattern and practice of illegal conduct, including illegal stops, pursuits, searches, seizures and fabrication of evidence was sufficiently widespread within the BPD to constitute a "custom or usage" of which BPD policymakers had actual or constructive knowledge.

9.      The BPD and its policymakers and supervisors demonstrated a deliberate indifference to stopping this type of unlawful policing by its officers and/or tacitly or directly authorized such misconduct.

10.      This lawsuit seeks redress for the death of the Decedent, and the injuries to Ms. Cain, which resulted from the wrongful acts of the Officers in accordance with BPD policies, patterns and/or practices, of which BPD supervisors knew or should have known.

## JURISDICTION AND VENUE

11.      Jurisdiction exists in this action pursuant to 28 U.S.C. § 1331, as this action seeks redress for the violation of the Decedent's and Ms. Cain's constitutional and civil rights pursuant to 42 U.S.C. § 1983, for attorney's fees under 42 U.S.C. § 1988(b), a/k/a the Civil Rights

Attorney's Fee Awards Act of 1976, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over state law claims.

12.     Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to this Complaint occurred in this judicial district.

13.     On February 6, 2018, Plaintiffs sent Andre M. Davis, Baltimore City Solicitor, notice of Plaintiffs' claims.

14.     On February 7, 2018, Plaintiffs sent Nancy K. Kopp, Treasurer of the State of Maryland, notice of Plaintiffs' claims.

## PARTIES

15.     Plaintiff Shirley Johnson is the Personal Representative of the Estate of Elbert Davis, Sr., deceased.

16.     Plaintiff Shirley Johnson is the Personal Representative of the Estate of Phosa Cain, Sr., deceased.

17.     Plaintiffs Shirley Johnson, Delores A. Davis, Mary A. Cox, Gloria A. Davis, Albert Cain, Elbert Davis, Jr., Arthur Cain (deceased) and Use Plaintiffs Leroy Davis, Elbert Lee Davis, and Gail S. Davis are adult children of the Decedent and Ms. Cain.

18.     Plaintiffs Shirley Johnson, Mary A. Cox, Gloria A. Davis, and Elbert Davis, Jr., and Use Plaintiffs Gail S. Davis, and Elbert Lee Davis are residents of Baltimore County, Maryland.

19.     Plaintiff Delores Davis, and Use Plaintiff Leroy Davis are residents of Baltimore City, Maryland.

20.     Plaintiff Anita Cain, is the Administrator of the Estate of Arthur Cain, deceased son of Elbert Davis, Sr.  Anita Cain is a resident of Mecklenburg County, Virginia.

21.     At all times relevant hereto, Mr. Jenkins, Mr. Guinn, and Mr. Palmere, Mr. Gladstone, Mr. Willard, Mr. Knoerlein and Mr. Fries were employed by the BPD, and all committed the acts and omissions alleged herein while acting under color of law and within the scope of their employment.

22.     Mr. Jenkins is a former member of the BPD.  Mr. Jenkins joined the BPD in 2003, was promoted to Sergeant in 2012, and was designated officer-in-charge of a special enforcement section in 2013.  In 2016, Mr. Jenkins was named the supervisor of the elite plainclothes unit within the BPD known as the Gun Trace Task Force ("GTTF").

23.     Mr. Guinn is a current member of the BPD.  Upon information and belief, at all times relevant hereto, Mr. Guinn worked as part of the GTTF and was working with Mr. Jenkins during the events which give rise to this Complaint.

24.     Mr. Gladstone is a former member of the BPD.  Mr. Gladstone joined the BPD in 1992.  From 1994 to 1995, he was assigned to the Eastern District Flex Unit.  After stints in various drug units, he worked as part of the Northwest District Patrol Division and the Northwest District Flex Unit from 2002-2004.  From 2004 to 2008, he worked on a Drug Enforcement Agency task force.  Beginning in 2008, Mr. Gladstone joined the Violent Crime Impact Section ("VCIS" at times also known as Violent Crime Impact Division "VCID").

25.     Mr. Willard is a former member of the BPD.  Mr. Willard joined the BPD in 1992.  Mr. Willard was a Sergeant in VCID and directly supervised then-Officer Jenkins, including before and at the time of the April 28, 2010 collision.

26.     Mr. Knoerlein is a current member of the BPD.  On information and belief, Mr. Knoerlein was a Sergeant in VCID and directly supervised both then-Officer Gladstone and then-Officer Jenkins prior to and at the time of the April 28, 2010 collision.

27.     Mr. Fries is a current member of the BPD.  Mr. Fries was part of a Special Enforcement Team from at least 2004 to 2006, during which time he supervised Officer Jenkins. On information and belief, Mr. Fries was a Lieutenant in VCID and directly supervised Mr. Gladstone prior to and at the time of the April 28, 2010 collision.

2~~4~~8.     Mr. Palmere is a former member of the BPD.  He was employed by the BPD for more than twenty (20) years before his retirement in 2018.  Mr. Palmere held various supervisory roles within the BPD in which he oversaw multiple BPD plainclothes units.  Beginning in 2006, Mr. Palmere oversaw a plainclothes unit as Commander of the Central District.  From 2008-2010, Mr. Palmere led the ~~Violent Crime Impact Section ("VCIS" at times also known as Violent Crime Impact Division "VCID")~~ VCID.  In 2010, Mr. Palmere was promoted to Chief of the Criminal Investigations Division into which VCIS merged.  In 2011, he briefly served as Chief of the Patrol Division before returning in 2012 to his role as Chief of the Criminal Investigations Division. From 2013 until his retirement in 2018, Mr. Palmere served as Deputy Commissioner overseeing the BPD's Patrol and Operations Bureaus and the BPD plainclothes units.

~~25.~~     Upon information and belief, Mr. Palmere had supervisory responsibility for plainclothes units, was aware of a continuing, widespread, persistent pattern of constitutional violations by BPD officers in those units, including the Officers, and was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates.

2~~6~~9.     The BPD is a law enforcement agency charged with enforcing the laws of Maryland within Baltimore City, training BPD officers to perform their duties in accordance with clearly established constitutional law, implementing policies and procedures to ensure BPD officers

10

perform their duties in accordance with clearly established constitutional law, and supervising and disciplining BPD officers.

30~~27~~.   The BPD either employs or employed Mr. Jenkins, Mr. Guinn~~, and~~ Mr. Palmere, Mr. Gladstone, Mr. Willard, Mr. Knoerlein and Mr. Fries.

31~~28~~.   The BPD is a "person" within the context of 42 U.S.C. 1983.

## FACTUAL BACKGROUND

### I. ____ THE ILLEGAL STOP, PURSUIT, AND FATAL CAR CRASH

32~~29~~.   On April 28, 2010, Umar Burley ("Mr. Burley") was sitting in a vehicle parked in the 3800 block of Parkview Avenue in Baltimore City waiting for his friend, Brent Matthews ("Mr. Matthews").

33~~0~~.   After Mr. Matthews entered Mr. Burley's vehicle, Mr. Jenkins moved his unmarked police vehicle in front of Mr. Burley's vehicle at an angle and a second unmarked police car pulled behind Mr. Burley's vehicle in an attempt to "box him in."

34~~1~~.   Mr. Jenkins and Mr. Guinn~~The Officers~~ did not identify themselves as police, were plain-clothed, driving unmarked vehicles, and began approaching Mr. Burley and Mr. Matthews with their guns drawn.

35~~2~~.   Mr. Burley and Mr. Matthews stated that they believed they were about to be robbed and Mr. Burley then fled the scene in his vehicle.

36~~3~~.   In an attempt to escape the Officers, Mr. Burley drove down Parkview Avenue and turned onto Belle Avenue at a high rate of speed.

37~~4~~.   The two unmarked vehicles, driven by Mr. Jenkins and another BPD officer, pursued Mr. Burley at a high rate of speed, running five (5) stop signs and endangering the public.

358.   Mr. Burley and Mr. Matthews stated that at no time did the pursuing officers turn on their emergency sirens or lights to indicate they were police.

369.   At approximately 11:49 AM, the Decedent was lawfully operating his vehicle, with Ms. Cain seated in the front passenger seat, heading eastbound on Gwynn Oak Avenue, near its intersection with Belle Avenue, in Baltimore City.

4037.   The aforementioned intersection is controlled with four (4) stop signs, with one for each direction of travel.  When the Decedent arrived at the intersection's stop sign for the east bound lane of Gwynn Oak Avenue, he brought his vehicle to a complete stop, and proceeded to enter the intersection when it appeared safe to do so.

4138.   Without any warning, and while attempting to evade the pursuing officers, Mr. Burley negligently ran the stop sign at the intersection of Belle Avenue and Gwynn Oak Avenue at a high rate of speed, striking Decedent's vehicle with great force.

4239.   After the collision, the Decedent was severely injured and trapped in his vehicle with Ms. Cain who also suffered serious injuries.

4340.   Decedent died later that day, at approximately 2:34 PM, as a result of the injuries he sustained in the collision.  Ms. Cain was hospitalized as a result of her injuries.

## II. ____THE COVER-UP

441.   Mr. Jenkins and Mr. Guinn did not promptly render aid to the Decedent or Ms. Cain or call for aid.  Instead, the Officers worked to cover their tracks to justify their unlawful actions.

452.   Following the collision, Mr. Jenkins did not find any drugs in Mr. Burley's vehicle.

46.   To justify the illegal stop, Mr. Jenkins instructed Mr. Guinn to call another officer and ask him to bring the "stuff" or "shit" in his car (referring to a stash of illegal drugs to plant in Mr. Burley's vehicle).

47.     In addition to Mr. Jenkins and Mr. Guinn, who had chased Mr. Burley and Mr. Matthews, two (2) other BPD officers, Mr. Gladstone and Mr. Willard, were also present on the scene.

4~~3~~8.     Mr. Jenkins~~, and another officer, identified as Keith~~Mr. Gladstone and Mr. Willard ~~Gladstone,~~ then orchestrated the delivery of approximately thirty-two (32) grams of heroin to the collision scene and planted the drugs in Mr. Burley's vehicle to justify the wrongful stop and pursuit of Mr. Burley and Mr. Matthews.

49.     Once the heroin was planted, another BPD officer was instructed to search the car. That officer searched Mr. Burley's car and signaled that he had found something.

