# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SHIRLEY JOHNSON, *et al.*,      \*

               \*

       Plaintiffs,      \*

               \*

v.                   \*      Civil Case No. SAG-18-2375

               \*

BALTIMORE POLICE DEPARTMENT,    \*

*et al.*,               \*

               \*

       Defendants.     \*

               \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>AMENDED MEMORANDUM OPINION</u>

This case is one of many filed in this District against current and former Baltimore Police Department ("BPD") officers, stemming from allegedly illegal conduct in plainclothes units within the BPD. On April 28, 2010, BPD officers allegedly ambushed Umar Burley and Brent Matthews, who were sitting in a car on Parkview Avenue in Baltimore City, Maryland. Fearing for their lives, Burley, the driver, sped away, and the officers gave chase. Several blocks later, with the officers in pursuit, Burley ran a stop sign, and crashed into a car driven by Elbert Davis, Sr. ("Davis" or "Decedent"). The crash killed Davis, and left his passenger, Phosa Cain ("Cain"), severely injured.

On August 2, 2018, Plaintiff Shirley Johnson, personally and as personal representative of the Estates of Davis, and of Cain, along with Plaintiffs Delores Davis, Mary Cox, Gloria Davis, Albert Cain, Elbert Davis, Jr., Anita Cain (the administrator of the Estate of Arthur Cain), and the Use of Gail Davis, Leroy Davis, and Elbert Lee Davis (collectively, "Plaintiffs") sued the BPD, along with Dean Palmere ("Palmere"), Wayne Jenkins ("Jenkins"), Ryan Guinn ("Guinn"), Richard Willard ("Willard"), William Knoerlein ("Knoerlein"), Michael Fries ("Fries"), and

Keith Gladstone ("Gladstone") (collectively, "Defendants"). ECF 1. Plaintiffs filed a Third Amended Complaint on August 16, 2019. ECF 57. Jenkins answered on October 4, 2019. ECF 64.

Before the Court are three Motions to Dismiss the Third Amended Complaint: one by the BPD and Palmere, ECF 63; one by Guinn, ECF 65; and one by Fries, Gladstone, Knoerlein, and Willard, ECF 66. The Court has reviewed each Motion, along with the related Oppositions and Replies thereto. *See* ECF 71 to 76. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, the Motions will be granted in part and denied in part.

## I.    FACTUAL BACKGROUND

The following facts from the Third Amended Complaint are accepted as true, and all reasonable inferences are drawn in Plaintiffs' favor. *See, e.g.*, *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

### A.    Defendants' Positions within the BPD

In 2010, the BPD employed each Defendant as a police officer. ECF 57, ¶ 21. At the time, Palmere led the Violent Crime Impact Section ("VCIS") within the BPD.[1] *Id.* ¶ 28; *see also id.* ¶¶ 169-70 (explaining that Palmere led the VCIS from 2008 to 2010, and still oversaw VCIS when, in 2010, he was promoted to the Chief of the Criminal Investigation Division, into which VCIS merged). Palmere later served as a Deputy Commissioner in the BPD from 2013 to 2018, overseeing all plainclothes units and the BPD's Patrol and Operations Bureaus. *Id.* ¶ 28. Palmere retired from the BPD in 2018. *Id.* ¶ 28.

In 2010, Fries was a Lieutenant in VCIS, and Willard and Knoerlein were both Sergeants. *Id.* ¶¶ 25-27. Fries, Willard, and Knoerlein therefore all held supervisory roles. *Id.* ¶ 133.

---

[1] Plaintiffs allege that VCIS was, at times, referred to as the Victim Crime Impact Division, or VCID. For ease of reference, the Court will refer to the unit as VCIS.

Plaintiffs allege that Jenkins, Gladstone, and Guinn ("the Officer Defendants") worked together in VCIS, under the supervision of Fries, Willard, Knoerlein, and Palmere. *Id.* ¶¶ 23-27, 133. Fries, Knoerlein, and Guinn are still BPD officers. *Id.* ¶¶ 22-28.

**B.      The BPD's Allegedly Unconstitutional Policing Practices in April, 2010**

Beginning in the "early 2000s," the BPD held a "widespread, persistent pattern and practice of unconstitutional police conduct, including illegal stops without probable cause or reasonable suspicion, illegal pursuits and arrests, and falsification of evidence by plainclothes officers regularly employed within the BPD." *Id.* ¶¶ 70, 80. The pattern of unconstitutional practices began, according to Plaintiffs, when the BPD first utilized "elite units comprised of plainclothes officers," including "flex squads" and "Special Enforcement Teams" ("SETs"), who had "wide latitude to investigate and arrest persons suspected of dealing drugs and/or gun violations." *Id.* ¶ 77. These officers, who drove unmarked cars, were often referred to as "knockers" or "jump out boys," because of their tendency to drive up to citizens, jump out of their cars, chase citizens, and conduct "aggressive illegal searches" of them. *Id.* ¶ 79. Plaintiffs recount a number of instances, leading up to 2010, in which BPD officers in units like VCIS raped, robbed, and even killed Baltimore residents while on duty. *Id.* ¶¶ 81-99.

Plaintiffs specifically allege previous instances of misconduct by Jenkins and Gladstone. *Id.* ¶¶ 107-130. Gladstone was involved in a 2003 incident that a federal judge held violated the arrestee's constitutional rights. *Id.* ¶ 108. Further, Plaintiffs allege that, upon information and belief, Gladstone had an internal affairs finding of misconduct upheld against him in 2004, and allowed confidential sources to keep drugs in exchange for information "on multiple occasions." *Id.* ¶¶ 109-10. Gladstone became Jenkins's "mentor" once they started working together in 2008. *Id.* ¶ 111.

Jenkins had a much more colored past. *Id.* ¶¶ 112-25. Plaintiffs allege that Jenkins "repeatedly crashed BPD-issued vehicles, damaging them and/or rendering them inoperable," and that he allegedly "went through as many as one department-issued vehicle per month." *Id.* ¶ 113. Plaintiffs also recount instances in which Jenkins assaulted a Baltimore resident, but incurred no departmental consequences, *id.* ¶ 117-20, and in which Jenkins fabricated evidence in order to incriminate an individual in 2008, *id.* ¶¶ 121-25. According to one of Jenkins's former colleagues on the Gun Trace Task Force ("GTTF"), "Jenkins was very reckless, you know. I mean, he was just out of control, putting citizens at risk, you know, driving on the side of the street, going in people bumpers. I just never saw anything like this . . . ." *Id.* ¶ 128.

Plaintiffs allege that Willard, Knoerlein, and Fries each "held supervisory roles within the plainclothes units in which the Officers worked." *Id.* ¶ 133. Beginning in 2004, Fries supervised Jenkins when Jenkins served on a SET, and knew of the "widespread abuse[s]" officers in that SET committed. *Id.* ¶ 134, 152. Plaintiffs allege that Fries selected Jenkins to join VCIS, which Fries supervised in 2006, despite "knowledge of Jenkins's prior misconduct." *Id.* ¶ 139. Fries was also Gladstone's supervisor in VCIS starting in 2008, and upon information and belief, was his supervisor when Gladstone committed misconduct prior to 2010, as well as during the April 28, 2010 incident giving rise to this lawsuit. *Id.* ¶¶ 140-41. Plaintiffs further allege that Knoerlein had "actual or constructive knowledge" of Jenkins's and Gladstone's prior instances of misconduct while supervising them, and that he supervised them during some of those instances, including the April 28, 2010 incident. *Id.* ¶¶ 143, 145-56. Willard also allegedly had "actual or constructive knowledge" of Jenkins's prior instances of misconduct before joining VCIS. *Id.* ¶¶ 147-48.

Despite knowing that their subordinate VCIS officers were "committing widespread abuse[s]," Plaintiffs allege that Willard, Knoerlein, and Fries took no steps "to report or remedy illegal conduct," and that this failure to properly investigate demonstrated "a gross disregard for the constitutional rights of the public." *Id.* ¶¶ 154-55. Plaintiffs also allege that Willard, Knoerlein, and Fries failed to properly train Jenkins and Gladstone, despite knowing about their history of misconduct, and also "encouraged plainclothes officers under their supervision . . . to violate the constitutional rights of Baltimore residents." *Id.* ¶¶ 156-57, 160. Willard, Knoerlein, and Fries encouraged VCIS officers to commit "overtime fraud," and to conduct illegal searches "to get as many guns off the street by whatever means necessary." *Id.* ¶¶ 161-62.

Palmere, as a high-ranking, senior command-level officer in the BPD, is alleged to have had "the authority and responsibility to discipline officers he knew had engaged in misconduct." *Id.* ¶ 166. Despite this, Palmere failed to take any actions to report or remedy illegal conduct. *Id.* ¶¶ 177-78, 182. For example, in 2005, Palmere, while serving on an officer's trial board, voted to only give the officer a "reduced sentence" for his actions in engaging in an unlawful search of a home, and later lying and saying that he had a warrant to search the home. *Id.* ¶ 167. With Palmere as head of VCIS, the unit saw "increased citizen complaints and widespread abuses," which included one incident that resulted in a $200,000 payout to the victim, and another in which three VCIS officers were charged with kidnapping two Baltimore City teenagers. *Id.* ¶ 169. Palmere also "assisted and coached former GTTF officer Jemell Rayam in the cover up of the fatal shooting of Shawn Cannady" in 2009. *Id.* ¶ 176. Jenkins was allegedly a "golden boy" and "prince" under Palmere, despite Palmere knowing of his previous instances of misconduct. *Id.* ¶¶ 178-180. Indeed, Palmere awarded Jenkins, and other BPD plainclothes officers, an achievement pin for their work in the plainclothes units. *Id.* ¶ 181.

Plaintiffs further allege a number of other instances of police misconduct that occurred under the BPD's watch prior to 2010. *E.g.*, *id.* ¶¶ 191-195. However, Plaintiffs allege that the BPD "provided no meaningful oversight of," and doled out no meaningful disciplinary actions against, Jenkins, Gladstone, and Guinn. *Id.* ¶¶ 199-200. Further, "[d]espite knowing of the recurrent misconduct by its plainclothes officers, [the] BPD failed to establish reasonable and necessary systems to train, supervise, investigate, and hold accountable those officers or to take the necessary steps to eliminate [plainclothes] units' culture of corruption" and ensure that officers did not engage in further misconduct. *Id.* ¶¶ 187, 204. Indeed, former Commissioner Kevin Davis "admitted that the BPD 'absolutely' should have known about the conduct of the GTTF officers and stated that, 'the culture here contributes to it.'" *Id.* ¶ 205.

Plaintiffs also allege that the BPD "did not institute any meaningful oversight of [its] specialized plainclothes units." *Id.* ¶ 215; *see also id.* ¶ 226. They allege that the BPD's Internal Affairs Division's ("IAD") procedures were deficient in a large number of respects, including, but not limited to: discouraging people from filing complaints; tolerating "excessive and chronic delays in resolving disciplinary complaints"; supervisors "misclassif[ying] serious complaints as minor ones" to avoid IAD involvement; failing to consider evidence contrary to an officer's report; and failing "to effectively discipline" those officers found to have engaged in misconduct. *Id.* ¶ 228; *see also id.* ¶¶ 227, 229-231. Plaintiffs allege that this failure to supervise and discipline officers properly, combined with the BPD's knowledge of the number of instances of officer misconduct, allowed a custom of unconstitutional policing to develop in the BPD's plainclothes units, and that the BPD "condoned" it by "willfully ignoring it." *Id.* ¶¶ 238, 240-44.

### C. The April 28, 2010 Incident

On April 28, 2010, Burley and Matthews were sitting in a vehicle parked in the 3800 block of Parkview Avenue in Baltimore City when Jenkins and a second officer, both in unmarked police vehicles, pulled behind Burley's vehicle "in an attempt to 'box him in.'" *Id.* ¶¶ 32-33. Jenkins and the other officer, who Plaintiffs allege was Guinn, approached Burley's vehicle with their guns drawn. *Id.* ¶ 34. Both officers were in plain clothes, and neither identified himself as a police officer. *Id.* Believing they were about to be robbed, Burley fled in his vehicle, and sped down Parkview Avenue towards Belle Avenue. *Id.* ¶¶ 35-36. Jenkins and the other officer gave chase, speeding through at least five stop signs, without activating their vehicles' emergency equipment. *Id.* ¶¶ 37-38.