50.     Despite knowledge that the heroin had been planted, Mr. Jenkins, Mr. Gladstone and Mr. Guinn, together with Mr. Willard, intentionally withheld this information from others and used it to justify the stop which led to the deadly collision.

51~~44~~.  Following the collision, ~~Mr. Jenkins, Mr. Guinn and other BPD~~the ~~o~~ Officers provided false witness statements to investigating officers and fabricated evidence to provide legitimacy to the illegal stop, pursuit and arrest of Mr. Burley and Mr. Matthews to exculpate themselves from their wrongful actions and omissions which caused the death of the Decedent and the injuries to Ms. Cain.

52~~45~~.  Mr. Jenkins also knowingly authored a false statement of probable cause, framing Mr. Burley and Mr. Matthews for crimes they did not commit.

53~~46~~.  There was no lawful basis for Mr. Jenkins~~, and~~ Mr. Guinn, Mr. Gladstone and Mr. Willard to conclude that Mr. Burley or Mr. Matthews were involved in any criminal conduct. The actions of the Officers violated not only Mr. Burley and Matthew's rights, but also deprived

13

the Decedent and Ms. Cain their right to life and liberty in violation of the Due Process Clause

of the Fourteenth (14th) Amendment to the United States Constitution.

### III. ___THE CONVICTIONS OF MR. BURLEY AND MR. MATTHEWS

5447.   Based on the false statements and evidence manufactured by the BPD, on June 10,

2011, Mr. Burley plead guilty to possession with intent to distribute heroin in the United States

District Court for the District of Maryland.

5548.   Based on the false statements and evidence manufactured by the BPD, Mr.

Matthews also plead guilty to possession with intent to distribute.

5649.   On August 10, 2011, Mr. Burley plead guilty to vehicular manslaughter of

Decedent in the Circuit Court for Baltimore City and was sentenced to serve ten (10) years in state

prison.

570.   On August 18, 2011, Mr. Burley was sentenced to fifteen (15) years in federal

prison, to be served concurrently with his state sentence.

581.   On February 3, 2017, Mr. Burley completed his sentence in state prison and was

transferred to federal prison where he remained until August 31, 2017.

### IV. ___THE INVESTIGATION OF THE GTTF
### AND               CONVICTION          OF          MR.          JENKINS

529.   As a result of the DOJ Report and subsequent federal investigations, federal agents

uncovered a long-standing, continuing, widespread, persistent pattern and practice of

unconstitutional practices and policies that pervaded the BPD and plainclothes police units.

6053.   On March 1, 2017, federal agents arrested seven members of BPD's GTTF,

including Mr. Jenkins, for racketeering offenses, including robbery, extortion, distribution of

narcotics, overtime fraud, and other crimes.

61~~54~~.   On August 30, 2017, the eighth member of BPD's GTTF was also arrested for racketeering offenses, including robbery, extortion and other crimes.

62~~55~~.   During the course of the investigation, federal investigators also discovered that Mr. Jenkins knowingly participated in the illegal stop, pursuit, arrest and conviction of Mr. Burley on April 28, 2010.

63~~56~~.   On January 5, 2018, Mr. Jenkins plead guilty to many criminal acts, including the illegal stop, pursuit, arrest and conspiracy to plant heroin in Mr. Burley's vehicle on April 28, 2010.

64~~57~~.   Mr. Jenkins admitted, among other things, that he knowingly concealed, covered up and falsified entries in an official Statement of Probable Cause in the District Court of Maryland for Baltimore City reflecting his actions, and actions of his fellow BPD officers, in relation to the seizure of heroin from Mr. Burley's vehicle on April 28, 2010, with the intent to impede, obstruct and influence the investigation of the events which lead to the fatal car crash on April 28, 2010, and Mr. Burley and Mr. Matthews' subsequent arrest and conviction.

65~~58~~.   In light of Mr. Jenkins' admission of guilt, on December 18, 2017, the United States District Court for the District of Maryland entered an order vacating the convictions of Mr. Burley and Mr. Matthews.

66~~59~~.   Furthermore, on April 9, 2018, the Circuit Court for Baltimore City entered an Order Vacating Mr. Burley's vehicular manslaughter conviction as it was a result of an illegal stop, pursuit and arrest of Mr. Burley and Mr. Matthews.

67~~0~~.   The false statements of Mr. Jenkins, Mr. Guinn, Mr. Gladstone, Mr. Willard and other BPD officers, adopted by the BPD, misled not only state and federal agents and prosecutors, but also Decedent's family and Ms. Cain as they were unaware of the role of the Defendants played in the deadly crash.

15

**V.    BPD'S WIDESPREAD PATTERN OR PRACTICE
OF ILLEGAL STOPS, PPURSUITS, AND ARRESTS**

681.    At all times alleged herein, the Officers were acting under the color of state law in the course and scope of their duties as BPD officers by engaging in the conduct set forth above.

692.    At all times alleged herein, the Officers acted for and on behalf of the BPD with the power and authority vested in them as officers, agents, and employees of the BPD, and incident to the pursuit of their duties as officers, employees and agents of the BPD.

7063.    The Officers' conduct on April 28, 2010, was part of a long-standing, continuing, widespread, persistent pattern and practice of unconstitutional police conduct, including illegal stops without probable cause or reasonable suspicion, illegal pursuits and arrests, and falsification of evidence by plainclothes officers regularly employed within the BPD in the years preceding the Decedent's death and Ms. Cain's injuries.

7164.    For many years before the Officers caused the deadly collision, BPD supervisors, including Mr. Palmere, Mr. Knoerlein, Mr. Fries, and policymakers had actual or constructive knowledge of these unlawful policing practices.

7265.    The BPD and its supervisors, including Mr. Palmere Mr. Knoerlein and Mr. Fries, knew or should have known years ago that officers given broad authority as part of "elite" plainclothes units to combat violence, guns, and drugs, often engaged in a pattern or practice of illegal activities like those that lead to the Decedent's death and Ms. Cain's injuries.

7366.    Despite such actual or constructive knowledge, BPD supervisors, including Mr. Palmere, Mr. Knoerlein and Mr. Fries, and policymakers acted with deliberate indifference to the widespread police misconduct.

74<s>67</s>.    Despite such actual or constructive knowledge, BPD supervisors, including Mr. Palmere, Mr. Knoerlein and Mr. Fries, and policymakers tacitly authorized and/or condoned such unlawful policing by its officers.

75<s>68</s>.    Despite such actual or constructive knowledge of this pattern and practice, the BPD condoned unlawful police conduct committed by plainclothes BPD units by ignoring the widespread abuses.   Rather than discontinuing the use of plainclothes units or instituting meaningful reforms and supervision, the BPD simply renamed these plainclothes units from time to time.  While the names of these units changed over the years, the unconstitutional police conduct perpetrated by these units remained the same.

76<s>69</s>.    The BPD turned a blind eye to this pattern and practice of illegal activity and allowed the Officers an opportunity to violate the rights of the Decedent and Ms. Cain.

## VI.    PRIOR COMPLAINTS AGAINST BPD PLAINCLOTHES OFFICERS

7<s>0</s>7.    For many years before the events alleged herein, the BPD utilized elite units comprised of plainclothes officers given wide latitude to investigate and arrest persons suspected of dealing drugs and/or gun violations, including the so-called "flex squads" and Special Enforcement Teams ("SETs").

7<s>1</s>8.    Rather than traditional police uniforms, plainclothes police officers wore non-police issued clothing, such as jeans, T-shirts and tactical vests while on duty.

7<s>2</s>9.    Plainclothes officers are referred to as "knockers" or "jump out boys" throughout Baltimore, as they are known for driving unmarked vehicles towards groups of people, jumping out of their vehicles, chasing Baltimore residents, and conducting aggressive illegal searches of persons in the vicinity.

7<s>8</s>0<s>3</s>.    Since at least the early 2000s, the BPD's plainclothes units were a recurrent source of unconstitutional policing conduct.

17

81~~74~~.   In January 2006, the Baltimore Sun published an article regarding the misconduct within the BPD's "flex squads."  The article, titled "Questions Raised for Years about City 'Flex Squad'" noted, *inter alia*, that:

▪ The BPD employed "flex squads" in all its districts whose officers had enhanced freedom "to chase down suspected criminals in neighborhoods dominated by drug dealing and violence."

▪ "Defense attorneys, prosecutors and community members say they have heard for years about allegations of misconduct that included planted drugs and troublesome practices about how suspects were treated and charged."

▪ The "review of court and other records show that allegations of wrongdoing have dogged some of the squad's member's for several years."

▪ "In a warrant police used to search the 'flex squad' office last month, investigators noted that previous allegations against [certain officers] 'have been made as to the planting of controlled dangerous substances on citizens in an effort to knowingly make false arrests.'"

▪ "The inquiry in the Southwest [district flex squad] has prompted concern about flex squads in other districts – each of the nine has at least one. In a statement, the [BPD] said it was examining 'all practices and procedures' of every district's 'flex' and drug enforcement units."

▪ "A department spokesman said that internal affairs will soon begin conducting annual evaluations of every officer in those units."

82~~75~~.   Plainclothes BPD officers, working as part of "flex squads", repeatedly engaged in acts of misconduct, including numerous instances prior to the events leading to the death of the Decedent.

83~~76~~.   For instance, in 2004, a BPD officer working as part of a "flex squad" was repeatedly accused of dropping a teenage boy in rival gang territory in Baltimore, where the young boy was subsequently assaulted.

84~~77~~.   In 2005, two (2) BPD plainclothes officers, William King and Antonio Murray, were charged, later convicted, of robbing drug dealers, drug trafficking, gun violations and terrorizing citizens of Baltimore for many years.

18

8578.    Also in 2005, Jemini Jones, a member of the Southwest District's "flex squad" was accused of raping a woman.

8679.    While investigating Jemini Jones, Baltimore police detectives discovered that "flex squad" officers were guilty of widespread police misconduct.

8780.    Police commanders later disbanded the Southwest District's "flex squad" and the BPD promised to conduct an internal affairs investigation into "every officer in those units."

8881.    The BPD was thus on notice of the potential for abuse associated with "flex squad" and plainclothes officers who had wide latitude to conduct highly aggressive and unconstitutional police practices.