At that same time, Davis and Cain were traveling in a vehicle heading eastbound on Gwynn Oak Avenue, towards Belle Avenue. *Id.* ¶ 39. Decedent, operating the car, approached the four-way intersection of Gwynn Oak and Belle Avenues, which was controlled by stop signs in each direction of travel. *Id.* Decedent brought his vehicle to a complete stop, and entered the intersection. *Id.* ¶¶ 39-40. Burley, still traveling at a high rate of speed, ran the stop sign controlling his direction of travel, and collided with Decedent's vehicle, on its driver's side door. *Id.* ¶¶ 41-42. Decedent passed away just hours later, and Cain sustained severe physical injuries. *Id.* ¶ 43.

Following the collision, Jenkins instructed Guinn to "call another officer and ask him to bring the 'stuff' or 'shit' in his car," which referred to a stash of illegal drugs. *Id.* ¶¶ 45-46. Jenkins, Gladstone, and Willard (who eventually arrived on the scene of the crash), planted thirty-two grams of heroin in Burley's vehicle, as a means of providing a lawful justification for the otherwise unlawful pursuit of Burley. *Id.* ¶¶ 46-48. Guinn was also present at the scene

during the planting of the heroin. *Id.* ¶ 47. A separate BPD officer, who was directed to search Burley's vehicle, found the heroin. *Id.* ¶ 49. Jenkins, Guinn, Gladstone, and Willard thereafter gave false statements to the investigating officer, and Jenkins also authored a false probable cause statement in support of criminal charges against Burley and Matthews. *Id.* ¶¶ 51-52, 54. Plaintiffs allege that this incident was a result of the illegal conduct by BPD plainclothes units that the BPD "condoned." *Id.* ¶¶ 240-42.

As a result of the incident, and based upon the false evidence and statements given by the Officer Defendants, Burley pled guilty in Maryland state court to vehicular manslaughter, and received a ten year prison sentence on August 10, 2011. *Id.* ¶ 55. Both Matthews and Burley also pled guilty to possession with intent to distribute heroin in this Court. *Id.* ¶¶ 56-57. Burley received a fifteen year prison sentence on August 18, 2011, to run concurrently with his state prison sentence. *Id.* ¶¶ 54, 57. On April 11, 2013, Shirley Johnson, Delores Davis, Gloria Davis, Mary Alice Cox, Leroy Davis, Decedent's Estate, Elbert Davis, Jr., Arthur Cain, Albert Cain, and the Use of Gail S. Davis filed suit against Burley in the Circuit Court for Baltimore City, Maryland.[2] *Johnson v. Burley*, No. 24-c-13-002083 (Cir. Ct. Balt. City Apr. 11, 2013), Docket Entry No. 1/0. On January 29, 2014, the court entered a judgment in favor of Plaintiffs in the amount of $1,092,500, against Burley. *Id.*, Docket Entry No. 18/0, 18/1.

## D. The Department of Justice Investigates the BPD Beginning in 2015, Eventually Leading to the Conviction of Defendant Wayne Jenkins and Seven Other BPD Officers

In April, 2015, then-Mayor Stephanie Rawlings-Blake asked the United States Department of Justice ("DOJ") to investigate the BPD's policies, patterns, and practices. *Id.* ¶

---

[2] Upon a Rule 12(b)(6) motion, the Court may consider "matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see* Fed. R. Evid. 201. "The most frequent use of judicial notice . . . is in noticing the content of court records." *Colonial Penn. Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) (citation omitted).

208. Out of that investigation came a report from the DOJ's Civil Rights Division ("the DOJ Report"), issued on August 10, 2016, detailing several instances of unconstitutional BPD police practices. *Id.* ¶¶ 209-10; *see also* ECF 1-1 (the DOJ Report). On January 12, 2017, the United States filed a civil complaint against the Baltimore Police Department. ECF 57, ¶ 211. That same day, the United States and the BPD entered a consent decree, providing for a full-scale review of the BPD's practices, and calling for additional training of its officers. *Id.* ¶ 212.

Just over one month later, on February 23, 2017, a federal grand jury indicted eight BPD officers in connection with their actions as members of the GTTF. *Id.* ¶ 189. The GTTF, a separate unit from VCIS, was formed in 2007, "with the stated goal of tracking and curbing illegal gun sales and gun activity." *Id.* ¶ 185. Among the GTTF officers indicted was Wayne Jenkins, who pled guilty to several of the indicted offenses on January 5, 2018. *Id.* ¶¶ 63, 189; *see also* Plea Agreement, *United States v. Jenkins*, Crim. No. CCB-17-638 (D. Md. Jan. 5, 2018), ECF 5.[3] Plaintiffs allege that Jenkins admitted that he

> knowingly concealed, covered up[,] and falsified entries in an official Statement of Probable Cause in the District Court of Maryland for Baltimore City reflecting his actions, and actions of his fellow BPD officers, in relation to the seizure of heroin from Mr. Burley's vehicle on April 28, 2010, with the intent to impede, obstruct[,] and influence the investigation of the events which [led] to the fatal car crash on April 28, 2010, and Mr. Burley and Mr. Matthews' subsequent arrest and conviction.

ECF 57, ¶ 64. As a result, Burley's and Matthews's convictions in federal and state court, stemming from the April 28, 2010 incident, were vacated. *Id.* ¶¶ 65-66. Most recently, however, the Circuit Court for Baltimore City rejected Burley's attempt to vacate the civil judgment rendered against him in January, 2014. *See Johnson*, No. 24-c-13-002083 (Cir. Ct. Balt. City

---

[3] Plea agreements, as public records filed in open court, are also subject to judicial notice. *See, e.g.*, *Drubetskoy v. Wells Fargo Bank, N.A.*, Civ. No. CCB-13-2196, 2013 WL 6839508, at *2 (D. Md. Dec. 20, 2013).

Nov. 22, 2019), Docket Entry No. 32/0.  Burley has since noted an appeal, *id.*, Docket Entry No. 33/0, and has filed his own suit against the BPD in this Court, *see generally Burley v. BPD*, No. SAG-18-1743 (D. Md. filed June 13, 2018).

### E. Plaintiffs' Instant Claims for Relief

On February 6 and February 7, 2018, Plaintiffs sent the Baltimore City Solicitor and the Treasurer of the State of Maryland, respectively, notice of Plaintiffs' claims.  ECF 57, ¶¶ 13-14.  As relevant here, Plaintiffs' Third Amended Complaint alleges that as a result of the unlawful pursuit of Burley, Decedent was severely injured and died, and that both he (in the moments prior to his death) and Cain suffered "severe physical and emotional pain."  *Id.* ¶¶ 248-49, 251.  Plaintiffs also allege that they suffered "extensive damages," including "pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship," and other noneconomic harms.  *Id.* ¶ 250.

Plaintiffs seek recovery of compensatory damages, punitive damages, and reasonable attorneys' fees based on eight claims for relief.  Count I alleges that Jenkins, Guinn, Gladstone, and Willard deprived Decedent, Cain, and all other Plaintiffs of their Fourteenth Amendment right to due process, in violation of 42 U.S.C. § 1983.  *Id.* ¶¶ 252-59.  Count II asserts that Palmere, Knoerlein, Fries, and Willard are liable under § 1983 for the same constitutional violations, under a supervisory liability theory.  *Id.* ¶¶ 260-66.  Count III alleges that the BPD is also liable under § 1983 for those constitutional violations, pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  *Id.* ¶¶ 267-277.  Count IV, brought only by Plaintiff Shirley Johnson, individually, as the daughter of Decedent, Delores Davis, Mary Cox, Gloria Davis, Albert Cain, Elbert Davis, Jr., and Anita Cain (administrator of Arthur Cain's estate), asserts a wrongful death action against all Defendants.  *Id.* ¶¶ 278-85.  Count V is a survival

action, brought only by Plaintiff Shirley Johnson, as representative of Decedent's Estate, for Decedent's "conscious pain and suffering, mental anguish, pre-death fright," and other damages. *Id.* ¶¶ 286-90. Count VI seeks to hold Defendants Jenkins, Guinn, Gladstone, and Willard liable in negligence. *Id.* ¶¶ 291-97. Count VII asserts that all Defendants, except the BPD, violated Decedent's and Cain's Due Process rights, as guaranteed by Article 24 of the Maryland Declaration of Rights, causing Plaintiffs damages. *Id.* ¶¶ 298-301. Finally, Count VIII seeks to compel the BPD to indemnify the individual Defendants, upon a finding of their liability to Plaintiffs. *Id.* ¶¶ 302-07.

## II. LEGAL STANDARDS

With the exception of Jenkins, Defendants have filed motions to dismiss the Third Amended Complaint, in its entirety, under Federal Rule of Civil Procedure 12(b)(6). ECF 63, 65, 66. A defendant is permitted to test the legal sufficiency of a complaint by way of a motion to dismiss. *See, e.g.*, *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Rule 8(a)(2), which provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Ashcroft v. Iqbal*, 556 U.S.

662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions.'"); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. ___, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d 435 at 440 (citations omitted); *see Semenova v. Maryland Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, a court is not required to accept legal conclusions drawn from the facts. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the

legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011),

*cert. denied*, 566 U.S. 937 (2012).

## III.    ANALYSIS

The pending motions seek to dismiss each Count of the Third Amended Complaint. First,

various Defendants assert immunity to certain Counts.   Palmere, Willard, Knoerlein, Fries,

Gladstone, and Guinn assert public official immunity to Plaintiffs' state law claims.  ECF 63-1 at

32-33; ECF 65 (Guinn's Motion, adopting certain portions of ECF 63-1); ECF 66 (Gladstone,

Willard, Knoerlein, and Fries's Motion, adopting certain portions of ECF 63-1).[4]   Palmere

asserts sovereign immunity to all state law claims in his official capacity, and to the § 1983 claim

against him.  ECF 63-1 at 21-23, 31.   The BPD likewise asserts sovereign immunity to the §

1983 claim against it.  *Id.* at 21-23.   Second, on the merits, Palmere, Willard, Knoerlein, Fries,

and the BPD argue that the § 1983 claims against them fail to state a claim.  *Id.* at 25-29, 31-32.

Third, Defendants assert three affirmative defenses:  (1) all of Plaintiffs' claims are time-barred;

(2) Plaintiffs failed to comply with the Local Government Tort Claims Act's notice provisions;

and (3) the rule prohibiting double recovery bars Plaintiffs' instant suit.  *Id.* at 5-19, 23-24.

Finally, the BPD argues that Plaintiffs' indemnification claim must be dismissed.  *Id.* at 29-31.

Before addressing these arguments, however, the Court must determine whether any of the

Exhibits attached to Palmere and the BPD's Motion may be considered at this stage.

### A.    Two of Defendants' Attached Exhibits are Improper for Consideration at the Rule 12(b)(6) Stage.

Defendants have attached six exhibits to their Motion.  While Plaintiffs do not challenge

their authenticity, they do challenge this Court's ability to take judicial notice of two of them:  a

---

[4] Because Fries, Gladstone, Guinn, Knoerlein, and Willard simply adopt the BPD and Palmere's arguments, ECF 65-66, the Court will just refer to Palmere and the BPD's Motion, ECF 63-1.

copy of a letter sent to Plaintiffs from their current counsel of record at the law firm Azrael, Franz, Schwab, & Lipowitz, LLC ("AFSL"), ECF 63-3; and a copy of a purported letter sent to Gail Davis by AFSL, ECF 63-5 (collectively, "the ASFL letters"). ECF 71 at 6-7.

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger*, 510 F.3d 442, 450 (4th Cir. 2007). However, a court may properly consider documents incorporated into the complaint or attached to the motion to dismiss, "so long as they are integral to the complaint and authentic." *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). As noted previously, the Court may also consider "matters of which a court may take judicial notice." *Tellabs, Inc.*, 551 U.S. at 322; *see* Fed. R. Evid. 201; *Zak v. Chelsea Theraputics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) (characterizing this as a "narrow exception" to the general rule that the Court's analysis must be limited to the four corners of the Complaint, and all documents integrated therein). Even when taking notice of such facts, the Court must still construe them in a light most favorable to Plaintiffs. *Zak*, 780 F.3d at 607.

Defendants argue that the AFSL letters "are public records, the authenticity of which is not in dispute," because they were included in the *Burley* state court file. ECF 74 at 1; *see also id.* at 1-2. Thus, according to Defendants, this Court may take judicial notice of all assertions made therein as facts that are not subject to reasonable dispute. This argument is misplaced. As an initial matter, the Court agrees with Plaintiffs that the two challenged exhibits are neither integral to the Complaint, nor expressly incorporated into it. The copies of the Memorandum

Opinion, ECF 63-6, and Judgment, ECF 63-2, from Plaintiffs' state court litigation against Burley, are the types of court records appropriate for judicial notice. *See, e.g.*, *Colonial Penn. Ins. Co.*, 887 F.2d at 1239. But Defendants improperly attempt to stretch this legal principle to the AFSL letters. While a court-generated document is unquestionably authentic, that authenticity does not *ipso facto* give this Court the ability to "accurately and readily" determine the accuracy of the assertions made in *any* document filed in court, like the AFSL letters. *See* Fed. R. Evid. 201. Because these two letters are neither integral to, nor expressly incorporated into, the Third Amended Complaint, the Court will exclude both, ECF 63-3 and ECF 63-5, from its consideration of all of Defendants' arguments in favor of dismissal.