8982.    At around the same time that allegations surfaced regarding the "flex squads," the Baltimore Sun reported on similar allegations leveled at the SETs whose "officers [were] accused of lying in charging documents, most of which involve drug arrests that result from car stops."

9083.    Like the "flex squads," SET members normally patrolled the streets in plain clothes and in unmarked vehicles. But whereas the "flex squads" were managed by each of the nine (9) district commanders, the SETs (there were two: one on the east side of Baltimore and one on the west side of Baltimore) were managed directly by the BPD's Chief of Patrol.

9184.    SET unit members were encouraged to make as many arrests as possible.  One SET member recently stated, "we stopped just about every adult we saw on the street to check their names for open warrants.  We conducted car stops with the intended goal of searching the vehicles."

9285.    In September 2006, the Associated Press published an article titled "Baltimore Police Unit Reassigned amid Scandal."  The article noted, *inter alia*, that BPD confirmed its investigation of the SET described as a "discretionary unit," operating in the Southeastern district. It reported that "dozens of criminal cases have been thrown out, because of misconduct allegations

against the specialized unit, allegations that have led the department to reassign all seven of the unit's members to desk jobs."

93~~86~~.    Despite being aware of the rampant misconduct that plagued the "flex squads" and SETs, in July 2007, the BPD formed a new elite, plainclothes unit known as the VCIS to focus on "bad guys with guns."

87~~94~~.    Like their predecessors, VCIS members operated with little supervision and, unsurprisingly, engaged in widespread abuse of Baltimore residents.  In short order, the VCIS became the source of a disproportionate number of citizen complaints and came under criticism from members of the community and of the Baltimore City Council.

88~~95~~.    In March 2009, BPD Officer Jemell Rayam, who later worked under Mr. Jenkins as part of the GTTF, fatally shot Shawn Cannady while working as part of VCIS.  It was Officer Rayam's third (3rd) shooting in a span of twenty (20) months.  The City later settled a lawsuit brought by Mr. Cannady's family for One Hundred Thousand Dollars ($100,000.)

96~~89~~.    In June 2009, Officer Rayam, while driving an unmarked vehicle with two (2) other plainclothes officers, pulled over a driver for allegedly not wearing a seatbelt.  During the subsequent stop, Officer Rayam and the other officers put the driver in flex cuffs and stole $11,000 they found in the vehicle.

97~~0~~.    Around this time, Officer Rayam was awarded the Citation of Valor & Silver Star for his work in the VCIS.

9~~1~~8.    Another VCIS officer, Fabien Laronde, was the subject of numerous complaints throughout his lengthy tenure with the BPD, a large portion of which involved work as a plainclothes officer.  Among many other incidents, Laronde was accused of planting evidence and

using excessive force in 2006 as well as of conducting an illegal strip search of a man in a shopping center parking lot in 2009.

9<u>29</u>.    In 2010, the BPD suspended an officer assigned to VCIS for stealing money that was planted on an undercover officer.

<u>100</u>9~~3~~. In 2011, the City of Baltimore paid a $100,000 settlement after VCIS members used excessive force against a 65 year old church deacon who was rolling a tobacco cigarette outside his home.

<u>101</u>9~~4~~. The misconduct in the VCIS was so widespread that, in 2013, the FBI initiated an investigation in which it was determined that multiple unit members had falsified reports to further their cases.  Several officers were suspended as a result of the investigation, another received six (6) months of home detention, and another pled guilty to federal gun and drug charges.  On a wiretapped call, an officer who pled guilty discussed planting a gun in an unlicensed cab and then pulling over and arresting the cab driver on a gun violation.

~~95~~<u>102</u>. In addition to the illegal searches and seizures by the various plainclothes units, these units and the BPD maintained a pattern or practice of conducting illegal stops and seizures, including but not limited to the conduct that formed the basis of a 2006 lawsuit brought by ACLU of Maryland against the BPD.

~~96~~<u>103</u>. In sum, for many years prior to the illegal stop and pursuit of Mr. Burley and Mr. Matthews, which resulted in the death of the Decedent and Ms. Cain's injuries, the BPD, its policymakers ~~and Mr. Palmere knew of the illegal misconduct committed by plainclothes police units and officers.~~ <u>knew of illegal acts committed by unsupervised police units and officers;  the illegal conduct of the BPD's flex squads, SETs, the VCIS, and other plainclothes units was no</u>

secret to the BPD or its supervisors, including Mr. Willard, Mr. Knoerlein, Mr. Fries and Mr. Palmere.

10497. Therefore, Tthe BPD had sufficient notice of the problems that were likely to arise, and did arise, with utilizing elite units of plainclothes officers driving unmarked vehicles who had wide latitude to combat drug and gun-related offenses years before the Officers' illegal stop, pursuit and arrest of Mr. Burley and Mr. Matthews.

10598. Given the knowledge the BPD had prior to the events at issue in the instant Complaint, a reasonable police department would have taken sufficient steps to adequately train, supervise and discipline officers to prevent misconduct by its officers and to ensure that those event would not occur.

10699. The BPD failed to take such steps, thus allowing the Officers to illegally stop, pursue, search, seize, fabricate, and falsify and suppress evidence, as members of the "flex squads," SETs, the VCIS, and other plainclothes units had done before them.

100.   On January 5, 2018, Mr. Jenkins pled guilty to racketeering conspiracy, racketeering, two (2) counts of Hobbs Act Robbery, falsification of records in a federal investigation, and four (4) counts of deprivation of rights under color of law.  In his plea agreement, Mr. Jenkins admitted that, among other things, he and other member of his units authored false incident and arrest reports, engaged in warrantless stops and seizures without probable cause, made false arrests, created false charging documents, and planted drugs.**VII.    BEYOND KNOWLEDGE OF THE RAMPANT ILLEGAL CONDUCT WITHIN PLAINCLOTHES UNITS, THE BPD HAD ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF THEN-OFFICERS GLADSTONE AND JENKINS' MISCONDUCT**

107.    Mr. Gladstone's and Mr. Jenkins' illegal actions in this case are part of their long history of misconduct while employed by the BPD.

108.    On information and belief, Mr. Gladstone was involved in the 2003 arrest of Mason Weaver, in which a federal judge held that the BPD officers involved had violated Mr. Weaver's constitutional rights.

109.    On information and belief, the BPD's Internal Affairs Division ("IAD") sustained a finding of misconduct against Mr. Gladstone for misconduct he committed between 2002 and 2004 while working in the Northwest District.

110.    On information and belief, on multiple occasions prior to 2010, Mr. Gladstone allowed his sources to keep drugs in exchange for information.

111.    Mr. Gladstone served as a mentor to Mr. Jenkins, and they began working with each other as early as 2008, frequently making arrests together in 2010.

112.    Like Mr. Gladstone, Mr. Jenkins engaged in repeated misconduct as a police officer.

113.    Throughout his tenure with the BPD, Mr. Jenkins repeatedly crashed BPD-issued vehicles, damaging them and/or rendering them inoperable.  On information and belief, Mr. Jenkins went through as many as one department-issued vehicle per month.

114.    On or about July 24, 2004, Officer Jenkins was involved in a car collision while on duty; IAD subsequently conducted an investigation and disciplined Mr. Jenkins for the accident that was deemed "preventable."

115.    On information and belief, Officer Jenkins modified or enhanced the department-issued vehicles in an effort to withstand frequent collisions – in contravention of BPD policy.

116.    On information and belief, Officer Jenkins' supervisors and other high-ranking officials in the BPD had actual or constructive knowledge of Officer Jenkins' reckless driving.

117.    Above and beyond his reckless driving, Mr. Jenkins repeatedly engaged in misconduct while employed with the BDP; among the publicly-reported incidents, in 2005, then-Officer Jenkins, at that time a member of the SET in the Eastern District, struck a private citizen, Timothy O'Conner, causing Mr. O'Conner to suffer a facial fracture.

118.    According to court documents, Mr. Jenkins (and another officer) claimed that they had not seen who harmed Mr. O'Conner as they were purportedly distracted by another altercation. However, two witnesses testified that they saw an officer throw Mr. O'Conner to the ground and hold him down with a nightstick.

119.    In September 2008, the City agreed to settle the case brought by Mr. O'Conner regarding that incident for Seventy-Five Thousand Dollars ($75,000.00).

120.    On information and belief, Officer Jenkins suffered no consequences for his actions, despite BPD supervisors and policymakers having knowledge of the same.

121.    In February 2008, as a member of the VCID, Mr. Jenkins fabricated an affidavit in support of a search warrant, writing that a confidential source had told him that a black male by the name of Mickey Oakley was distributing large amounts of cocaine and heroin in Baltimore and that the confidential source had been inside an apartment where the drugs were stored with Mr. Oakley.

122.    Mr. Jenkins and others entered Mr. Oakley's apartment without a search warrant – a practice that the officers referred to and was known within the BPD as a "sneak and peek."

123.    That same day, Mr. Jenkins and another officer who later worked under him as part of the GTTF, Daniel Hersl (who himself was the subject of at least thirty (30) complaints by 2006), stopped and apprehended Mr. Oakley.

124.    At a subsequent motions' hearing in 2009, Mr. Jenkins took the stand and lied when he stated that a fellow officer (Detective Randolph) had told him that he saw Mr. Oakley exit an apartment building holding a brown paper bag and get into a black SUV.

125.    Federal prosecutors later agreed to Mr. Oakley's release from federal prison due to Mr. Jenkins' misconduct.

126.    In November 2010, Mr. Jenkins and Mr. Gladstone, while working in VCID, arrested Jamal Walker during a car stop and then went to Mr. Walker's hold, where they tried to break in.  Mr. Walker's wife, Jovonne Walker, set off a silent burglary alarm during the break-in attempt which brought police to the home.  Mr. Jenkins and Mr. Gladstone sent the police away so that they could conduct a search of the home themselves.  Prosecutors later dropped the case against Mr. Walker once the inconsistencies in Jenkin's account came to light.

127.    On information and belief, Mr. Jenkins was the subject of several IAD investigations.

128.    One fellow GTTF officer, Momodu Gondo, speaking of his experience with Mr. Jenkins at the RICO trial, stated:

> "Defendant Wayne Jenkins was very reckless, you know.  I mean, he was just out of control, putting citizens at risk, you know, driving on the side of the street, going in people bumpers.  I just never saw anything like this…This dude is out of control…It was crazy.  His – his tactics in law enforcement, you know, he was – you know what I mean? He was – it was crazy.  It was bad.  It was bad."