**B.** **Outside of the Single Claim that Plaintiffs Concede Should Be Dismissed, Defendants' Assertions of Public Official Immunity Fail at this Stage.**

All Defendants named in Counts IV, V, and VI – Palmere, Willard, Fries, Knoerlein, Gladstone, and Guinn – assert that they have public official immunity to those claims. ECF 63-1 at 32-33. Plaintiffs concede that they have public official immunity to Count VI, the negligence claim. ECF 71 at 23; ECF 72 at 1 (adopting this concession); ECF 73 at 1 (same); ECF 80 (clarifying the scope of their concession). However, Defendants' argument in favor of dismissal appears to extend also to Counts IV and V, the Wrongful Death and Survival Action claims. *See* ECF 63-1 at 32-33. Plaintiffs offer no argument as to why those two claims are not subject to dismissal. *See generally* ECF 71-73. In effect, then, the Motions to Dismiss the wrongful death and survival action claims on public official immunity grounds are unopposed. Nevertheless, the Fourth Circuit has made clear that this Court retains an "obligation to review the motions to ensure that dismissal is proper," even though they are unopposed. *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416 n.3 (4th Cir. 2014).

Maryland courts have long recognized the common law doctrine of public official immunity. *E.g.*, *James v. Prince George's County*, 288 Md. 315, 323 (1980). Public official immunity is "generally applicable only in negligence actions or defamation actions based on allegedly negligent conduct." *Lee v. Cline*, 384 Md. 245, 258 (2004). The immunity typically applies in cases involving "a tort claim based upon [an] alleged mis-judgment or a negligent exercise of judgment," and is "intended to be a defense against claims that a 'better choice' could have been made." *Id.* at 261.

For public official immunity to apply, it must be shown that (1) the actor is a public official, "rather than a mere government employee or agent"; (2) the alleged tortious conduct "occurred while the actor was performing discretionary, as opposed to ministerial, acts"; (3) the actor committed the relevant acts "within the scope of his official duties." *Thomas v. City of Annapolis*, 113 Md. App. 440, 452 (1997). Police officers are "public officials" under Maryland law, *see, e.g.*, *Robinson v. Bd. of Cty. Comm'rs for Prince George's Cty.*, 262 Md. 342, 347 (1971), leaving only the final two elements at issue here.

Once those three conditions are met, "the public official enjoys a qualified immunity." *Thomas*, 113 Md. App. at 452. That immunity is defeated if the actor performed the relevant acts with "malice," *id.*, acts with "gross negligence," *Cooper v. Rodriguez*, 443 Md. 680, 723 (2015), commits an intentional tort, *Houghton v. Forrest*, 412 Md. 578, 586, 588 (2010), or commits a state constitutional tort, *Ritchie v. Donnelly*, 324 Md. 344, 370 (1991). "Actual malice is established by proof that the defendant-officer 'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'" *Bord v. Baltimore County*, 220 Md. App. 529, 557 (2014) (quoting *Town of Port Deposit v. Petetit*, 113 Md. App. 401, 416 (1997));

*see also Hines v. French*, 157 Md. App. 536, 562-63 (2004) (characterizing this definition as the standard for "malice" for the purposes of public official immunity). Gross negligence, on the other hand, is

> an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he [or she] inflicts injury intentionally or is so utterly indifferent to the rights of others that he [or she] acts as if such rights did not exist.

*Cooper*, 443 Md. at 708 (quoting *Barbre v. Pope*, 402 Md. 157, 187 (2007)). Whether one acted with malice or gross negligence is typically a fact-dependent determination. *See id.* at 708-09; *Artis v. Cyphers*, 100 Md. App. 633, 653-54 (1994).

First, as to Gladstone and Guinn, their claims of public official immunity fail at this stage. Their actions are only considered to be within their "discretionary functions" "if the decision which involves an exercise of personal judgment also includes, to more than a minor degree, the manner in which the police power of the State should be utilized." *James*, 288 Md. at 327. Indeed, "*when they are within the scope of their law enforcement functions*," police officers "are clearly acting in a discretionary capacity." *Robinson*, 262 Md. at 347 (emphasis added). Here, however, Plaintiffs have sufficiently alleged that Jenkins, Gladstone, and Guinn had no reason at all to initiate their pursuit of Burley and Matthews. *See* ECF 57, ¶¶ 32-38. In fact, taking Plaintiffs' allegations as true, the Officer Defendants needed to plant drugs in Burley's car, provide false statements after the fact, and author false police reports, in order to justify their actions. *See id.* ¶¶ 44-53. This criminal course of conduct led, in part, to Jenkins pleading guilty to a RICO offense in this Court. *See id.* ¶¶ 63-64, 189; *see also* Plea Agreement, *Jenkins*, Crim. No. CCB-17-638 (D. Md. Jan. 5, 2018), ECF 5. Further, even if these actions are considered to

be within the scope of their duties as law enforcement officers, those allegations give rise to the reasonable inference that Guinn and Gladstone acted with at least gross negligence. If these facts are proven at trial, this case falls far from the typical public official immunity case in which the public official made a simple misjudgment. *See Lee*, 384 Md. at 261. Therefore, at the current stage of the proceedings, Guinn and Gladstone's assertions of public official immunity fail.

Second, as to Palmere, Willard, Fries, and Knoerlein, the Third Amended Complaint similarly contains sufficient factual allegations to permit the reasonable inference that they acted with gross negligence in supervising the Officer Defendants. Even assuming that their failure to properly supervise and discipline the Officer Defendants constitutes a "discretionary act" within the scope of their duties, as discussed more fully in Section III.E.2.i, *infra*, Plaintiffs have alleged facts that, taken as true, show that Palmere, Willard, Knoerlein, and Fries acted with a deliberate indifference towards a pervasive and unreasonable risk of constitutional harm to citizens like Decedent and Cain. Defendants' reliance on *Baltimore Police Dep't v. Cherkes*, 140 Md. App. 282, 330-31 (2001), is unavailing, because the complaint in that case was "utterly devoid of any factual foundation" to support a finding of malice. Accordingly, the remaining state law claims against Palmere, Willard, Knoerlein, and Fries will proceed to discovery.

### C. Neither Palmere Nor the BPD Has Sovereign Immunity to the Claims of Supervisory Liability or *Monell* Liability, Respectively

Next, Palmere and the BPD argue that they enjoy sovereign immunity as to Counts II and III, Plaintiffs' § 1983 claims against them. ECF 63-1 at 21-23; ECF 74 at 9. In three recent decisions, all of which are currently before the Fourth Circuit, United States District Judges in this District have rejected that contention. *See Burley v. Balt. Police Dep't*, __ F. Supp. 3d __, No. ELH-18-1743, 2019 WL 6253251, at *27-29 (D. Md. amended Nov. 22, 2019), *appeal docketed and consolidated*, No. 19-2029 (4th Cir. Sept. 27, 2019); *Lucero v. Early*, No. GLR-13-

1036, 2019 WL 4673448, at *3-5 (D. Md. Sept. 25, 2019), *appeal docketed*, No. 19-2072 (4th Cir. Oct. 4, 2019); Order, *Parks v. Balt. Police Dep't*, No. TDC-18-3092 (D. Md. Sept. 9, 2019), ECF 86, *appeal docketed and consolidated*, No. 19-2029 (4th Cir. Sept. 27, 2019). Having deemed the rationales in those decisions persuasive, this Court hereby adopts them, and concludes that the BPD and Palmere are not entitled to sovereign immunity from Plaintiffs' § 1983 claims, at this stage in the litigation. However, should the Fourth Circuit issue an opinion in those cases to the contrary, this Court will entertain a motion for reconsideration on this issue.

### D. Plaintiffs Concede that Palmere Has Sovereign Immunity to their State Law Negligence Claims

Finally, notwithstanding the fact that Palmere lacks sovereign immunity as to the § 1983 claim, Plaintiffs concede that Palmere has sovereign immunity as to the state law claims brought against him in his official capacity. ECF 71 at 21. Accordingly, Counts IV, V, and VI, against Palmere, in his official capacity, will be dismissed with prejudice.

### E. The Estates of Decedent and Cain Plausibly Allege a Claim of Supervisory Liability under § 1983

Next, Defendants Palmere, Willard, Knoerlein, and Fries argue that Plaintiffs fail to plausibly allege a theory of supervisory liability under § 1983. ECF 63-1 at 31-32; ECF 74 at 5-7 & n.2. First, these Defendants assert that Plaintiffs do not properly allege a violation of their constitutional rights. ECF 63-1 at 25, 32. Second, they contend that Plaintiffs fail to "plead a connection between the alleged pattern and practice and the alleged violation of constitutional rights in their specific case." ECF 74 at 5. As discussed *infra*, only the Estates of Decedent and Cain have plausibly alleged a theory of supervisory liability.

1.      <u>Only the Estates of Decedent and Phosa Cain Have Plausibly Alleged a Constitutional Violation</u>

If any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives a United States citizen of any constitutional right, he may be liable in a suit for money damages. 42 U.S.C. § 1983 (2018). Necessarily, then, Plaintiffs must first plausibly allege two prerequisites for supervisory and *Monell* liability: (1) that Defendants were acting "under color of state law"; and (2) that their conduct deprived them of the "rights, privileges, or immunities secured by the Constitution or laws of the United States." *Temkin v. Frederick Cty. Comm'rs*, 945 F.2d 716, 720 (4th Cir. 1991) (citation omitted). Defendants make no argument that the officers involved were not acting under color of state law.

As noted at the outset, there are two groups of Plaintiffs in this case. First, Plaintiff Shirley Johnson sues as Personal Representative of the Estates of Decedent and Cain, respectively ("the Estates"). ECF 57, ¶¶ 15-16. The second group, including Shirley Johnson in her individual capacity, is comprised entirely of the adult children of the Decedent and Cain. *Id.* ¶ 17. The constitutional rights violations asserted by each group are addressed in turn.

    i.    *The Third Amended Complaint Sufficiently Alleges Conduct by the Officer Defendants that "Shocks the Conscience," Plausibly Demonstrating a Violation of Decedent's and Cain's Substantive Due Process Rights*

The Estates assert that the actions of the Officer Defendants deprived them of their right to life and liberty without due process of law, in violation of the Due Process Clause of the Fourteenth Amendment. ECF 57, ¶ 256; *see* U.S. CONST. amend. XIV. Substantive due process violations are actionable under § 1983. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Indeed, the Due Process Clause was intended "to prevent the government 'from abusing [its] power, or employing it as an instrument of oppression.'" *DeShaney v. Winnebago Cty. Dep't of Soc.*

*Servs.*, 489 U.S. 189, 196 (1989) (quoting *Davidson v. Cannon*, 474 U.S. 344, 348 (1986)). The question remains whether the Estates have properly alleged such a violation.

In cases like this, which allege unconstitutional action by an arm of the executive branch of government, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" such that a substantive due process violation lies. *County of Sacramento v. Lewis*, 532 U.S. 833, 846 (1998) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)). Specifically, the Supreme Court in *Lewis* reaffirmed that only official conduct that "shocks the conscience" will give rise to a substantive due process violation. *Id.* at 846-47; *see also, e.g.*, *United States v. Salerno*, 481 U.S. 739, 746 (1987) ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.'" (citations omitted)); *Temkin v. Frederick Cty. Comm'rs*, 945 F.2d 716, 720 (4th Cir. 1991) ("[C]onduct which 'amount[s] to a brutal and inhumane abuse of official power literally shocking to the conscience,' violates the substantive guarantees of the Due Process Clause . . . ." (quoting *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980))). The "most likely" sort of conduct to "shock the conscience," the Court noted, was "conduct intended to injure in some way unjustifiable by any government interest." *Lewis*, 532 U.S. at 849 (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

Defendants urge that the facts underlying the Supreme Court's decision in *Lewis* compel a finding that the Estates have not plausibly alleged a violation of the Due Process Clause. ECF 74 at 5 n.5. In *Lewis*, the parents and representatives of the estate of Philip Lewis sued Sacramento County, its Sheriff's Department, and the Sheriff's Deputy involved in Philip's death. 532 U.S. at 837. Philip Lewis died after a Sacramento County Sheriff's Deputy initiated a traffic stop of the motorcycle Lewis was riding on, because the motorcycle was traveling at a

high rate of speed.  *Id.* at 836-37.  The operator of the motorcycle, Willard, led the Deputy on a high-speed chase through a residential neighborhood, at times reaching speeds of up to 100 miles per hour.  *Id.* at 837.  The motorcycle eventually crashed, and the Deputy, unable to stop in time, crashed directly into Lewis, who was pronounced dead at the scene.  *Id.*

After elucidating the appropriate "shock the conscience" standard for the claim that Lewis was deprived of his life, in violation of the Fourteenth Amendment, the Supreme Court considered the routine application of that standard to law enforcement officers' engagement in high-speed chases.  *Id.* at 851-54.  Considering the *ad hoc* judgments facing law enforcement officers engaging in such pursuits, the Court held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight," ordinarily, do not "shock the conscience." *Id.* at 854.  But in a footnote, the Court observed that there may be a different result if "a citizen suffers or is seriously threatened with physical injury due to a police officer's *intentional misuse* of his vehicle."  *Id.* at 854 n.13 (quoting *Checki v. Webb*, 785 F.2d 534, 538 (5th Cir. 1986)).