129.    Mr. Gondo further testified that he feared that if he spoke up about Mr. Jenkins' conduct, he would "have been blackballed" because Mr. Jenkins "knew so many people in command."

130.    Another GTTF officer, Evodio Hendrix, testified at the RICO trial that Mr. Jenkins was a "golden boy" and a "prince" within the BPD who was "untouchable" because he looked after by higher-ups within the department.

131.    ~~100.~~  On January 5, 2018, Mr. Jenkins pled guilty to racketeering conspiracy, racketeering, two (2) counts of Hobbs Act Robbery, falsification of records in a federal investigation, and four (4) counts of deprivation of rights under color of law.  In his plea agreement, Mr. Jenkins admitted that, among other things, he and other member of his units authored false

incident and arrest reports, engaged in warrantless stops and seizures without probable cause, made false arrests, created false charging documents, and planted drugs.

## VIII.   MR. WILLARD, MR. KNOERLIEN AND MR FRIES WERE DELIBERATELY INDIFFERENT TO THE MISCONDUCT OF SUBORDINATES WITHIN PLAINCLOTHES UNITS, INCLUDING MR. JENKINS AND MR. GLADSTONE, WHOM THEY SUPERVISED PRIOR TO AND AT THE TIME OF THE APRIL 28, 2010 COLLISION

132.    The misconduct of the Officers in this case resulted from and was permitted by the deliberate indifferent of their direct supervisors who, despite actual or constructive knowledge that plainclothes officers (including Mr. Jenkins and Mr. Gladstone) had posed a pervasive and unreasonable risk of constitutional injury to citizens like the Decedent and Ms. Cain, condoned their illegal conduct by failing to supervise and/or correct their misconduct.

133.    On information and belief, at all times relevant hereto, Mr. Willard, Mr. Knoerlein and Mr. Fries held supervisory roles within the plainclothes units in which the Officers worked. As such, they were responsible for supervising, disciplining, and training the Officers.

134.    Mr. Willard, Mr. Knoerlein and Mr. Fries each served as a direct supervisor  for Mr. Jenkins and/or Mr. Gladstone at various times during the events at issue.

135.    Mr. Fries supervised both Mr. Jenkins and Mr. Gladstone.  Beginning in 2004 and continuing to 2006, Mr. Fries supervised Mr. Jenkins while part of the Special Enforcement Team.

136.    On information and belief, Mr. Fries was Mr. Jenkins' supervisor in 2004 when IAD sustained a finding against Mr. Jenkins for a vehicular accident it deemed "preventable."

137.    Mr. Fries was Officer Jenkins' supervisor in 2005 when Mr. Jenkins struck Timothy O'Conner in the face, resulting in a settlement paid by the city as described above.

138.    On information and belief, Mr. Fries had actual or constructive knowledge of Mr. Jenkins' use of excessive force against Timothy O'Conner (as well as numerous other instances of

Mr. Jenkins' misconduct), but nonetheless took no remedial or disciplinary action against Mr. Jenkins.

139.    On information and belief, Mr. Fries played a role in selecting which officers served in which plainclothes units.  Despite knowledge of Mr. Jenkins' prior misconduct, Mr. Fries selected Mr. Jenkins to join VCID in June 2006.

140.    Beginning in 2008, Mr. Fries served as Mr. Gladstone's direct supervisor in VCID.

141.    On information and belief, Mr. Fries was his supervisor when Mr. Gladstone, together with Mr. Jenkins, arrested Mickey Oakley in 2008 and Jamal Walker in 2010 and committed the acts alleged in Paragraphs 32-43.

142.    Beginning in 2006, Mr. Knoerlein supervised Mr. Jenkins in VCID.

143.    On information and belief, Mr. Knoerlein had actual or constructive knowledge of Mr. Jenkins' history of misconduct prior to joining VCID, including but not limited to the 2004 sustained IAD finding and the 2005 incident involving Timothy O'Conner.

144.    Beginning in 2008, Mr. Knoerlein supervised Mr. Gladstone in VCID.

145.    On information and belief, Mr. Knoerlein had actual or constructive knowledge of Mr. Gladstone's history of misconduct prior to joining VCID, including but not limited to an earlier sustained IAD finding and his practice of allowing individuals to keep drugs in exchange for information.

146.    On information and belief, Mr. Knoerlein directly supervised both Mr. Jenkins and Mr. Gladstone in VCID when they committed numerous acts of misconduct including their arrests of Mickey Oakley and Jamal Walker and committed the acts alleged in Paragraphs 29-40.

147.    Mr. Willard supervised Mr. Jenkins in VCID, both prior to and on April 28, 2010.

27

148.    On information and belief, Mr. Willard had actual or constructive knowledge of Mr. Jenkins' history of misconduct prior to joining VCID, including but not limited to the 2004 sustained IAD finding and the 2005 Timothy O'Conner incident.

149.    On information and belief, Mr. Willard was present at the April 28, 2010 collision scene when heroin was planted in Mr. Burley's vehicle, as discussed above.

150.    On information and belief, Mr. Fries, Mr. Knoerlein and Mr. Willard had knowledge of several other instances of misconduct involving Mr. Jenkins and Mr. Gladstone prior to the collision that led to the Decedent's death and Ms. Cain's serious injuries.

151.    On information and belief, as supervisors within BPD's plainclothes units, Mr. Fries, Mr. Knoerlein and Mr. Willard each had actual or constructive knowledge of the rampant misconduct present within those units in the early-to-mid 2000s, including the misconduct in the flex squads, SETs and VCID, as described above, yet did nothing to remedy the misconduct.

152.    Mr. Fries was a supervisor in a SET in the Eastern District when that unit's officers were committing widespread abuse.

153.    Mr. Willard, Mr. Knoerlein and Mr. Fries held supervisory roles in VCID during the time when that unit's officers were committing widespread abuse, including the repeated illegal conduct of Jemell Rayam.

154.    On information and belief, neither Mr. Willard, Mr. Knoerlein nor Mr. Fries took any steps (let alone reasonable steps) to report or remedy illegal conduct that each of them knew or should have known was occurring in the plainclothes units under their supervision.

155.    Mr. Willard, Mr. Knoerlein and Mr. Fries' failure to properly investigate, supervise and discipline plainclothes officers, even after the above-referenced scandals, demonstrates a gross disregard for the constitutional rights of the public and those of the Decedent and Ms. Cain, and

Mr. Willard, Mr. Knoerlein and Mr. Fries' failure was the proximate cause of the Decedent's death and Ms. Cain's serious injuries.

156.    On information and belief, Mr. Willard, Mr. Knoerlein and Mr. Fries did not conduct or request any meaningful training specific for plainclothes officers under their supervision, even after the misconduct within the SETs and VCIS was publicly reported.

157.    Despite actual or constructive knowledge of Mr. Jenkins and Mr. Gladstone's history of misconduct and the unreasonable risk they posed to citizens, Mr. Fries, Mr. Knoerlein and Mr. Willard specifically failed to adequately train, investigate, supervise or discipline Mr. Jenkins or Mr. Gladstone.

158.    Mr. Fries, Mr. Knoerlein and Mr. Willard knew of the significant risk that plainclothes officers, and specifically Mr. Jenkins and Mr. Gladstone, would violate the rights of the Decedent, Ms. Cain and other Baltimore residents, but Mr. Fries, Mr. Knoerlein and Mr. Willard deliberately chose a course of action that allowed these violations to continue.

159.    The continued inaction of Mr. Fries, Mr. Knoerlein and Mr. Willard, over a substantial period of time, in the face of widespread and longstanding abuses committed by plainclothes officers under their supervision allowed the Officers to violate the constitutional rights of numerous residents include the Decedent and Ms. Cain.

160.    In addition to condoning the numerous instances of misconduct, on information and belief, Mr. Willard, Mr. Knoerlein and Mr. Fries actively encouraged plainclothes officers under their supervision, including Mr. Jenkins and Mr. Gladstone, to violate the constitutional rights of Baltimore residents.

161.    On information and belief, Mr. Willard, Mr. Knoerlein and Mr. Fries directed their subordinates to conduct searches without regard for the limitation of the Fourth (4th) Amendment, and to get as many guns off the street by whatever means necessary, legal or otherwise.

162.    On information and belief, Mr. Willard, Mr. Knoerlein and Mr. Fries not only were aware of, but actively encouraged and approved, the overtime fraud committed by their subordinates.

163.    In spite of the well-documented misconduct by the plainclothes officers whom they supervised, Mr. Willard, Mr. Knoerlein and Mr. Fries rose within the ranks of the BPD, thereby allowing those below them, including Mr. Jenkins and Mr. Gladstone, to continue their actions unabated.

## IXVII.  MR. PALMERE'S KNOWLEDGE AND TACIT AUTHORIZATION OF MISCONDUCT BY PLAINCLOTHES OFFICERS

16401. The illegal actions of the Officers in this case would not have been possible without the actual or tacit authorization of one (1) or more high-ranking, senior command-level officer within the BPD.

16502. Mr. Palmere oversaw many of the BPD's plainclothes units throughout his tenure and had actual or constructive knowledge of his officers' misconduct, yet he did nothing to stop their unlawful policing practices.

16603. Upon information and belief, Mr. Palmere had the authority and responsibility to discipline officers he knew had engaged in misconduct.

16704. In 2005, Mr. Palmere served on the trial board for Officer Thomas E. Wilson, who had entered and searched a home without a warrant, later obtained a warrant, and then falsified police reports to state that he had received the warrant prior to the home invasion (a "sneak and

peek").  Even though IAD recommended that Officer Wilson be fired, Mr. Palmere voted for a reduced sentence, allowing Mr. Wilson to remain on the force and sending a message to other officers that "sneak and peeks" would be tolerated.

168.   Mr. Palmere began supervising plainclothes units in 2006, as Commander of the Central District.  There, he oversaw plainclothes officers in the District's first "Safe Zone," an aggressive patrol program aimed at combating drug dealing and reducing violent crime in Reservoir Hill and Upton neighborhoods.