Applying those standards, the Court held that the Deputy's action did not shock the conscience.  *Id.* at 854-55.  According to the Court, the Deputy "was faced with a course of lawless behavior" for which he bore no blame.  *Id.* at 855.  He did "nothing to cause Willard's high-speed driving in the first place . . . and nothing (beyond a refusal to call off the chase) to encourage him to race through traffic at breakneck speed."  *Id.* Though "prudence would have repressed" the Deputy's decision to continue the chase, the Court reasoned that his "instinct was to do his job as a law enforcement officer, not to induce Willard's lawlessness, or to terrorize, cause harm, or kill."  *Id.*  Accordingly, the Court held that the Deputy's actions failed to violate Lewis's substantive due process rights.  *Id.*

To be sure, there is a long line of cases holding that a police officer's engaging in a high-speed pursuit, eventually leading to the death of an innocent bystander uninvolved in the pursuit, is not, by itself, conscience-shocking behavior. *See, e.g.*, *Meals v. City of Memphis*, 493 F.3d 720, 723-24, 730-31 (6th Cir. 2007); *Slusarchuk v. Hoff*, 346 F.3d 1178, 1180-81, 1183 (8th Cir. 2003); *Onossian v. Block*, 175 F.3d 1169, 1170, 1172 (9th Cir. 1999); *Fagan v. City of Vineland*, 22 F.3d 1296, 1299-1300, 1307-08 (3d Cir. 1994) (en banc); *Temkin*, 945 F.2d at 718, 723.

If there were ever a case whose facts almost precisely fit the contours of the *Lewis* Court's narrow definition of a police chase that might shock the conscience, Plaintiffs have alleged it. Plaintiffs have alleged that Jenkins and Guinn, dressed in plainclothes and without observing any suspicious or ongoing criminal conduct, attempted to maneuver their BPD-issued, unmarked police vehicle to "box in" the car Burley and Matthews occupied. ECF 57, ¶¶ 33-34. Burley, fearing for his and Matthews's lives, was able to escape the "box in," and speed down Parkview Avenue. *Id.* ¶¶ 36-37. Instead of ending the failed effort to illegally seize Burley and Matthews, Plaintiffs allege that Jenkins and Guinn sped after them down residential streets, running stop signs in five different intersections, without ever activating their vehicles' emergency equipment. *Id.* ¶¶ 36-38. This chase only ended once Burley struck Decedent's car at Gwynn Oak Avenue and Belle Avenue. *Id.* ¶¶ 39-42.

Considering these facts, as well as all reasonable inferences drawn therefrom, it is plausible that Guinn and Jenkins were not driven by their "instinct to do [their] job as a law enforcement officer," but instead by "an improper or malicious motive," such as to "terrorize, [or] cause harm" to Burley and Matthews. *Lewis*, 532 U.S. at 855. Indeed, the facts alleged plausibly demonstrate an instance in which two citizens "suffer[ed] . . . physical injury due to a police officer's *intentional misuse* of his vehicle," not just injury due to mere negligence, or even

gross negligence.  *Id.* at 854 n.13 (quoting *Checki*, 785 F.2d at 538).  That conclusion is only

fortified by the allegations that the Officer Defendants falsified police reports, and planted drugs

in Burley and Matthews's car, in order to provide a *post hoc* justification of their pursuit.  ECF

57, ¶¶ 44-53.  This case therefore stands in stark contrast to *Lewis*, and all other cases cited

above, because in each of those cases, the defendant officers at least had probable cause to

initiate the high-speed chases.  *Compare with Lewis*, 523 U.S. at 854-55; *Meals*, 493 F.3d at

723-24, 730-31; *Slusarchuk*, 346 F.3d at 1180-81, 1183; *Onossin* 175 F.3d at 1170, 1172;

*Fagan*, 22 F.3d at 1299-1300, 1307-08; *Temkin*, 945 F.2d at 718, 723.

As a final point, in a single sentence of a footnote in their Reply, Defendants assert that

there cannot be any constitutional violation here, per *Lewis*, because "is no allegation that any of

the Defendants intended to harm the Plaintiffs, or that they intentionally caused their injuries."

ECF 74 at 5.  This argument fails.  As previously stated, *Lewis* held "that high-speed police

chases with no intent to harm suspects physically or to worsen their legal plight do not give rise

to liability under the Fourteenth Amendment, redressable by an action under § 1983."  523 U.S.

at 854.  Though the Fourth Circuit has not directly addressed this precise issue, the weight of

authority post-*Lewis* holds that the "intent to harm" standard applies to substantive due process

claims arising out of police chases, whether the claim is brought by the target of the chase, or an

innocent bystander.[5]  *E.g.*, *Ellis ex rel. Estate of Ellis v. Ogden City*, 589 F.3d 1099, 1102-03

---

[5] In *Bringue v. Prunchak*, the Ninth Circuit recognized that there remained some uncertainty
whether *Lewis* required that the "intent to harm" standard apply to every claim arising out of a
police chase.  512 F.3d 1169, 1175-76 (9th Cir. 2008).  Some courts have held that a plaintiff
need only show that an officer acted with "deliberate indifference" for a due process violation to
lie, if there was a sufficient opportunity to deliberate prior to acting.  *See Rivas v. City of
Passaic*, 365 F.3d 181, 195-96 (3d Cir. 2004); *Ewolski v. City of Brunswick*, 287 F.3d 492, 510-
13 (6th Cir. 2002); *Radecki v. Barela*, 146 F.3d 1227, 1231-32 (10th Cir. 1998).  It is worth
noting that if there was a sound basis in law for applying a "deliberate indifference" standard in
some police chase cases, the instant case would likely qualify as one such case.  As alleged here,

(10th Cir. 2009); *Helseth v. Burch*, 258 F.3d 867, 872 (8th Cir. 2001) (en banc); *Onossian*, 175 F.3d at 1171-72; *Davis v. Township of Hillside*, 190 F.3d 167, 170 n.2 (3d Cir. 1999). Notably, in none of these cases did a court reject a bystander's substantive due process claim because the police did not intend to harm *them*; rather, the claims all failed because of the claimant's inability to demonstrate that the relevant officer had no intent to harm the target of the pursuit. *See also Meals*, 493 F.3d at 730-31; *Slusarchuk*, 346 F.3d at 1180-81, 1183; *Onossian* 175 F.3d at 1172. An officer's actions motivated by an intent to harm a suspect are no less conscience shocking, whether the resulting harm accrues to the intended target (the suspect), or an innocent third party.

Accordingly, the Estates have plausibly alleged conscience-shocking conduct that caused Decedent and Cain to suffer serious physical injury and death, in violation of the substantive due process rights the Fourteenth Amendment guarantees.

> ii.   *The Remaining Plaintiffs Have Not Alleged a Violation of a Recognized Due Process Right*

In Count III of the Third Amended Complaint, which asserts that the BPD is liable under *Monell*, Decedent's children allege that as a result of the BPD's unconstitutional policy, custom, pattern, and practices, they "suffered pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of parental care, loss of attention, loss of advice, loss of counsel, loss of training, loss of guidance, and loss of services." ECF 57, ¶ 277. Notably, these allegations are not included in Count II, the supervisory liability count. *See id.* ¶¶ 260-66.

---

the Officer Defendants had no basis in law for engaging in the initial stop of Burley and Matthews. None of the concerns the Supreme Court detailed in *Lewis* regarding the *ad hoc* decisionmaking needed in emergency, high-speed pursuits, are implicated on these facts. *See* 523 U.S. at 852-54. This Court need not reach the issue, however, because even under the higher "intent to harm" standard, the Estates have plausibly alleged a constitutional harm.

Reading these allegations in a light most favorable to them, Decedent's children appear to allege that their substantive due process rights were violated because the Officer Defendants' actions, and the BPD's condonation of such conduct as a matter of custom or policy, deprived them of the continued companionship of, and support from, their father. Indeed, this must be the case, for without a violation of Decedent's children's constitutional rights, the BPD can have no *Monell* liability under § 1983. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."). This claim fails as a matter of law.

In *Cook v. Howard*, United States District Judge J. Frederick Motz considered such a substantive due process claim made by the parents and children of a man, Cook, who was allegedly killed as a result of unlawful BPD police action. No. JFM-10-cv-0332, 2011 WL 2118652, at *1, *5-6 (D. Md. May 27, 2011). Cook's parents and children argued that they had a "constitutional liberty interest in continued association and support of [Cook]." *Id.* at *6. Judge Motz rejected this claim, because "[t]he Fourth Circuit does not recognize that cause of action." *Id.* (citing *Shaw v. Stroud*, 13 F.3d 791, 804-05 (4th Cir. 1994)). On appeal, the Fourth Circuit affirmed this ruling for the exact same reason:

> As we recognized in *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), "the Supreme Court has never extended the constitutionally protected liberty interest incorporated by the Fourteenth Amendment due process clause to encompass deprivations resulting from governmental actions affecting the family only incidentally." *Id.* at 805. We declined to sanction such a claim in *Shaw*, and we adhere to that precedent. *See id.*

*Cook v. Howard*, 484 F. App'x 805, 825 (4th Cir. 2012) (per curiam), *cert. denied*, 568 U.S. 1230 (2013). Thus, here, because Decedent's children allege (conscious-shocking) BPD conduct that "only incidentally" affected their familial association with their father, Decedent's children's

fail, as a matter of law, to allege a violation of their own constitutional rights. *Id.* To the extent Decedent's children assert a § 1983 claim in Count II, it must be dismissed with prejudice.[6]

        2.    <u>The Estates Plausibly Allege that Fries, Knoerlein, Willard, and Palmere Are Liable as Supervisors</u>

The Estates seek to hold Fries, Knoerlein, Willard, and Palmere liable under § 1983 as supervisors. It is well settled that, under § 1983, "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). Technically, "the term 'supervisory liability' is a misnomer," because supervisory officials can only be liable "for his or her own misconduct"; supervisors cannot have § 1983 liability under a *respondeat superior* theory. *Iqbal*, 556 U.S. at 677; *accord Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) (citing *Monell*, 436 U.S. at 691).

"Supervisory liability" exists only to address those cases in which a supervising authority's "indifference or tacit authorization of subordinates' misconduct may be a causative factor" in constitutional harm suffered at the hand of those subordinates. *Slakan*, 737 F.2d at 372-73. Specifically, plaintiffs alleging supervisory liability must show:

(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;

(2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and

(3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

_____

[6] The parties have not argued, and the Court therefore does not address, whether this conclusion, and the conclusion regarding the Estates' substantive due process rights plausibly having been violated, *see supra* Section III.E.1.i, apply equally to Plaintiffs' claims for relief under Article 24 of the Maryland Declaration of Rights.

*Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (alteration omitted) (quoting *Shaw*, 13 F.3d at 799). Whether supervisory liability exists "is ordinarily [an issue] of fact, not law." *Shaw*, 13 F.3d at 799.

Fries, Willard, Knoerlein, and Palmere argue that the Estates have failed to plausibly establish each of these elements, because "[t]he allegations purport to show knowledge of wrongful arrests, searches, and seizures, not the type of alleged violations at issue *in this case*." ECF 63-1 at 32. As demonstrated below, this argument is unpersuasive.