16905. From 2008 to 2010, as head of the VCIS, then-Colonel Palmere supervised plainclothes officers during a time of increased citizen complaints and widespread abuses.  For example, he supervised the VCIS officer who assault Jerriel Lyles, resulting in a Two Hundred Thousand Dollar ($200,000.00) payout to Mr. Lyles; then-Colonel Palmere had direct oversight responsibility for the three VCIS officers who were charged with kidnapping two Baltimore city teenagers and leaving one in Howard County in 2010, as well as the numerous other instances of VCIS abuses detailed above.

10706. In 2010, Mr. Palmere was named Colonel and Chief of the Criminal Investigations Division, into which the troubled VCIS merged.  In this role, Mr. Palmere oversaw the VCIS, the Homicide and Sex Offense units.

171.   In 2011, Mr. Palmere was promoted to the Chief of Patrol for all of the BPD's nine (9) districts.  The following year, he returned to his role as Chief of the Criminal Investigations Division, where he remained until 2013, when he was named Deputy Commissioner.

172.   As Deputy Commissioner from 2013 to 2018, Mr. Palmere served as Chief of the Patrol and Operations Bureaus.  In these roles, he was the second-in-command of the BPD's operations and responsible for the actions of the various plainclothes unit officers.

31

173.    During the four-plus years which Mr. Palmere led the BPD's operations, the SESs and GTTF operated with immunity.  Mr. Jenkins, an officer whom Mr. Palmere had worked with in the past and whom he knew or should have known had committed repeated acts of misconduct, was named head of an SES in 2013 and named supervisor of the GTTF in 2016

174.    On information and belief, at all relevant times, Mr. Palmere had a role in selecting which officers served on which plainclothes units and was also involved in the promotion decisions regarding plainclothes officers.

17507. The widespread and persistent misconduct of the plainclothes units and the Officers was condoned and authorized by Mr. Palmere.

17608. Furthermore, Momodu Gondo, a convicted former GTTF member, testified at the recent trial of former GTTF members, Daniel Hersl and Marcus Taylor, that in 2009, then-Colonel Palmere assisted and coached former GTTF officer Jemell Rayam in the cover up of the fatal shooting of Shawn Cannady.

10977. Upon information and belief, Mr. Palmere was a supervisor responsible for Mr. Jenkins,  and Mr. Guinn and Mr. Gladstone, and had actual or constructive knowledge of their misconduct, including the misconduct which caused the death of the Decedent and injuries to Ms. Cain.

178.    Mr. Palmere had actual or constructive knowledge of the prior and subsequent misconduct committed by those officers, particularly Mr. Jenkins, who had engaged in several illegal acts by that point, many of which were publicly reported and thus were known or should have been known to his supervisors.

179.    Upon information and belief, when Officer Hendrix testified at the RICO trial that Mr. Jenkins was a "golden boy" and a "prince" who was "untouchable" within the BPD due to his

32

support among the department's top leadership, he was referring, at least in part, to Mr. Palmere's protection and promotion of Mr. Jenkins over an extended period of time.

180.    Upon information and belief, when Mr. Gondo testified at the RICO trial that he feared retribution from Mr. Jenkins because he knew "so many people in command," Mr. Gondo was referring, at least in part, to Mr. Jenkins' close relationship with Mr. Palmere.

181.    Mr. Palmere awarded Mr. Jenkins and other BPD officers an achievement pin for their work as part of plainclothes units.

182~~10~~. Mr. Palmere did not take any steps to report or remedy illegal conduct of the Officers and other plainclothes officers.

183~~11~~. The continued inaction of Mr. Palmere, over a substantial period of time, in the face of continuing widespread and persistent abuses committed by plainclothes officers under his supervision, including Mr. Jenkins, ~~and~~ Mr. Guinn and Mr. Gladstone, demonstrates Mr. Palmere's deliberate indifference to that pattern of misconduct committed by BPD plainclothes officers, including the misconduct that lead to the death of the Decedent and the serious injuries of Ms. Cain.

184.    The arrests and charges against several GTTF officers for illegal conduct led to the dissolution of the GTTF and precipitated then-Deputy Commissioner Palmere's abrupt retirement from the BPD in 2018.

## XVIII. BPD ALLOWED MR. JENKINS, ~~AND~~ MR. GUINN AND MR. GLADSTONE TO CONTINUE THE SAME PATTERN OF ILLEGAL CONDUCT AS PREVIOUSLY EMPLOYED BY PLAINCLOTHES OFFICERS

1~~12~~85.  The BPD formed the GTTF in May 2007, around the same time it formed VCIS, with the stated goal of tracking and curbing illegal gun sales and gun activity.

1~~13~~86. Mr. Jenkins, and Mr. Guinn and Mr. Gladstone were members of plainclothes units, including the GTTF, and operated with broad authority to canvas Baltimore City in search of guns and drugs.

1~~87~~4. Although the BPD had conducted internal investigations into former elite units, and thus had ample opportunity to correct the illegal police tactics, BPD failed to provide necessary supervision, oversight, discipline and/or training to ensure that its plainclothes officers, including Mr. Jenkins, and Mr. Guinn and Mr. Gladstone, did not engage in the same pattern of misconduct utilized by plainclothes officers before them.

188~~115~~.      The recent indictments against the GTTF officers show that the BPD failed to adequately monitor its plainclothes officers, including Mr. Jenkins and Mr. Guinn, and failed to stop illegal and abusive police tactics.

1~~89~~6. On February 23, 2017, a number of GTTF officers, including Mr. Jenkins, were indicted by the United States Attorney's Office for the District of Maryland ("USAO") for various RICO offenses ("RICO Indictment").

1~~17~~90. The RICO Indictment revealed that GTTF officers engaged in, among other things, the following overt acts:

- Conducting unlawful traffic stops of vehicles and stealing money, property, and narcotics from the vehicle occupants; and

- Preparing false and fraudulent official incident and arrest reports.

191.    One of the defendants in that case, Jemell Rayam, pled guilty to a RICO conspiracy charge and cooperated with federal authorities during the investigation.  In his plea agreement, he publicly admitted that, among other things, he:

"[r]obbed civilians he detained and in some cases arrested and stole money and drugs from them.  Rayam did this beginning in at least 2009 or 2010 when he joined the GTTF.  At times, Rayam shared the proceeds with co-defendants

Momodu Gondo, Wayne Jenkins, Daniel Hersl, Marcus Taylor, Defendant A, and others, and on other occasions, he kept all the proceeds for himself…Rayam also sold, through associates of his, drugs that Jenkins gave him and split the proceeds of those sales.  Jenkins obtained the drugs by robbing detainees and arrestees."

1<del>48</del>92. The BPD was well-aware that Officer Rayam had lied on a BPD-administered polygraph examination about the June 2009 vehicle stop in which he stole Eleven Thousand Dollars ($11,000.00), yet he kept his job and was promoted to the GTTF shortly thereafter.

193.    Specifically, Officer Rayam was asked two (2) series of questions about his conduct as well as the conduct of fellow officers, including:

- "Did you see Detective Giordano remove a bag from the truck of that car [yu pulled over on Lafayette Avenue on June 8, 2009]?"
- "Did you see Officer Sylvester take possession of a bag that was removed from that car?"
- "Did you conspire with Officer Sylvester to take money from anyone on June 8, 2009?"

194.    For each question, Officer Rayam answered "No."  The BPD's polygraph examiner "found the possibility of deception [by Rayam] to be greater than 99% in both tests."

195.    The BPD did nothing to investigate or address this misconduct.

196.    In a 2014 case involving Mr. Jenkins and Mr. Gladstone, Assistant City State's Attorney (ASA) Molly Webb notified defense counsel that video camera footage taken of a search of a car directly contradicted the sworn statement of probable cause submitted by the officers.

197.    In response to the troubling footage, ASA Webb dismissed the case and reported the inconsistency to BPD's IAD.

198.    Upon information and belief, after ASA Webb reported the incident, Officer Jenkins threated ASA Webb, stating that she should "stop talking about him."

199.    Upon information and belief, prior to the RICO Indictment, the BPD provided no meaningful oversight of Mr. Jenkins' and/or Mr. Guinn's conduct.

200119.    Upon information and belief, prior to the RICO Indictment, the BPD conducted no meaningful investigation, and doled out no meaningful disciplinary actions against Mr. Jenkins, or Mr. Guinn or Mr. Gladstone in relation to their misconduct.

21201. Instead, Mr. Jenkins rose through the BPD ranks and was promoted to officer-in-charge of the GTTF in 2016.

202121.    Mr. Guinn was selected to serve as a training instructor for the BPD's police academy.

203122.    Upon information and belief, Mr. Guinn continues to train other BPD officers to this day.

204.    Despite knowing of the recurrent misconduct by its plainclothes officers, BPD failed to establish reasonable and necessary systems to train, supervise, investigate, and hold accountable those officers or to take the necessary steps to eliminate those units' culture of corruption.

123205.    In a statement following the RICO Indictment of several GTTF officers, former BPD Commissioner, Kevin Davis admitted that the BPD "absolutely" should have known about the conduct of the GTTF officers and stated that, "the culture here contributes to it."

124206.    Former Commissioner Davis then announced that he was effectively ending plainclothes policing within Baltimore City, explaining that plainclothes officers had adopted a corner-cutting mindset and that requiring officers to wear uniforms creates a level of accountability that was absent in policing by plainclothes officers.

125207.    In 2018, Baltimore Police Commissioner Darryl De Sousa revived the use of plainclothes police units within the BPD.

**IXXI. BPD ENTERED INTO A CONSENT DECREE WHERE IT ADMITTED TO A PATTERN OR PRACTICE OF CONDUCT IDENTICAL TO THAT AT ISSUE HERE AND BASED IN PART ON ACTIVITIES THAT OCCURRED IN 2010.**

126208.         Following the April 2015 death of Freddie Gray in police custody,

Baltimore Mayor Stephanie Rawlings-Blake asked the United States Department of Justice Civil

Rights

Division to conduct an investigation of BPD's policies, patterns and practices.