> i. *The Estates Have Plausibly Alleged that Fries, Knoerlein, Willard, and Palmere Were Deliberately Indifferent to Conduct by the Officer Defendants Posing an Unreasonable, Pervasive Risk of Constitutional Harm to Citizens Like the Estates*

Because the first two elements of supervisory liability are intertwined, the Court analyzes them together. *See Shaw*, 13 F.3d at 799 n.12. As to the first element, the Estates must allege facts showing that the Officer Defendants' conduct "is widespread, or at least has been used on several different occasions[,] and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Wilkins*, 751 F.3d at 226 (quoting *Shaw*, 13 F.3d at 799). The second element, the supervisors' deliberate indifference to the alleged offensive practices, can be established "by demonstrating a supervisor's continued inaction in the face of documented widespread abuses." *Id.* (quoting *Shaw*, 13 F.3d at 799). In *Slakan*, the Fourth Circuit explained how a plaintiff meets the "heavy burden" to show deliberate indifference:

> Ordinarily, [the plaintiff] cannot satisfy his burden of proof by pointing to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities. Nor can he reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct. A supervisor's continued inaction in the face of documented widespread abuses, however, provides an independent basis for

finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates.

737 F.2d at 373 (internal citation omitted).

The Estates have plausibly alleged these first two elements. Like Burley and Matthews in their Second Amended Complaint, *see Burley*, 2019 WL 6253251, at *36-38, the Estates have alleged that both Jenkins and Gladstone have numerous documented instances of misconduct, including, but not limited to, previous unlawful arrests, allowing informants to keep illicit controlled substances, excessive use of force, and fabrication of evidence. *See* ECF 57, ¶¶ 108-25; *see also supra* Section I.B. Fries, Knoerlein, and Willard were all supervising Jenkins and Gladstone when Jenkins and Gladstone committed documented instances of misconduct in the VCIS, and are alleged to have had actual or constructive knowledge of their misconduct prior to joining the VCIS. ECF 57, ¶¶ 133-34, 139-48. Indeed, the Estates allege that Fries supervised Jenkins when he committed instances of misconduct prior to their time in the VCIS, and still specifically chose Jenkins to join the VCIS. *Id.* ¶¶ 135-39. Willard is even alleged to have been present at the April, 2010 crash scene when Jenkins, Gladstone, and Guinn planted the drugs in Burley's vehicle. *Id.* ¶ 149. Finally, Fries, Knoerlein, and Willard are further alleged to have known about the misconduct committed by other VCIS members, including the repeated instances of misconduct by Officer Jemell Rayam, who, in 2009, was involved in the fatal shooting of a citizen (his third in the span of twenty months), and a robbery of two citizens. *Id.* ¶¶ 95-96, 153. Despite all of this knowledge, Fries, Willard, and Knoerlein "failed to adequately train, investigate, supervise, or discipline" their subordinates, and in fact "encouraged" them "to violate the constitutional rights of Baltimore residents." *Id.* ¶¶ 157-60.

Taking these facts as true, as well as all others referenced in the Third Amended Complaint, the Court finds that they are sufficient to demonstrate that Fries, Knoerlein, and

Willard were deliberately indifferent to a pervasive pattern of misconduct by the Officer Defendants, which posed an unreasonable risk of constitutional harm to the citizens of Baltimore. *See Burley*, 2019 WL 6253251, at *36-38.

The Estates have also plausibly alleged these first two elements vis-à-vis Palmere. Palmere began supervising plainclothes units in the BPD in 2006, was named the head of VCIS in 2008, and led that unit until 2013. ECF 57, ¶¶ 168-71. He is alleged to have had both "the authority and responsibility to discipline officers he knew engaged in misconduct," and actual or constructive knowledge of VCIS officers' misconduct. *Id.* ¶¶ 166, 177-78. However, Palmere condoned the conduct, and failed to take any steps "to report or remedy" it. *Id.* ¶¶ 175, 182. In addition to the instances previously described, the Estates point to the 2005 vote Palmere cast for a reduced internal punishment for an officer who engaged in, and lied about, an unlawful search, and how, in 2009, Palmere "assisted and coached former GTTF officer Jemell Rayam in the cover up of the fatal shooting of Shawn Cannady." *Id.* ¶¶ 167, 176; *see also id.* ¶ 169 (discussing how Palmere had direct oversight of three officers who kidnapped two Baltimore City teenagers in 2010). Instead of reprimanding officers like Rayam and Jenkins, Palmere approved of their tactics through service awards. *Id.* ¶¶ 97, 181. These allegations are also sufficient to demonstrate Palmere's deliberate indifference to the pervasive misconduct engaged in by officers of BPD plainclothes units, including VCIS officers Jenkins, Gladstone, and Guinn. *See Burley*, 2019 WL 6253251, at *37-38.

Fries, Knoerlein, Willard, and Palmere's primary objection is that there are no allegations to show that they were deliberately indifferent to widespread instances of the constitutional violations alleged here – substantive due process violations. ECF 63-1 at 32. This argument is unpersuasive. Whether a supervisor was deliberately indifferent to a course of conduct that

posed an unreasonable risk of constitutional harm to a *group of citizens* is a distinct question from whether that course of conduct is causally connected to the plaintiff's *particular* harm. *See Wilkins*, 751 F.3d at 226. The Estates have plausibly alleged that the Officer Defendants targeted and pursued essentially anyone that they believed, in their "discretion," to be involved in drug- and/or gun-related offenses. In doing so, the Officer Defendants plausibly engaged in conduct posing unreasonable risk of constitutional harm to citizens *like* Decedent and Cain – citizens of Baltimore. The more difficult question is whether Fries, Knoerlein, Willard, and Palmere's deliberate indifference to that conduct was the legal cause of the *particular* constitutional harm Decedent and Cain suffered. *See id.* It is this question that Fries, Knoerlein, Willard, and Palmere improperly attempt to merge into the Court's initial analysis of whether they were deliberately indifferent to some unconstitutional policy or custom by the Officer Defendants.

      ii.     *Fries, Knoerlein, Willard, and Palmere's Deliberate Indifference Is Plausibly Causally Connected to the Estates' Harms*

Turning to that causation issue, because the Estates do not have any proof of direct causation (i.e., that any BPD policy directly "command[ed] the injury" the Estates suffered), the Estates must demonstrate causation according to "the tort principle that holds a person liable for the natural consequences of his actions." *Id.* (quoting *Shaw*, 13 F.3d at 799); *Wellington v. Daniels*, 717 F.2d 932, 936 (1983). Pursuant to those well-established tort principles, a supervisor will be liable if he "proximately caused a violation of the plaintiff's rights by doing something or failing to do something he should have done." *Shaw*, 13 F.3d at 799 (citing *Spell v. McDaniel*, 591 F. Supp. 1090, 1109-10 (E.D.N.C. 1984)); *id.* at 800 ("In *Slakan*, we determined that the causal link in § 1983 cases is analogous to proximate cause."); *see also, e.g.*, *Bodine v. Warwick*, 72 F.3d 393, 400 (3d Cir. 1995) (Alito, J.) (noting that, "under basic principles of tort law," an officer's § 1983 liability will only extend to "the harm 'proximately' or 'legally' caused

by their tortious conduct" (citing Restatement (Second) of Torts §§ 431, 871 cmt. 1 (Am. Law Inst. 1965 & 1979))).

Defendants' point that the alleged unconstitutional practices concern not the deprivation of substantive due process rights, but rather the fabrication of evidence, and the violations of citizens' right to be free from unlawful searches and seizures, is well taken. *See* ECF 63-1 at 28-29, 32. The law, however, is clear that if supervising officers have actual or constructive knowledge that their subordinate officers are engaging in a pattern of conduct that poses an unreasonable risk of constitutional harm, then the supervising officers are liable for any constitutional harm that is the "natural consequence[]" of – or, in other words, proximately caused by – the supervising officer's deliberate indifference. *Shaw*, 13 F.3d at 799. Defendants have not cited to, nor could the Court independently discern, any precedent to support the notion that a supervising officer can evade § 1983 liability because the pattern of misconduct he has been deliberately indifferent to caused a different kind of constitutional harm than it typically does, even though that constitutional harm was reasonably foreseeable from his subordinate's course of conduct.

Though a close question, on the current record, and drawing all factual inferences in a light most favorable to the Estates, the Court concludes that Fries, Knoerlein, Willard, and Palmere's deliberate indifference to the Officer Defendants' conduct has an "affirmative causal link" to the particular substantive due process violations the Estates suffered. *Shaw*, 13 F.3d at 799. The Estates have plausibly alleged that, as relevant here, the Officer Defendants engaged in tactics that involved "driving unmarked vehicles towards groups of people, jumping out of their vehicles, chasing Baltimore residents, and conducting aggressive illegal searches of persons in the vicinity," ECF 57, ¶ 79, and that Fries, Knoerlein, Willard, and Palmere had knowledge of

these tactics, *id.* ¶¶ 70-72, 91, 103.  Reading all facts in a light most favorable to the Estates, Defendants' failure "to investigate, or even to address, the pervasive" misconduct by the Officer Defendants is, plausibly, a proximate cause of Burley's crash into Decedent's car.  While the facts adduced in discovery may later call this into question, at this stage, the Court cannot say that, as a matter of law, that there exists any superseding intervening factor that breaks the causal chain leading to the Estates' alleged constitutional deprivations.  Accordingly, Fries, Knoerlein, Willard, and Palmere's Motion to Dismiss Count II will be denied as to the Estates, but granted as to Decedent's children.

F.      **The Estates of Decedent and Cain Plausibly Allege a Claim of *Monell* Liability under § 1983**

The BPD similarly contends that the Third Amended Complaint insufficiently alleges its liability to Plaintiffs under the theory espoused in *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  ECF 63-1 at 25-29; ECF 74 at 5-7 & n.2.  There are three necessary elements for *Monell* liability.  First, the plaintiff must plausibly allege that his constitutional harm stems from the acts of a municipal employee "taken in furtherance of some municipal 'policy or custom.'"  *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (quoting *Monell*, 436 U.S. at 694); *see also Spell*, 824 F.2d at 1389.  As interpreted by the Fourth Circuit, a "policy or custom" can exist in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).  Second, the plaintiff must allege facts showing that the policy's creation is

fairly attributable to the municipality. *Spell*, 824 F.2d at 1389; *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379, 402 (4th Cir. 2014) ("Only if a municipality subscribes to a custom, policy, or practice can it be said to have committed an independent act, the *sine qua non* of *Monell* liability."). Third, the plaintiff must allege an affirmative causal link between the "policy or custom," and the particular injury suffered by the plaintiff. *Spell*, 824 F.2d at 1389. The BPD only addresses the first and third prongs. *See* ECF 63-1 at 25-29; ECF 74 at 5-6.

As an initial note, because Decedent's children fail to plausibly allege a constitutional violation, their *Monell* claims must be dismissed. As to the Estates, reading their allegations in a light most favorable to them, they appear to allege the existence of an unconstitutional "custom or policy" in the BPD in three ways: through the decisions of a person with final policymaking authority; through a failure to properly train officers; and through the condonation of a widespread pattern of unconstitutional conduct. *See* ECF 57, ¶¶ 267-77. Only the condonation theory is properly alleged.

> ### 1. The Estates Fail to Plausibly Allege that a BPD Official with Final Policymaking Authority Established an Official Policy

As noted, a municipality can be held liable for constitutional harms stemming from a policy or custom instituted by the "official actions" of municipal officials with "final policymaking authority," or those officials who "have the responsibility and authority to implement *final* municipal policy with respect to a particular course of action." *Riddick v. Sch. Bd. of the City of Portsmouth*, 238 F.3d 518, 522-23 (4th Cir. 2000) (citations omitted). The "official policy" of a municipality "refers to formal rules or understandings – often but not always committed to writing – that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986).

34

The Third Amended Complaint's allegations are insufficient to establish any sort of official policy instituted by a BPD official with final policymaking authority. Indeed, the Estates often couch their allegations in terms of the BPD's *failure* to do something, not in terms of an official, enacted policy. *See, e.g.*, ECF 57, ¶ 75 ("[T]he BPD condoned unlawful police conduct committed by plainclothes BPD units by ignoring the widespread abuses."); *id.* ¶ 76 ("The BPD turned a blind eye to this pattern and practice of illegal activity . . . ."); *id.* ¶¶ 104-05 (alleging that the BPD "had sufficient notice" of the problems with plainclothes units, and that "a reasonable police department would have taken sufficient steps to adequately train, supervise and discipline officers"); *id.* ¶ 204 ("[The] BPD failed to establish reasonable and necessary systems to train, supervise, investigate, and hold accountable these officers or to take the necessary steps to eliminate those units' culture of corruption"); *id.* ¶¶ 214-244 (alleging, in detail, the shortcomings in the BPD's policies). Further, to the extent that the Estates have alleged some official policy, there are no allegations concerning (1) exactly who, within the BPD, instituted the policy, and (2) why that individual (or group of individuals) had final policymaking authority. Accordingly, the Estates have failed to allege a "decision of a person with final policymaking authority" sufficient to sustain a viable claim.