127209.         The Civil Rights Division issued the DOJ Report on August 10, 2016,

which included the following findings:

- The Civil Rights Division "reviewed hundreds of thousands of pages of documents, including all relevant policies and training manuals used by the [BPD] since 2010; BPD's database of internal affairs files; a random sample of about 800 case files on non-deadly force incidents; files on all deadly force incidents since 2010" and other data;

- The BPD engaged in a pattern or practice of conduct that violates the United States Constitution and federal law, including stops, searches and arrests without the reasonable suspicion or probable cause required under the Fourth Amendment to the United States Constitution;

- The foregoing pattern or practice is rooted in BPD's deficient supervision and oversight of officer activity and resulted in part from BPDs zero tolerance enforcement strategy, dating back to the early 2000s;

- The BPD failed to take action against officers with a long history of misconduct that is well known to the Department. For example, one officer currently employed by the BPD had received approximately 125 complaints from complaints within the Department and from the community since 2010, and many of these complaints allege serious misconduct. However, the DOJ found that the BPD had sustained only one complaint against the officer for minor misconduct;

- In June 2006, the ACLU of Maryland sued the BPD regarding its illegal arrests of thousands of Baltimore residents. In December 2008, the parties stayed the case and engaged in protracted settlement negotiations. In 2010, that case settled with BPD agreeing to change its policies and procedures and submit to an independent auditor to evaluate its progress toward adopting stop and arrest practices consistent with the United States Constitution;

- The final report of the auditor from 2014 noted that there were no systemic improvements in reporting for those stop and arrest offenses during the monitoring period; and

- ▪ Various policies that pre-date the events at issue in the instant complaint demonstrate that BPD failed to adequately equip its officers to police effectively and constitutionally.

128210.    The DOJ Report specifically highlighted the illegal conduct of the various plainclothes units and noted that a "disproportionate share of complaints" identified plainclothes officers as "particularly aggressive and unrestrained in their practice of stopping individuals without cause."

129211. On January 12, 2017, the United States filed a complaint in the United States District Court for the District of Maryland against the BPD. The complaint alleged in relevant part that:

- ▪ In the late 1990s, BPD adopted zero tolerance policing strategies that prioritized officers making large numbers of stops, searches, and arrests for misdemeanor offenses without ensuring robust oversight to hold officers accountable for misconduct and protect the constitutional rights of Baltimore City residents;

- ▪ Based on data from 2010 — 2015, BPD engaged in a pattern or practice of conduct that violated the United States Constitution and federal laws. Those violations included unconstitutional stops, searches, and arrests that run afoul of the rights guaranteed to Baltimore's citizens by the Fourth and Fourteenth Amendments to the United States Constitution; and

- ▪ BPD's violations of the Constitution and federal law are driven by BPD's systemic deficiencies in policies, training, supervision, and accountability structures. BPD has been aware of these structural challenges for many years but has not taken adequate steps to comply with the Constitution or federal law.

130212.    That same day, the United States and the BPD jointly filed a motion asking the court to approve a 227-page consent decree. That decree provides in relevant part that:

- ▪ BPD will provide its officers with training on stops, searches, and seizures;

- ▪ BPD will ensure that a supervising officer reviews all documentation relating to stops, searches, seizures, and arrests for completeness and adherence to the law and BPD policy; and

▪ BPD will audit the aforementioned supervisory reviews.

2131.   On April 7, 2017, the court granted that motion, entered a slightly-modified version of the consent decree, and stated that the court will retain jurisdiction over the decree until it is terminated.  As of the date of the filing of this Amended Complaint, the decree remains in place.

## XII.   THE POLICIES AND "CUSTOMS AND USAGE" OF THE BPD

214.   BPD Policymakers, aware since at least the early 2000s of numerous instances of misconduct committed by plainclothes officers and units similar to that at issue here, failed to adequately supervise their plainclothes units, thus allowing unconstitutional conduct described herein to occur.

215.   BPD supervisors condoned the widespread misconduct within plainclothes units. Despite knowledge that the plainclothes units were the source of a disproportionate share of complaints against the BPD for many years, and at the center of numerous allegations and cases of police misconduct, the BPD continued to permit plainclothes officers to roam the streets with high levels of discretion and little supervision.  Even after several public scandals highlighting the abuses endemic to flex squads, SETs, and VCIS, and others, as detailed above, the BPD did not institute any meaningful oversight of these specialized plainclothes units.  The BPD's continued inaction in the face of pervasive constitutional violations evidences its deliberate indifference to the rights of citizens.

216.   To make matters worse, despite knowledge that Mr. Jenkins engaged in repeated acts of misconduct, the BPD did not punish Officer Jenkins but rather rewarded him by promoting him to lead two of those very units.

217.    On multiple occasions, the BPD promoted Mr. Palmere to high-ranking, senior command-level positions, in spite of rampant misconduct by the officers he supervised, of which BPD knew or should have known.

218.    The frequency and duration of the misconduct involving plainclothes units demonstrate the misconduct was pervasive within the BPD at the time of the events at issue, and, on information and belief, the misconduct was committed with the knowledge of BPD supervisors, or because of their deliberate indifference to this misconduct.

219.    Upon information and belief, plainclothes officers were encouraged and pressured by BPD supervisors, including Mr. Willard, Mr. Knoerlein, Mr. Fries and Mr. Palmere, to recover as many guns and make as many arrests as possible, and in fact plainclothes officers were promoted in large part based on their arrest statistics, without regard for the methods the plainclothes officers used to recover those guns and make those arrests.

220.    Upon information and belief, plainclothes officers were praised by BPD supervisors, notwithstanding the numerous allegations of misconduct.  For example, Mr. Palmere awarded Mr. Jenkins and others an achievement pin for their work as part of plainclothes units.

221.    In September 2011, the BPD held a Medal Day ceremony to honor a select few officers within the department.  At the ceremony, the BPD awarded bronze medals to Mr. Jenkins and Mr. Gladstone, as well as one to Mr. Knoerlein, which accounted for three (3) out of the seven (7) bronze medals awarded at the ceremony.

222.    In a BPD newsletter, Lieutenant Christopher O'Ree wrote, "I am extremely proud to showcase the work of Sergeant Wayne Jenkins and [his team]…Their relentless pursuit to make our streets safer by removing guns and arresting the right people for the right reasons has made our city safer.  I couldn't be more proud of the strong work of this team."  Lieutenant O'Ree added, "This team of dedicated detectives has a work ethic that is beyond reproach."

132223.      The unconstitutional conduct at issue in this case includes the continuing, widespread and persistent practices of plainclothes officers driving unmarked vehicles, illegally stopping Baltimore citizens without cause, pursuing and arresting those who flee, fabricating evidence, suppressing exculpatory and/or impeachment evidence, and falsifying police reports to support those unlawful arrests.

133224.      The unconstitutional conduct at issue in this case also includes the continuing, widespread and persistent BPD practice of utilizing elite plainclothes officers, with broad discretion and authority to stop, arrest and violate the constitutional rights of Baltimore citizens.

134225.      At all times relevant hereto, the unconstitutional conduct at issue in this case was so sufficiently widespread and pervasive within the BPD, that it assumed the quality of a "custom or usage" or pattern or practice of the BPD.

135226.      Despite widespread unconstitutional police conduct within the plainclothes units, BPD supervisors conducted minimal substantive review of plainclothes officers' justification for unlawful stops and searches and BPD .

136.     Despite widespread unconstitutional police conduct within the plainclothes units, the BPD did not take seriously its obligation to supervise or discipline its officers.

22137.At all times relevant hereto, the BPD lacked adequate systems and processes to investigate and punish officers who engaged in misconduct.  For instance, prior to the events at issue, the BPD's Internal Affairs Division ("IAD") did not track or investigate complaints made against its officers through civil lawsuits even those that resulted in judgments against officers, like a settlement reached by Timothy O'Conner concerning the actions of Officer Jenkins in 2005.

This failing, among many others, allowed officers like Mr. Jenkins and Mr. Guinn to engage in repeated misconduct without consequence.

132228. As detailed in the DOJ Report, among other things, the BPD's disciplinary system, including IAD, was deficient in the following respects:

- Discouraged individuals from filing complaints;

- Tolerated excessive and chronic delays in resolving disciplinary complaints;

- Supervisors misclassified serious complaints as minor ones so that they could be resolved at the command level without IAD involvement;

- Supervisors summarily closed complaints without investigation;

- Failed to investigate complaints in a timely manner;

- Failed to consider evidence that contradicted explanations provided by officers accused of misconduct;

- Failed to probe beyond reports the accused officer already provided;

- Provided officers with a detailed notice of the alleged misconduct at the outset of an investigation, compromising the investigation and creating the possibility that the complaining party could be targeted for retaliation or intimidation;

- Used a trial board system beset by delays and deficiencies;

- Failed to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

- Supervisors failed to identify deficiencies or questionable findings in investigations; and

- Failed take steps to ensure that investigators did not have conflicts of interest vis-à-vis the officers they were investigating.

132229. Additionally, the BPD's Internal Affairs Division was underprepared and overburdened during the relevant time period.  IAD detectives, as detailed in an independent report, lacked key training on how to investigate officers suspected of misconduct.  Upon

information and belief, at all times relevant hereto, IAD investigators were also assigned, on average, between 35-50 cases to investigate (far above the national average), and were also frequently ordered to patrol the streets, further limiting their already-stretched capacity to handle their investigations of officer misconduct.  At times IAD investigators were detailed to patrol alongside the very officers they were investigating.

~~14~~2230. Retired Police Sergeant Chad Ellis, who worked in the Internal Affairs Division, explained that IAD was "ill-prepared and inexperienced in their area of alleged expertise – from top to bottom.".

~~14~~2231. A police spokesperson likewise acknowledged that, in 2009 the BPD did not have an adequate early intervention system in place for flagging problem police officers.

~~14~~2232. In 2013, then-Police Commissioner Anthony Batts acknowledged in the BPD's "Strategic Plan for Improvement" that "[d]iscipline has not always been a priority for the Baltimore Police Department."  He explained that for "many years [the] internal affairs system accrued numerous deficiencies," including "a backlog of disciplinary verdicts that were never carried out and a substantial case backlog…It has not been uncommon," Commissioner Batts wrote, "for cases in the department to take as many as three years to resolve."

~~14~~2233. At all times relevant hereto, the BPD also lacked adequate staffing to conduct trainings of its officers, facilities for training, and mechanisms to ensure that officers had received and understood the supposedly mandatory training.

~~14~~2234. For instance, as detailed in the DOJ Report, a BPD training lesson plan from 2009 regarding stop and frisk training misstated the relevant standard for search and seizures ("Investigative contacts of citizens by members of this agency will be conducted with articulable

reason.")  The 2009 training also mistakenly instructed officers that the standard of suspicion required for any investigatory stop and a subsequent frisk was the same.