2.    The Estates Do Not Plausibly Allege a Custom Through the BPD's Failure to Train BPD Plainclothes Officers

A municipality can also be liable for an established "policy" through a failure to train, if it "reflects a 'deliberate' or 'conscious' choice" to not do so. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Training policy deficiencies can include (1) "express authorizations of unconstitutional conduct," (2) "tacit authorizations" of such unconstitutional conduct, and (3) failures to adequately "prohibit or discourage readily foreseeable conduct in light of known exigencies of police duty." *Spell*, 824 F.2d at 1390. No matter which theory is alleged, the

plaintiff must point out "a specific deficiency" in training, "rather than general laxness or ineffectiveness in training." *Id.* But the municipality will only be liable if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been *deliberately indifferent* to the need." *Harris*, 489 U.S. at 390 (emphasis added); *accord Jordan by Jordan v. Jackson*, 15 F.3d 333, 341 (4th Cir. 1994).

The BPD asserts that Count III's failure to train claim is insufficient, because the Estates "do not allege any facts about the training program or point to any specific deficiencies in the training." ECF 63-1 at 27 (citing *McDowell v. Grimes*, No. GLR-17-3200, 2018 WL 3756727, at *4 (D. Md. Aug. 7, 2018)). The Estates, conclusorily, counter that they have sufficiently alleged a pattern and practice of widespread illegal conduct in the BPD. ECF 71 at 18-19. This, however, is insufficient. As courts in this District have made clear, a plaintiff must provide factual allegations about the specific deficiencies in the BPD's training to state a failure to train claim. *McDowell*, 2018 WL 3756727, at *4; *see also, e.g.*, *Peters v. City of Mount Rainier*, No. GJH-14-955, 2014 WL 4855032, at *5 (D. Md. Sept. 29, 2014); *Hall v. Fabrizio*, No. JKB-12-754, 2012 2905293, at *2 (D. Md. July 13, 2012). Here, the Estates' only allegation regarding any sort of training is a 2009 lesson plan regarding stop-and-frisk training, which "misstated the relevant standard for search and seizures." ECF 57, ¶ 234. This lone allegation is insufficient to push the Estates' failure to train claim beyond the line from "possible" to "plausible." *See Peters*, 2014 WL 4855032, at *5.

But even if that allegation were sufficient, it does little to demonstrate a causal link between the insufficient training and the harm the Estates suffered here. Plainly, a single allegation that BPD plainclothes officers were insufficiently trained, on one occasion, on the

proper standard for conducting a lawful seizure of an individual does not plausibly link the BPD's training to Jenkins's admittedly intentional criminal conduct. *Compare with Estate of Bryant v. Balt. Police Dep't*, No. ELH-19-384, 2020 WL 673571, at *39 (D. Md. Feb. 10, 2020) (finding that specific allegations regarding the BPD's failure to train officers on disclosing evidence pursuant to *Brady* plausibly alleged the BPD's *Monell* liability to the plaintiff for the alleged actions of evidence suppression leading to his conviction for felony murder). Thus, the Estates do not plausibly allege a *Monell* claim through the BPD's failure to train its officers.

### 3. The Estates Plausibly Allege that the BPD Condoned the Plainclothes Units' Unconstitutional Practices

The BPD's arguments regarding the Estates' condonation theory of *Monell* liability largely focus on the causation prong. ECF 63-1 at 28-29; ECF 74 at 5-6. But, in a footnote to its Motion, the BPD states that it does not "concede that the allegations are sufficient to make out a *Monell* claim for a violation of *any*" constitutional right. ECF 63-1 at 28. Assuming that this is sufficient to raise the argument that the Estates have not plausibly alleged the presence of a policy or custom via condonation, it nonetheless fails.

A municipality is liable under a condonation theory "if municipal policymakers fail 'to put a stop to[,] or correct[,] a widespread pattern of unconstitutional conduct.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1389). To plausibly allege *Monell* liability by condonation, a plaintiff must state facts showing "a persistent and widespread practice of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference." *Id.* at 402-03 (internal alterations and quotations omitted) (quoting *Spell*, 824 F.2d at 1386-91). While "[p]revailing under such a theory is no easy task . . . alleging such a claim is, by definition, easier." *Id.* at 403.

The Estates have sufficiently alleged such a claim. As described at the outset, the Estates have alleged a wide range of misconduct, including unlawful stops and pursuits of citizens, by various plainclothes officers, including Jenkins and Gladstone, that went unpunished. These well-pleaded facts give rise to the reasonable inference that policymakers within the BPD had actual or constructive knowledge of that misconduct. The Estates' allegations regarding the "minimal substantive review of plainclothes officers' justification for unlawful stops and searches," and regarding the BPD's inadequate Internal Affairs protocol for ferreting out such unlawful conduct, renders the BPD's deliberate indifference to that conduct plausible. ECF 57, ¶¶ 226-27; *see also id.* ¶¶ 228-236 (discussing, in detail, the BPD's shortcomings in disciplining the relevant misconduct). Indeed, the BPD's deliberate indifference can be further inferred from the Estates' extensive factual allegations of BPD plainclothes officers' misconduct, which demonstrates a recurrent, widespread pattern of misconduct, to include unlawful stops, and pursuits, of Baltimore citizens. *Owens*, 767 F.3d at 403 (internal quotations omitted) (quoting *Spell*, 824 F.2d at 1391). In fact, the amount of specific past instances that the Estates have alleged far exceed those complaints in other cases that, without any specific past incidents of misconduct, have been determined to adequately plead a policy by condonation. *See McDowell*, 2018 WL 3756727, at *5 (citing *Jones v. Jordan*, No. GLR-16-2662, 2017 WL 4122795, at *9 (D. Md. Sept. 18, 2017); *Johnson v. Holmes*, 204 F.Supp.3d 880, 892 (W.D. Va. 2016); *Jones v. Chapman*, No. ELH-14-2627, 2015 WL 4509871, at *5, *17 (D. Md. July 24, 2015)). Accordingly, the Estates have properly alleged the existence of an unconstitutional policy or custom by condonation.

Merely alleging that the BPD condoned an unconstitutional policy does not automatically give rise to a *Monell* claim. The Estates must also plausibly allege that the condoned policy or

custom has an affirmative causal link to their particular constitutional violation. *E.g.*, *Spell*, 824 F.2d at 1391. This causal link is satisfied "if occurrence of the specific violation [alleged] was made reasonably probable by permitted continuation of the custom," such that the specific violation was "almost bound to happen, sooner or later, rather than merely likely to happen in the long run." *Id.* (internal quotations omitted); *see also, e.g.*, *Carter*, 164 F.3d at 218 (quoting *Spell*, 824 F.2d at 1390).

As the Fourth Circuit has recognized, however, at the pleading stage, "[t]here is no requirement that" the plaintiff "plead the multiple incidents of constitutional violations that may be necessary at later stages to establish . . . causation." *Jordan by Jordan*, 15 F.3d at 339. Indeed, in holding that only the notice pleading requirements of Federal Rule of Civil Procedure 8 applied to *Monell* claims, the Supreme Court stated, "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims." *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168-69 (1993); *accord Jordan by Jordan*, 15 F.3d at 340. Courts in this District have heeded this call, and held that a plaintiff need only allege that the municipality "was aware of ongoing constitutional violations," and that this awareness allowed the custom of unconstitutional practices to continue developing. *Garcia v. Montgomery County*, No. JFM-12-3592, 2013 WL 4539394, at *5 (D. Md. Aug. 23, 2013); *see also, e.g.*, *McDowell*, 2018 WL 3756727, at *6; *J.A. v. Miranda*, No. PX-16-3953, 2017 WL 3840026, at *7 (D. Md. Sept. 1, 2017).

Here, the Court recognizes that, as the BPD urges, the Estates have not alleged any prior instances in which the BPD's (plausibly) unlawful practice of unlawful stops, and pursuits, of Baltimore citizens caused the deprivation of a bystander's substantive due process rights under the Fourteenth Amendment. ECF 74 at 5-6. At this stage, however, it suffices that the Estates

have alleged that the BPD was aware of these ongoing constitutional violations, and that this pattern developed throughout the 2000s, and into 2010. *See, e.g.*, *Garcia*, 2013 WL 4539394, at *5; *see also Miranda*, 2017 WL 3840026, at *7; *McDowell*, 2018 WL 3756727, at *6. As discussed with regards to supervisory liability claim (Count II) in Section III.E.2.ii, *supra,* determining whether the BPD's condoned policy or custom is too attenuated from the particular harm the Estates suffered requires the development of a factual record through discovery. Accordingly, the BPD's Motion to Dismiss Count III will be denied.

### G. Plaintiffs' Claims, Viewed in the Light Most Favorable to Them, Are Not Time-Barred.

Turning the first of Defendants' various affirmative defenses, Defendants argue that Plaintiffs' claims are time-barred. They assert that Plaintiffs' claims all accrued on April 28, 2010, the date of the underlying motor vehicle accident, meaning that they needed to have been brought by April 28, 2013. ECF 63-1 at 8; *see id.* at 7-20. Ultimately, Defendants' arguments fail as to both Plaintiffs' § 1983 claims, and Plaintiffs' state law common law and constitutional law tort claims.

Federal Rule of Civil Procedure 8(c) provides that a statute of limitations defense is an affirmative defense. Accordingly, the burden rests on Defendants to prove that Plaintiffs' claims are time-barred. *See, e.g.*, *Newell v. Richards*, 323 Md. 717, 725 (1991). In *Goodman v. Praxair, Inc.*, an en banc Fourth Circuit explained that the trial court "generally cannot reach the merits" of a statute of limitations defense at the pleading stage. 494 F.3d 458, 464 (4th Cir. 2007) (en banc). Courts may only rule on the defense at the Rule 12(b)(6) stage "if all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint*.'" *Id.* (quoting *Richmond, Fredericksburg, & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)). Indeed, in resolving a motion to dismiss, courts generally do not "resolve contests surrounding the facts,

the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999) (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).  Only "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint" will a court, under Rule 12(b)(6), dismiss a complaint based on an affirmative defense.  *Goodman*, 494 F.3d at 464.

The parties agree that Maryland' three-year statute of limitations applies to Plaintiffs' § 1983 claims.  *See* 42 U.S.C. § 1988(a) (2018); Md. Code Ann., Cts. & Jud. Proc. § 5-101 (West 2019); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 187 (4th Cir. 1999) (noting the "well-settled" principle that § 1983 claims are governed by the forum state's personal injury statute of limitations).  The parties disagree, however, as to the relevant accrual date.

Importantly, while the statute of limitations for § 1983 claims is borrowed from state law, "the question of when a cause of action *accrues* under 42 U.S.C. § 1983 remains one of federal law." *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc); *see Tommy Davis Constr., Inc. v. Cape Fear Pub. Util. Auth.*, 807 F.3d 62, 66-67 (4th Cir. 2015) (clarifying that this principle applies to all claims rooted in § 1983, including *Monell* actions against municipalities and other local government entities).  The "standard rule" is that a § 1983 action accrues when the plaintiff has "a complete and present cause of action" such that he "can file suit and obtain relief." *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (quoting *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)). The Fourth Circuit has since clarified that the "standard rule" is that a § 1983 claim accrues when "the plaintiff knows or has reason to know of his injury." *Owens*, 767 F.3d at 389 (citation omitted).  In other words, the standard is inquiry notice: the "cause of action accrues either when the plaintiff has knowledge of his claim or when he is put on notice—e.g., by the knowledge of

the fact of injury and who caused it—to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim." *Nasim*, 64 F.3d at 955.[7]

Maryland law on this point is largely identical, and therefore instructive. It provides that any civil action must be filed "within three years from the date it accrues." Md. Code Ann., Cts. & Jud. Proc. § 5-101. Because section 5-101 leaves the word "accrues" undefined, Maryland courts use the discovery rule to determine accrual. *Frederick Road Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 95 (2000) (citing *Hahn v. Claybrook*, 130 Md. 179, 186-87 (1917)); *see also Poffenberger v. Risser*, 290 Md. 631, 636 (1981) (expanding the discovery rule's application to all civil actions). Under the discovery rule, a cause of action accrues "when a claimant gains knowledge sufficient to put him or her on inquiry notice." *Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 447 (2000). A plaintiff is on "inquiry notice" if he "has 'knowledge of circumstances which would cause a reasonable person in the position of the plaintiff[] to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [tort].'" *Estate of Adams v. Continental Ins. Co.*, 233 Md. App. 1, 25 (2017) (quoting *Lumsden*, 358 Md. at 446). The question of when a plaintiff had inquiry notice of his claim is typically one of fact for the jury, *O'Hara v. Kovens*, 305 Md. 280, 294-95 (1986), since it oftentimes "requires the balancing of factual issues and the assessment of the credibility of believability of the evidence," *Frederick Road*, 360 Md. at 96.