235.   Additionally, at all times relevant hereto, the BPD lacked adequate staffing to conduct trainings of its officers, facilities for training, and mechanisms to ensure that officers had received and understood the supposedly mandatory training.

~~145~~236.      In 2015, the former director of the BPD's Training Academy released a document outlining numerous deficiencies in training and highlighted the department's "internal culture of placing training second."

~~146~~237.      When the Baltimore Sun reported on "flex squad" and SET misconduct, the BPD, aware of the potential for abuse among elite units like the GTTF since at least the early 2000s, and having the final authority to establish and implement policies, permitted and condoned the GTTF's unconstitutional conduct alleged herein, and failed to establish and implement effective training policies, thus allowing for the unconstitutional conduct described herein to occur.

~~147~~238.      BPD policymakers, aware of specific instances of police misconduct similar to that at issue here since at least 2004, failed to adequately supervise and/or discipline their officers, thus allowing for the unconstitutional conduct described herein to occur.

239.   The illegal stop, search, arrest and seizure of Mr. Burley and Mr. Matthews, which lead to the Decedent's death and Ms. Cain's serious injuries, were part of a pattern or practice of illegal conduct sufficiently widespread and pervasive within the BPD that it assumed the quality of a "custom or usage" or pattern or practice of the BPD.

~~148~~240.      The BPD had actual or constructive knowledge of the pattern of misconduct, as identified above, and either intended that the "custom or usage" or pattern or

practice which resulted in Decedent's death and Ms. Cain's injuries, to continue or was deliberately indifferent to stopping or correcting the same.

241149. Since at least the early 2000s, the BPD had received notice through, *inter alia*, convictions of its police officers, complaints and suits lodged against its police officers, public reporting, settlements of claims, and notifications from state prosecutors, that its plainclothes officers engaged in a widespread pattern of flagrant unconstitutional violations like those alleged herein.

242150. Rather than take any action to stop such conduct, BPD condoned the pattern and/or practice by willfully ignoring it.

243. The BPD's policy, custom, or practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional policing, and its policy, custom, and pattern or practice of failing to adequately supervise, discipline, and train BPD plainclothes unites was reflected in numerous prior allegations and cases of misconduct involving plainclothes units.

244151. The long history of misconduct committed by plainclothes units was actually or constructively known to BPD supervisors or policy makers, who failed to supervise, discipline, or train in response to such notice. The continued adherence to these unconstitutional municipal customs, practices, and/or policies amounted to deliberate indifference to the constitutional rights of individuals, including the Decedent and Ms. Cain.

## XIII. THE DECEDENT WAS KILLED AND MS. CAIN WAS INJURED BECAUSE OF THE BPD'S ILLEGAL PRACTICES

152245. The customs or usages and patterns and practices alleged herein, were the moving force behind the collision which resulted in Decedent's death and Ms. Cain's injuries.

153246.        The Officers engaged in the illegal stop, pursuit and arrest of Mr. Burley and Mr. Matthews without the object of making a lawful arrest, but rather for the illegitimate purpose of arresting them without probable cause and fabricating and falsifying evidence to make the illegal arrest appear legitimate.

154247.        The purpose of the illegal conduct alleged herein was to harm and/or worsen the legal plight of Mr. Burley and Mr. Matthews.

## DAMAGES

155248.        As a direct and proximate result of the joint and several wrongful acts of the Defendants and of their respective agents, servants, employees and/or officers, the Decedent was severely injured and died.

156249.        As a direct and proximate result of the joint and several wrongful acts of Defendants and their respective agents, servants, employees and/or officers, prior to his death, the Decedent suffered severe physical and emotional pain, including but not limited to, pre-impact fright, serious bodily injuries, and severe conscious pain and suffering and mental anguish and other economic and non-economic damages.

157250.        As a direct and proximate result of the joint and several wrongful acts of the Defendants and of their respective agents, servants, employees and/or officers, the Plaintiffs, and Use-Plaintiffs, each sustained extensive damages including, but not limited to, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of parental care, loss of attention, loss of advice, loss of counsel, loss of training, loss of guidance, and loss of services.

158251.        As a direct and proximate result of the joint and several wrongful acts of Defendants and their respective agents, servants, employees and/or officers, Ms. Cain suffered

severe physical and emotional pain, including but not limited to, pre-impact fright, serious bodily injuries, and severe conscious pain and suffering and mental anguish and other economic and non-economic damages.

**CAUSES OF ACTION**

**COUNT I – 42 U.S.C. § 1983**
**VIOLATION OF DUE PROCESS**
**(AGAINST OFFICER DEFENDANTS AND DEFENDANT WILLARD)**

159252.        Each paragraph of this Complaint is incorporated as if fully stated herein.

160253.        As described above, the Officers, while acting individually, jointly, and/or in concert, as well as under color of law, and pursuant to custom and usage, pattern and practice and/or policies of the BPD, and within the scope of their employment, illegally stopped and pursued Mr. Burley and Mr. Matthews, which directly and proximately resulted in the Decedent's untimely and unnecessary death and Ms. Cain's injuries.

161254.        This conduct deprived the Decedent and Ms. Cain of their constitutional right to life and liberty, and deprived the Decedent's children the love and affection of their father.

162255.        Absent the Defendants' misconduct, the Decedent and Ms. Cain would not have

suffered the severe physical and emotional pain and death, and Plaintiffs and Use-Plaintiffs would not have suffered the loss of their father.

256163.        The wrongful acts of the Officers described herein directly and proximately resulted in the unjust and wrongful death of the Decedent and injuries to Ms. Cain, thereby depriving them of their right to life and liberty without due process of law, in violation of the Due Process Clause of the Fourteenth (14th) Amendment to the United States Constitution.

257164.        The wrongful acts of the Officers described herein "shocks the conscious," and "violates the decencies of civilized conduct."

47

258165.        The wrongful acts of the Officers described herein were committed maliciously and

sadistically with the intent to cause harm to Mr. Burley and Mr. Matthews and/or to worsen their

legal plight.

259166.        The wrongful acts of the Officers described herein were undertaken with willful

indifference to the Decedent's clearly established constitutional rights granted under the

Fourteenth (14th) Amendment.

**COUNT II – 42 USC § 1983**
**SUPERVISORY LIABILITY**
**(AGAINST DEFENDANTS EAN PALMERE, KNOERLEIN,  FRIES, AND WILLARD)**

260167.        Each paragraph of this Complaint is incorporated as if fully stated herein.

261168.        Mr. Palmere supervised many of the BPD's plainclothes units through their

various iterations.  Upon information and belief, in 2010, Mr. Palmere supervised the Officers,

each of whom were working as plainclothes officers at the time of the unconstitutional conduct at

issue.

262169.        Mr. Palmere had actual or constructive knowledge that the Officers and

other members of the plainclothes units, were engaged in widespread misconduct over a period of

years that posed an unreasonable risk of constitutional injury to Plaintiffs and to other Baltimore

citizens.

263170.        In spite of this knowledge, Mr. Palmere took no action to prevent or remedy

the misconduct by the Officers and/or other members of the plainclothes units.

264171.        Mr. Palmere was deliberately indifferent or acquiesced in the persistent

constitutional violations by the Officers and other subordinates, thus allowing the misconduct to

continue and thrive.

265172.        Mr. Palmere routinely failed to supervise and discipline the Officers, and

his other subordinates, and allowed the misconduct to continue within the BPD and the units he

supervised.

266173.        As a direct and proximate result of Mr. Palmere's inaction, the Decedent

suffered injuries and died and Ms. Cain suffered injuries as alleged herein.

## COUNT III – 42 U.S.C. § 1983
## MONELL LIABILITY
## (AGAINST THE BALTIMORE POLICE DEPARTMENT)

267174.        Each paragraph of this Complaint is incorporated as if fully stated herein.

268175.        The Officers' actions were undertaken pursuant to custom and usage and/or

policies, patterns and practices of the BPD ratified by policymakers with final policymaking

authority.

269176.        The unconstitutional customs, usages, patterns and practices heretofore

alleged include the continuing, widespread and persistent practice of plainclothes officers, driving

unmarked vehicles, jumping out of their vehicles to illegally stop Baltimore citizens without cause,

pursuing and arresting those who flee, fabricating evidence and falsifying police reports to support

those unlawful arrests.

270177.        The unconstitutional customs, usages, patterns and practices heretofore

alleged also include the continuing, widespread and persistent BPD practice of utilizing elite

plainclothes officers, with broad discretion and authority to violate the constitutional rights of

Baltimore citizens.

271178.        The unconstitutional customs, usages, patterns and practices heretofore

alleged also include, *inter alia,* the persistent failure  to train or supervise police officers with

regard to their constitutional obligations; the persistent failure to discipline police officers who engaged in constitutional violations; and allowing the use of fabricated reports and evidence to support unconstitutional stops.

272179.	These policies and practices were sufficiently widespread within the BPD to
assume the quality of a "custom or usage" of which BPD policymakers had actual or constructive knowledge.

273180.	The policies and practices described herein were maintained and implemented by
the BPD with deliberate indifference to the constitutional rights of individuals, including those of innocent bystanders like the Decedent and Ms. Cain.

274181.	Prior to and at the time of the events on April 28, 2010, the BPD, by and through its final policymakers, maintained a policy, custom, pattern or practice of failing to adequately supervise, discipline and train members of its plainclothes units with respect to their constitutional obligations.

275182.	The wrongful acts described herein were undertaken with willful indifference to the Decedent's and Ms. Cain's constitutional rights.

276183.	As a direct and proximate result of Defendants' conduct, the Decedent and Ms. Cain suffered severe bodily injuries, conscious pain and suffering and emotional distress, loss of life and loss of liberty, and other damages.

184277.	As a direct and proximate result of the Officers' conduct, the Decedent suffered severe injuries and death, Ms. Cain suffered severe injuries, and Decedent's children have suffered pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of

companionship, loss of comfort, loss of protection, loss of parental care, loss of attention, loss of advice, loss of counsel, loss of training, loss of guidance, and loss of services.