Defendants assert that, "[m]anifestly," Plaintiffs' claims all accrued on the date of the accident, April 28, 2010. ECF 63-1 at 8. At that time, according to Defendants, Plaintiffs knew

---

[7] *Wallace* held that some § 1983 claims do not accrue upon inquiry notice. 549 U.S. at 388-90 (holding that a § 1983 claim for unconstitutional detention accrued once the plaintiff was falsely arrested); *see also McDonough v. Smith*, __ U.S. __, 139 S. Ct. 2149, 2161 (2019). However, the parties here do not argue that a deviation from the standard rule of accrual is appropriate.

the "critical material facts" at issue here – namely, that Decedent and Cain were injured in a car accident caused by the Officer Defendants' chase of Burley. *Id.* at 17. "[T]he lawfulness of the stop," Defendants assert, is simply irrelevant. *Id.* Knowing that BPD officers were involved in the accident, Plaintiffs could have filed suit against Defendants back in 2010, but ultimately chose not to. *Id.* at 19. Indeed, Defendants go so far as to call Plaintiffs' suit a "reproachable" effort "to manipulate the legal system" that "border[s] on sanctionable conduct." *Id.* at 19-20.

Quite to the contrary, Plaintiffs have plausibly alleged that their instant § 1983 claims did not accrue until Jenkins's indictment on February 23, 2017. Defendants are correct that Plaintiffs knew in April, 2010 that the Officer Defendants were involved in a chase that led to the crash, which led to Decedent's death and Cain's injuries. But the cases Defendants cite – *Lewis v. Clark*, 534 F. Supp. 714, 714-16 (D. Md. 1982), *Miller v. Pacific Shore Funding*, 224 F. Supp. 2d 977, 986-87 (D. Md. 2002), and *Lumsden*, 358 Md. at 437, 448-49, 452 – do not, on the current record, compel the conclusions Defendants seek. In each of those cases, the claimants had knowledge of all of the operative facts underlying their claims, but were unaware of the legal significance of those facts. Here, however, Plaintiffs did not have knowledge of all of the operative facts. It is plausible that, despite knowing that the Officer Defendants were pursuing Burley, leading to the crash, that Plaintiffs did not know that, as alleged, the Officer Defendants lacked any probable cause to do so. The facts regarding the constitutionality of Burley's stop are legally significant to Plaintiffs' claims. Without knowledge of those facts, Plaintiffs could not have been aware of the legal rights associated therewith. *See Miller*, 224 F. Supp. 2d at 986-87; *see also McGinley v. Mauriello*, 682 F. App'x 868, 871-72 (11th Cir. 2017) (per curiam) (finding that a § 1983 claim against a police officer accrued when the plaintiffs possessed two expert

reports that "directly contradicted" the officer's investigation report; at that time, "plaintiffs plainly knew or should have known" that they had a claim).

By extension, without knowledge that Palmere, Willard, Knoerlein, and Fries allowed the Officer Defendants' unlawful conduct, and that the BPD ratified these unconstitutional practices, Plaintiffs could not have had inquiry notice of their § 1983 claims against those Defendants, until 2017. *See Wilson v. Hays*, 228 F. Supp. 3d 1100, 1112-13 (S.D. Cal. 2017) (finding that a plaintiff's *Monell* claim against a police department plausibly accrued later than her § 1983 claim against the individual officer, Hays, who sexually abused her, because "whether Plaintiff simply knew Hays 'caused her injury' does not resolve the issue of when her *Monell* claim accrued'").

Further, even reasonable measures to investigate Defendants' involvement in the crash likely would not have uncovered the pattern of unconstitutional actions giving rise to Plaintiffs' instant claims. Plaintiffs did have access to the names of the officers involved in the April, 2010 incident, and they had access to both Burley and Matthews, who could have attested to the false nature of the stop. But in the summer of 2011, both Burley and Matthews pled guilty to the offenses they were charged with stemming from the April, 2010 incident. ECF 57, ¶¶ 54-57. For Burley, this meant guilty pleas in *both* federal and state court, with a total sentence of fifteen years in prison. *Id.* ¶¶ 54, 56-57. Reading these facts in a light most favorable to Plaintiffs, a reasonable lawyer advising Plaintiffs might justifiably take no further action to investigate claims of police misconduct causing the April, 2010 accident, even had Burley and Matthews continued to make such claims or profess their actual innocence at that time. It is reasonable to infer that, in April, 2010, any inquiry into the Officer Defendants' liability, and the supervising Defendants' resulting liability, would not have revealed a colorable § 1983 claim.

Ultimately, whether Plaintiffs took efforts to uncover the allegedly unconstitutional motives behind the Officer Defendants' stop of Burley, whether those efforts were reasonable, and whether those efforts would have uncovered the facts now brought to light, requires the development of a factual record through discovery. *See Bell ex rel. Bell v. Bd. of Educ.*, 290 F. Supp. 2d 701, 711 (S.D. W. Va. 2003) (noting that when a party is placed on inquiry notice of their § 1983 claim, and whether he should have known of a public official's malfeasance, "are all fact questions not amenable to a motion to dismiss"). But on the current record, Plaintiffs have plausibly alleged that their § 1983 claims, including their supervisory liability and *Monell* claims, did not accrue until Jenkins's indictment on February 23, 2017. And because Maryland employs an identical discovery rule to determine accrual in all civil actions, *see Frederick Road*, 360 Md. at 94-95, Plaintiffs' remaining state law claims, as alleged, are also timely. Thus, Defendants' Motions to Dismiss will be denied on this ground, without prejudice to their raising the issue again at the summary judgment stage.[8]

### H. Plaintiffs' Noncompliance with the Local Government Tort Claims Act is Excused for Good Cause Shown

Next, Defendants argue that Plaintiffs gave untimely notice of their state law claims, pursuant to the Local Government Tort Claims Act ("LGTCA"), because Plaintiffs' state law

---

[8] Even if Plaintiffs' claims accrued in April, 2010 under section 5-101, Defendants' Motions would still be denied because of Maryland's statutory discovery rule, *see* Md. Code Ann., Cts. & Jud. Proc. § 5-203. As relevant for Plaintiffs' § 1983 claims, federal courts generally must apply a state's tolling rules to a § 1983 claim. *Battle v. Ledford*, 912 F.3d 708, 713 (4th Cir. 2019) (citation omitted). Section 5-203 tolls accrual "[i]f the knowledge of a cause of action is kept from a party by the fraud of an adverse party" until the time "when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud." Here, Plaintiffs alleged that the Officer Defendants falsely authored the statements of probable cause, which the BPD and Palmere, as the head of VCIS, adopted; that Burley and Matthews pled guilty to the offenses; and that the Defendants fraudulently concealed the officers' misconduct, allowing Burley and Matthews's guilty pleas to stand. ECF 57, ¶¶ 51-57, 64, 67, 281-83. These allegations, taken as true, suffice to trigger section 5-203.

claims arose in April, 2010. ECF 63-1 at 23-24. Conversely, Plaintiffs assert that their claims are timely, because, for similar reasons discussed above, their claims did not accrue until Jenkins's indictment in 2017. ECF 71 at 17. Further, even if they failed to give timely notice, Plaintiffs argue that their failure is excused for good cause. *Id.* at 17-18. Defendants counter that no such good cause exists. ECF 74 at 7-8. Ultimately, Plaintiffs prevail on their good cause argument.

1. <u>Based on the Text of the LGTCA's Notice Provision, Plaintiffs' Notice of their State Law Claims Is Untimely</u>

The LGTCA contains a notice provision that applies to all Maryland constitutional and common law tort claims for unliquidated damages. Md. Code Ann., Cts. & Jud. Proc. § 5-304; *Rounds v. Md.-Nat'l Capital Park & Planning Comm'n*, 441 Md. 621, 636 (2015). Before bringing any such claim, the claimant must serve notice of it upon the Baltimore City Solicitor "within one year after the injury." §§ 5-304(b)(1), (c)(3)(i). Before 2015, claimants only had 180 days to give such notice. *See* 2015 Md. Laws at 589 (Ch. 131, H.B. 113). Compliance with the notice requirement is a "condition precedent" to suit. *E.g.*, *Rios v. Montgomery County*, 386 Md. 104, 127 (2005).

Plaintiffs' argument that the LGTCA's notice requirement did not apply until their claims accrued in 2017, while sound in theory, is contradicted by law. In *Heron v. Strader*, the Maryland Court of Appeals considered, for the first time, when an "injury" occurs for purposes of the LGTCA's notice requirement. 361 Md. 258, 262-63 (2000). Noting the similarity between LGTCA's language and the language of the Maryland Torts Claim Act ("MTCA"), the Court of Appeals adopted, for the LGTCA, its interpretation of when an "injury" occurs under the MTCA. *Id.* Thus, the court held that, under section 5-304, a plaintiff must give notice of his "injury" "when his causes of action arose, i.e., when the legally operative facts permitting the

46

filing of his claims came into existence." *Id.* at 264. To determine when a cause of action "arose," courts "must examine the elements of the cause of action, since . . . a cause of action is said to have arisen 'when facts exist to support each element.'" *Id.* (quoting *Owens-Ill. v. Armstrong*, 326 Md. 107, 121 (1992)).

The Court of Appeals's citation to *Owens-Illinois* is instructive. In that case, Owens-Illinois argued against the application of a statutory cap on noneconomic damages. 326 Md. at 120. The statute provided that "[i]n any action for damages for personal injury in which the cause of action *arises* on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000." *Id.* (quoting Md. Code Ann., Cts. & Jud. Proc. § 11-108). Owens-Illinois asserted that the determination of when his cause of action arose should be governed by the discovery rule, *id.* at 121, which, as discussed above, is the default rule for determining accrual under Maryland's general statute of limitations provision, *see Frederick Road*, 360 Md. at 94-95. Thus, he contended, his cause of action did not "arise" until he was on inquiry notice of his potential claim.

The Court of Appeals explicitly rejected this argument. *Owens-Ill.*, 326 Md. at 121-22. It reasoned that the plain meaning of the word "arise" was "to come into being; originate," and, therefore, a cause of action "*arises* when it first comes into existence." *Id.* at 121 (citation omitted). The court differentiated language from its previous opinion in *Harig*, which reasoned that inquiry notice governs the accrual of certain claims, because the claimant cannot "be charged with slumbering on his rights, for there [is] *no notice* of *the existence of a cause of action*." *Id.* at 121 (quoting *Harig v. Johns-Manville Prods.*, 284 Md. 70, 83 (1978) (emphasis

added in *Owens-Illinois*)).[9]  The Legislature's use of the word "arises" in the statute, the court found, evidenced an intent to utilize a different means of determining when the statutory time period began.  *Id.*

Applying those principles here, even though Plaintiffs' claims plausibly did not *accrue* until 2017, the Court is compelled to conclude that their injury occurred, and thus, the LGTCA's notice requirement was triggered, in April, 2010.  All of the facts to support the elements of their due process, negligence, and wrongful death claims existed once the accident occurred in April, 2010 (i.e., when Decedent and Cain suffered their injuries).  Plaintiffs just had no knowledge of all of the relevant facts at that time.  Whether or not the Court views this result as absurd, the *Heron* court's interpretation of the phrase "after the injury" in the LGTCA's notice provision is presumptively what the Legislature intended, since the Legislature has amended section 5-304 multiple times since the *Heron* decision, without amending that key phrase.  *See Stewart v. State*, 275 Md. 258, 270 (1975) ("Since the Legislature has elected, following these decisions, not to amend the statute, but rather has acquiesced in its judicial construction[,] there is a strong presumption that the intention of the Legislature and the words used by it have been correctly interpreted[,] and such interpretation should not be disregarded.").  Accordingly, the Court concludes that, whether the 180 day or one year time period for giving notice applies in this case, Plaintiffs failed to provide timely notice of their state law claims.

---

[9] *Harig*, decided in 1978, came before the Court of Appeals made the discovery rule the default rule for accrual in *Poffenberger*, 290 Md. at 636.  But, notably, the *Owens-Illinois* decision was issued in 1992, eleven years after *Poffenberger*.  Thus, the *Owens-Illinois* court's distinction between "accrues" and "arises" was made with full knowledge that, in most cases, accrual was determined by when the plaintiff was on inquiry notice of his claim.