**COUNT IV –**
**WRONGFUL DEATH**
**(AGAINST OFFICER DEFENDANTS AND**
**DEFENDANTS PALMERE, KNOERLEIN, FRIES, AND WILLARD)**
~~(AGAINST ALL DEFENDANTS)~~

~~185~~278.        Each paragraph of this Complaint is incorporated as if fully stated herein.

279~~186~~.        Plaintiffs, Shirley Johnson, Individually, as daughter of Elbert Davis, Delores A.

Davis, Mary A. Cox, Gloria A. Davis, Albert Cain, Elbert Davis, Jr., and Anita Cain, Administrator

of the Estate of Arthur Cain, hereby sue and join this Wrongful Death action against all Defendants

pursuant to MD. CODE ANN., CTS. & JUD. PROC. §§ 3-901–3-904.

~~187~~280.        MD. CODE ANN., CTS. & JUD. PROC. § 3-904(g) provides that a wrongful death

claim shall be filed within three (3) years after the death of the injured person. However, Maryland

courts have held that "an estoppel based on fraud or <u>fraudulent concealment of the cause of action</u>

<u>operates to toll the substantive limitations period</u> in the wrongful death statute." *See Geisz v.*

*Greater Balt. Med. Ctr.*, 313 Md. 301 (1988); *Imbesi v. Carpenter Realty Corp.,* 357 Md. 375

(2000); *Ohio Casualty Ins. Co. v. Hallowell*, 94 Md. App. 444 (1993); *Chang-Williams v. United*

*States*, 965 F. Supp. 2d 673 (2013);   *Bausch v. Philatelic Leasing*, 728 F. Supp. 1201 (1989).

~~188~~281.        This Complaint is timely filed within three (3) years of Plaintiffs' discovery

of the causes of action alleged herein.

~~189~~282.        Plaintiffs' learned of the Officers' wrongful acts and falsification of

evidence upon the filing of an indictment against Mr. Jenkins on November 30, 2017.

283~~190~~.        Defendants fraudulently concealed the misconduct of the Officers by

providing

false statements, fabricating evidence and falsifying official BPD documents.

284~~191~~.      The Decedent's death was a direct and proximate result of Defendants' wrongfulb acts and/or indifference as alleged herein.

285~~192~~.      As a result of the Decedent's death, Plaintiffs, Shirley Johnson, Delores A. Davis,

Mary A. Cox, Gloria A. Davis, Albert Cain, Elbert Davis, Jr., and Anita Cain, Administrator of the Estate of Arthur Cain, and the Use Plaintiffs suffered and will continue to suffer sorrow, grief, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of filial care, loss of attention, loss of advice, loss of counsel, loss of training, loss of guidance, and loss of services and support which the Decedent could have and would have afforded and rendered had he continued to live.


## COUNT V –
## SURVIVAL ACTION
## (AGAINST OFFICER DEFENDANTS AND DEFENDANTS PALMERE, KNOERLEIN, FRIES, AND WILLARD~~ALL DEFENDANTS~~)

286~~193~~.      Each paragraph of this Complaint is incorporated as if fully stated herein.

287~~194~~.      MD. CODE ANN., EST. & TRUSTS §7-401(y) provides for actions on behalf of the Decedent's estate for conscious pain and suffering, mental anguish, pre-death fright and other damages for which the deceased could have recovered had he survived.

288~~195~~.      Shirley Johnson, Personal Representatives of the Estate of Elbert Davis, Sr., deceased, hereby is pursuing this survival action and the Estate's claims for the decedent's conscious pain and suffering, mental anguish, pre-death fright, and funeral and burial expenses, medical

expenses and other damages permitted by law.

289196.    As a direct and proximate result of the wrongful acts and/or indifference of Defendants, the Decedent sustained severe and conscious pain and suffering, mental anguish and horrific pre-death fright and other damages for which he could have recovered had he survived, all without any negligence on his part thereunto contributing.

290197.    As a further direct and proximate result of the wrongful acts and/or indifference of Defendants, the Decedent incurred monetary losses and expenses including, without limitation, funeral, burial and medical expenses.

**COUNT VI –**
**NEGLIGENCE**
**(AGAINST OFFICER DEFENDANTS AND DEFENDANT WILLARD)**

291198.    Each paragraph of this Complaint is incorporated as if fully stated herein.

292199.    The Officers owed the Decedent and Ms. Cain a duty to conduct police activities in a lawful manner that complied with the rights afforded citizens under the Constitution.

29300. The Officers owed the Decedent a duty to conduct police activities in a manner that did not create an unreasonable risk of injury to the Decedent and the citizens of Baltimore.

29401. The Officers breached their duty when they wrongfully stopped, pursued and arrested Mr. Burley and Mr. Matthews.

29502. As a direct and proximate result of the wrongful acts of Mr. Jenkins and Mr. Guinn, the Decedent sustained severe and conscious pain and suffering, mental anguish and horrific pre-death fright, and other damages, all without any negligence on his part thereunto contributing.

29603. As a direct and proximate result of the wrongful acts of Mr. Jenkins and Mr. Guinn, Ms. Cain sustained severe and conscious pain and suffering, mental anguish and horrific pre-and post-impact fright, and other damages, all without any negligence on his part thereunto contributing.

29704. As a further direct and proximate result of the negligence of Mr. Jenkins and Mr. Guinn, the Plaintiffs suffered sorrow, grief, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of filial care, loss of attention, loss of advice, loss of counsel, loss of training, loss of guidance, and loss of services and support which Decedent could have and would have afforded and rendered had he continued to live.

### COUNT VII
### RESPONDEAT SUPERIOR
### (AGAINST THE BALTIMORE POLICE DEPARTMENT)

205.    Each paragraph of this Complaint is incorporated as if fully stated herein.

206.    At all times relevant hereto, the Officers were acting within the scope of their employment with the BPD, when they wrongfully stopped, pursued and arrested Mr. Burley and Mr. Matthews, which resulted in the death of Decedent and damages to Plaintiffs.

207.    The BPD is vicariously liable to Plaintiffs under the doctrine of *respondeat superior* for the acts and omissions of the Officers.

### COUNT VIII
### NEGLIGENT HIRING, RETENTION AND/OR SUPERVISION
### (AGAINST THE BALTIMORE POLICE DEPARTMENT)

208.    Each paragraph of this Complaint is incorporated as if fully stated herein.

209.    At all relevant times, the BPD had a duty to members of the public not to employ someone who posed an unreasonable risk to others.

210.    The BPD had a duty to use reasonable care to select employees who are competent and fit to perform the duties of officers of the law.

211.    The BPD breached their duty by failing to take adequate measures in selecting, supervising, retaining and training employees, including the Officers, who might foreseeably cause harm or injury to citizens of Baltimore.

212.    The BPD breached their duty by failing to investigate, discipline and fire the Officers after the BPD knew, or reasonably should have known, violated the constitutional rights of citizens of Baltimore.

213.    The BPD knew or should have known, by the exercise of due diligence and reasonable care, that the employees herein were performing illegal acts in the performance of their duties as police officers.

214.    The BPD had actual or constructive knowledge of the Officers' wrongful acts.

215.    The BPD breached their duty to use reasonable care to select and retain officers who are competent and fit for the position of officers of the BPD.

216.    This breach caused the Decedent's injuries and death, and caused the Plaintiffs' damages as set forth herein.

**COUNT VIIIX –
ARTICLE 24 OF THE MARYLAND CONSTITUTION –
DECLARATION OF RIGHTS
(AGAINST OFFICER DEFENDANTS AND
DEFENDANTS PALMERE, KNOERLEIN, FRIES, AND WILLARD)
(AGAINST ALL DEFENDANTS)**

298217.    Each paragraph of this Complaint is incorporated as if fully stated herein.

299218.    As described more fully above, Defendants violated the Decedent's and Ms. Cain's Due Process rights.

300~~219~~.     The Decedent's injury and death, and Ms. Cain's injuries, were a direct and

proximate result of the Officers' and BPD's wrongful acts.

301~~220~~.     As a result of the Decedent's death, Plaintiffs suffered and will continue to

suffer

sorrow, grief, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss

of companionship, loss of comfort, loss of protection, loss of filial care, loss of attention, loss of

advice, loss of counsel, loss of training, loss of guidance, and loss of services and support which

Decedent could have and would have afforded and rendered had he continued to live.

**COUNT VIII~~X~~ –**
**INDEMNIFICATION**
**(AGAINST BALTIMORE POLICE DEPARTMENT~~ALL DEFENDANTS~~)**

302~~221~~.     Each paragraph of this Complaint is incorporated as if fully stated herein.

303~~222~~.     Under Maryland law, public entities are directed to pay any tort judgment

for which

their employees are liable within the scope of their employment.

304~~223~~.     Mr. Jenkins, Mr. Guinn and Mr. Palmere are or were employees of the BPD,

who acted within the scope of their employment, and in accordance with accepted custom and

usage when committing the acts described herein.

305~~224~~.     Mr. Jenkins, Mr. Guinn and Mr. Palmere were acting pursuant to the BPD's

customs, usages, patterns and practices when they caused the events and damages alleged herein.

306~~225~~.     In all respects in which Mr. Palmere supervised and failed to supervise,

discipline and adequately train the Officers and other plainclothes officers, Mr. Palmere was acting

in the scope of his employment as the Officers' supervisor.

307~~226~~.     Accordingly, the BPD is required to indemnify any and all of the individual

defendants against whom judgments are entered in this case.

56

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, the Baltimore City Police Department, Wayne Earl Jenkins, Ryan Guinn, and Dean Palmere, and award Plaintiffs:

l.      Compensatory damages in an amount to be determined by a jury, attorneys' fees, pre-judgment and post-judgment interest, and costs against each Defendant, jointly and severally;

2.      Punitive damages against each Defendant; and

3.      Any other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury pursuant to FED. R. CIV. P. 38(b) on all triable issues.

Respectfully submitted,

_____/s/_____
Jonathan A. Azrael (Bar No. 01630)
jazrael@azraelfranz.com
Judson Lipowitz (Bar No. 05138)
jlipowitz@azraelfranz.com
John R. Solter, Jr. (Bar No. 27483)
jsolter@azraelfranz.com
Azrael, Franz, Schwab & Lipowitz, LLC
101 E. Chesapeake Avenue, 5th Floor
Baltimore, Maryland 21286
410-821-6800
*Attorneys for Plaintiff*