2. <u>Plaintiffs Have Shown Good Cause for their Untimely Notice</u>

This does not, however, *per se* require dismissal of Plaintiffs' claims. Section 5-304(d) provides that "unless the defendant can affirmatively show that its defense has been prejudiced by lack of required notice, upon motion and for good cause shown the court may entertain the suit even though the required notice was not given." This provision "allows a court, in certain circumstances, to avoid an unjust result" from strict application of the notice requirement. *Prince George's County v. Longtin*, 419 Md. 450, 467 (2011). Good cause exists if "the claimant prosecuted his claim with that degree of diligence that an ordinarily prudent person would have exercised under the same or similar circumstances." *Heron*, 361 Md. at 271 (quoting *Westfarm Assoc. v. Wash. Suburban Sanitary Comm'n*, 66 F.3d 669, 676-77 (4th Cir. 1995)); *see also id.* at 272 (listing as one category of good cause "excusable neglect or mistake (generally determined in reference to a reasonably prudent person standard)"). Plaintiffs must first show that good cause exists, *see Longtin*, 419 Md. at 467, and the determination of whether good cause exists is in the trial court's discretion, *Westfarm*, 66 F.3d at 676; *Heron*, 361 Md. at 270. If good cause exists, the burden shifts to Defendants to demonstrate prejudice. *Longtin*, 419 Md. at 467.

Defendants initially argue that section 5-304(d) provides no protection to Plaintiffs, because they have failed to make a separate motion for the Court to excuse their untimely notice. ECF 74. This argument is unpersuasive. In *Mitchell v. Housing Authority of Baltimore City*, the Court of Special Appeals undertook an in-depth review of the trial court's finding of no good cause to justify noncompliance with section 5-304, upon the Housing Authority's motion for summary judgment, even though the record demonstrated that the plaintiff only raised the good cause argument in opposing the summary judgment motion. 200 Md. App. 176, 182-83, 204-12, *cert. denied*, 423 Md. 452 (2011). Courts typically decline to address a good cause argument

only if the plaintiff fails to raise the argument altogether. *See, e.g.*, *Ross v. Prince George's County*, No. DKC-11-1984, 2012 WL 1204087, at *5-8 & n.16 (D. Md. Apr. 10, 2012) (refusing to address the good cause exception, because the plaintiff only argued that the LGTCA's notice provision did not apply to his state law claims); *Luy v. Balt. Police Dep't*, 326 F. Supp. 2d 682, 693 (D. Md. 2004) (refusing to address the good cause exception because plaintiff had neither made such request under section 5-304(c), "nor alleged any facts that would establish good cause"). Indeed, it would be highly inefficient to require a plaintiff to file a separate motion seeking excusal from the LGTCA's notice provision for good cause, after the parties have fully briefed the issue in the context of a motion to dismiss.

As to the merits, Defendants conclusorily argue that Plaintiffs have failed to demonstrate good cause for their noncompliance with section 5-304. ECF 74 at 7. That argument fails. For the same reasons that Plaintiffs' claims plausibly did not accrue until 2017, Plaintiffs have also alleged good cause for not timely complying with the notice requirement. The Officer Defendants' alleged actions in falsifying police reports and giving false statements regarding the incident, mean that a reasonable plaintiff, exercising due diligence, would not have discovered the facts giving rise to Plaintiffs' instant state law claims against Defendants. *See Rios v. Montgomery County*, 386 Md. 104, 141-42 (2005) (noting that good cause can exist "where representations made by local government representatives are misleading"); *cf. Moore v. Norouzi*, 371 Md. 154, 179-81 (2002) (finding that an entity's misrepresentations that it was the third party claims administrator for Montgomery County led the plaintiff to reasonably believe that serving notice of his claim on that third party, demonstrating good cause for not serving notice on the county). This conclusion is, once again, amplified by the fact that both Burley and Matthews pled guilty to the criminal charges levied against them stemming from the April, 2010

incident. It is plausible, and indeed quite a logical inference, that no reasonable attorney would have probed further into any claimed misconduct by the BPD, or its officers, in connection with the accident in light of Burley's and Matthews's guilty pleas.

Indeed, Plaintiffs' reason for giving delayed notice stands in stark contrast to other cases where courts found a lack of good cause. *See, e.g.*, *Downey v. Collins*, 866 F. Supp. 887, (D. Md. 1994) (rejecting the claim that the government's failure to timely respond to document requests constituted good cause, because witness testimony that the plaintiff obtained three months into the six-month notice period was itself sufficient "to suggest to plaintiff that a claim might exist"); *Ellis v. Hous. Auth. of Balt. City*, 436 Md. 331, 351 (2013) (finding no good cause because plaintiffs took *no* action to prosecute their claims); *Heron*, 361 Md. at 271-72 (finding no good cause for delay caused by a claimant's need to focus on his criminal defense). A finding of good cause here is squarely in line with the provision's purpose of allowing the Court to prevent the notice requirement from working "an unjust result." *Longtin*, 419 Md. at 467. Plaintiffs have therefore plausibly alleged excusable neglect for not timely serving notice of their claims, *see Heron*, 361 Md. at 272, providing, at this stage, good cause for their noncompliance with the LGTCA.

### 3. Defendants Fail to Demonstrate Prejudice from the Untimely Notice

The burden then shifts to Defendants to "affirmatively show that [their] defense has been prejudiced by lack of required notice." § 5-304(d). On this point, Defendants assert:

> Plaintiffs' arguments that BPD and Palmere were not prejudiced by the lack of notice are unavailing under Maryland case law. *See Dehn Motor Sales, LLC v. Schultz*, 439 Md. 460, 487 n.28 (2014) ("We need not address the issue of prejudice because prejudice only becomes relevant if the issue being addressed is good cause for failing to file a notice of claim, . . . ."). Even if Plaintiffs' lack of prejudice argument were relevant, it actually supports BPD and Palmere's position that notice was untimely and that the claims are barred by limitations. Plaintiffs state that "BPD and Palmere were not prejudiced by any lack of

> statutory notice because they actually and constructively had notice of Decedent's and Ms. Cain's injuries when their employees responded to the scene of the injury." ECF No. 71 at 17. Assuming *arguendo* that BPD and Palmere had notice of Plaintiffs' injuries, it obviously follows that Plaintiffs would have had notice of their injuries as well.

ECF 74 at 7-8. To the extent these assertions make any affirmative showing of prejudice at all, they fall far short of showing that, as a matter of law, Defendants have been so prejudiced such that Plaintiffs' state law claims cannot proceed to discovery. Accordingly, Defendants' Motions will be denied on this ground.

## I.     Plaintiffs' Instant Suit May Not Constitute a Double Recovery

Defendants next posit that Plaintiffs' instant suit is a "blatant attempt to get a second bite at the apple." ECF 63-1 at 20.[10] They argue that because Plaintiffs already obtained a judgment for monetary damages against Burley in 2014, they are barred from recovering again from Defendants "under different legal theories for the same injury." *Id.* (quoting *Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, 637 F.3d 454, 460-61 (4th Cir. 2011)). However, Burley is currently appealing the Order in the state court suit against him, denying his motion to vacate that judgment. *See* Notice of Appeal, *Johnson*, No. 24-c-13-002083 (Cir. Ct. Balt. City Dec. 3, 2019), Docket Entry No. 33/0. At this stage, it would premature to dismiss Plaintiffs' entire Complaint on double recovery grounds. If this Court were to dismiss Plaintiffs' suit on this ground now, and the state court judgment against Burley is vacated, Plaintiffs may face even more substantial statute of limitations issues. Conversely, if the judgment is vacated and this action remains pending, then any concern regarding a double recovery will be vitiated. The

---

[10] As noted, Palmere and the BPD's briefing contains multiple extreme characterizations of Plaintiffs' claims. Especially in cases like this, such hyperbolic statements do nothing to help this Court's adjudication of these difficult issues.

Court will therefore deny this ground for dismissal, without prejudice to reconsidering the issue if the appeal pending in state court is denied.

### J.    Dismissal of Plaintiffs' Indemnification Claim Against the BPD Is Premature

Finally, the BPD argues that Plaintiffs' indemnification claim against it in Count VIII, ECF 57, ¶¶ 302-07, must be dismissed for three reasons:  (1) only a BPD employee has a right to indemnification; (2) Plaintiffs have not yet obtained a judgment against any individual BPD officer; and (3) there has been no finding that any individual officer was acting within the scope of his employment.  ECF 63-1 at 29-31.  Each argument lacks merit.

The LGTCA provides that any "local government," which includes the BPD, "shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment."  Md. Code Ann., Cts. & Jud. Proc. § 5-303(b)(1); *see id.* § 5-301(d)(21) (including the BPD in the LGTCA's definition of "local government").  Importantly, the LGTCA bars the relevant entity from asserting sovereign immunity as a defense to its indemnification obligation.  *See id.* § 5-303(b)(2); *Cherkes*, 140 Md. App. at 323.

The BPD's first argument is plainly contradicted by binding precedent.  In *Johnson v. Francis*, the Maryland Court of Special Appeals considered, and rejected, the argument that no individual plaintiff may sue the BPD directly for indemnification.  239 Md. App. 530, 549, 554-55 (2018), *cert. denied*, 463 Md. 155 (2019).  The Court of Special Appeals reasoned that "[w]hen read in the context with the statute, the local government's obligation under § 5-303(b)(1) unambiguously runs directly to the underlying plaintiff."  *Id.* at 551.  The court therefore specifically held that the LGTCA permits plaintiffs to sue local government agencies

directly for indemnification of harms caused by one of the agency's employees acting within the scope of the employment. *Id.* at 555. Thus, the BPD's argument here is patently unfounded.

As to the BPD's final two arguments, the decision of the court in *Johnson v. Baltimore Police Department*, No. ELH-19-00698, 2020 WL 1169739 (D. Md. Mar. 10, 2020), is on all fours. In that case, an exonerated Baltimore City prisoner, Jerome Johnson, sued the BPD and four BPD detectives for his wrongful murder conviction. *Id.* at *1. Mr. Johnson brought § 1983 claims against the detectives, and a *Monell* claim against the BPD. *Id.* Mr. Johnson also pled an indemnification claim against the BPD. *Id.* The BPD argued that the indemnification claim was premature, because there was no judgment against any detective, or a finding that any detective was acting within the scope of their employment with the BPD. *Id.* at *37.

The court rejected these arguments. *Id.* at *38. Collecting a number of cases from Maryland's appellate courts, the court first concluded that there is no case law "preclud[ing] a plaintiff from *pleading* an indemnification claim before final judgment." *Id.* (citations omitted). Next, the court found that, while some courts have dismissed indemnification claims against the BPD as premature, under the circumstances of Mr. Johnson's case, "permitting [him] to plead an indemnification claim against the BPD at the outset avoids the possibility of redundant litigation, thereby facilitating the efficient resolution of this case." *Id.* The court continued:

> Indeed, for that reason, courts in this District have permitted the BPD to file a cross-claim for indemnification against an officer under [Federal Rule of Civil Procedure] 13(g), seeking a declaration that it has no duty to indemnify despite the officer's liability not having been established. *See Bumgardner v. Taylor*, GLR-18-1438, 2019 WL 4115414, at *11 (D. Md. Aug. 29, 2019) (finding that "permitting BPD's Cross-Claim to proceed directly behind [the plaintiff's] claims serves the purposes of Rule 13(g)"); *Harrod v. Mayor & City Council of Balt.*, GLR-18-2542, 2019 WL 5636392, at *4 (D. Md. July 24, 2019) (same). That approach makes good sense where, as here, "[d]etermining whether [the] Officer Defendants were acting within the scope of their employment will, in turn, determine whether BPD is liable for [the] Officer Defendants' actions." *Bumgardner*, 2019 WL 4115414, at *11.

*Id.*

Similarly, here, Plaintiffs have lodged a *Monell* claim directly against the BPD, as well as a number of federal and state law claims against individuals allegedly employed by the BPD at the time of the April, 2010 incident.  Thus, to facilitate an efficient resolution of this case, and to avoid "the possibility of redundant litigation," the Court concludes that dismissal of Plaintiffs' indemnification claim would be improper at this time.  *Id.*

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motions to Dismiss, ECF 63, 65, and 66, are all GRANTED IN PART and DENIED IN PART.  A separate implementing Order follows.

Dated:  April 7, 2020                                          _____/s/_____
                                                                              Stephanie A. Gallagher
                                                                              United States District Judge