## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **SHIRLEY JOHNSON,** *et al.*, | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **Civil Case No. SAG-18-2375** |
| | * | |
| **BALTIMORE POLICE DEPARTMENT,** | * | |
| *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>MEMORANDUM OPINION</u>

On April 28, 2010, Baltimore Police Department ("BPD") officers allegedly ambushed Umar Burley and Brent Matthews, who were sitting in a car on Parkview Avenue in Baltimore City, Maryland.  Fearing for their lives, Burley, the driver, sped away, and the officers gave chase. Several blocks later, with the officers in pursuit, Burley ran a stop sign, and crashed into a car driven by Elbert Davis, Sr. ("Davis" or "Decedent").  The crash killed Davis and left his passenger, Phosa Cain ("Cain"), severely injured.  After a search of Burley's car revealed nothing illegal, BPD officers planted drugs in the car, and both Burley and Matthews were arrested, convicted, and sentenced in this Court for possession with intent to distribute heroin.  Burley was also convicted and sentenced on charges of vehicular manslaughter in the Circuit Court for Baltimore City.  Both men were exonerated of these convictions once a federal investigation revealed that the drugs found in Burley's car had been planted by the BPD.  The investigation also revealed widespread misconduct in plainclothes units within the BPD, which, in part, resulted in the indictment and conviction of Defendant Wayne Jenkins (and others) on racketeering charges.

On August 2, 2018, Plaintiff Shirley Johnson, personally and as personal representative of the Estates of Davis, and of Cain, along with Plaintiffs Delores Davis, Mary Cox, Gloria Davis, Albert Cain, Elbert Davis, Jr., Anita Cain (the administrator of the Estate of Arthur Cain), and the Use of Gail Davis, Leroy Davis, and Elbert Lee Davis (collectively, "Plaintiffs") sued the BPD, along with Dean Palmere, Wayne Jenkins, Ryan Guinn, Richard Willard, William Knoerlein, Michael Fries, and Keith Gladstone (collectively, "Defendants"). ECF 1. Plaintiffs filed a Fourth Amended Complaint on January 8, 2021. ECF 112.

Now pending before the Court are three motions for summary judgment filed by the Defendants, ECF 165, 166, 167, and the Defendants' motions in limine seeking to exclude the testimony of Plaintiffs' expert witness, Dennis Waller. ECF 162, 163, 164. The Court has reviewed each of these motions, along with the related oppositions and replies. ECF 170, 171, 174, 175, 176, 177, 178, 179. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons that follow, Defendants' motions in limine will be granted in part and denied in part, and their motions for summary judgment will be denied.

## I.     FACTUAL BACKGROUND

This Court has detailed the relevant factual background in two prior opinions deciding motions to dismiss. ECF 83, 125. The following facts are incorporated from those opinions, although, where relevant, the Court has adjusted and supplemented its factual recitation based on the evidence as it has been developed in discovery. While discovery has revealed different accounts of certain events, many of the following facts are matters of public record and are not in dispute.

### A.  Defendants' Positions Within the BPD

In 2010, the BPD employed each Defendant as a police officer.  ECF 112 ¶ 21.  At the time, Palmere led the Violent Crime Impact Section ("VCIS") within the BPD.  *Id.* ¶ 28; *see also id.* ¶¶ 169-70 (explaining that Palmere led the VCIS from 2008 to 2010, and still oversaw VCIS when, in 2010, he was promoted to the Chief of the Criminal Investigation Division, into which VCIS merged).  Palmere later served as a Deputy Commissioner in the BPD from 2013 to 2018, overseeing all plainclothes units and the BPD's Patrol and Operations Bureaus.  *Id.* ¶ 28.  Palmere retired from the BPD in 2018.  *Id.*

In 2010, Fries was a Lieutenant in VCIS, and Willard and Knoerlein were both Sergeants.  *Id.* ¶¶ 25-27.  Fries, Willard, and Knoerlein therefore all held supervisory roles.  *Id.* ¶ 133.  Plaintiffs allege that Jenkins, Gladstone, and Guinn ("the Officer Defendants") worked together in VCIS, under the supervision of Fries, Willard, Knoerlein, and Palmere.  *Id.* ¶¶ 23-27, 133.  Fries, Knoerlein, and Guinn are still BPD officers.  *Id.* ¶¶ 22-28.

### B.  The BPD's Allegedly Unconstitutional Policing Practices in April, 2010

Beginning in the "early 2000s," the BPD engaged in a "widespread, persistent pattern and practice of unconstitutional police conduct, including illegal stops without probable cause or reasonable suspicion, illegal pursuits and arrests, and falsification of evidence by plainclothes officers regularly employed within the BPD."  *Id.* ¶¶ 70, 80; ECF 165-1 at 19-20.  The pattern of unconstitutional practices began, according to Plaintiffs, when the BPD first utilized "elite units comprised of plainclothes officers," including "flex squads" and "Special Enforcement Teams" ("SETs"), who had "wide latitude to investigate and arrest persons suspected of dealing drugs and/or gun violations."  ECF 112 ¶ 77; ECF 165-1 at 19-20.  These officers, who drove unmarked cars, were often referred to as "knockers" or "jump out boys," because of their tendency to drive

up to citizens, jump out of their cars, chase citizens, and conduct "aggressive illegal searches" of them.  ECF 112 ¶ 79.  The Fourth Amended Complaint recounts a number of instances, leading up to 2010, in which BPD officers in units like VCIS raped, robbed, and even killed Baltimore residents while on duty.  *Id.* ¶¶ 81-99.

Plaintiffs specifically allege, and Defendants acknowledge, previous instances of misconduct by Jenkins and Gladstone.  *Id.* ¶¶ 107-130; ECF 165-1 at 21-22.  Plaintiffs allege that Jenkins "repeatedly crashed BPD-issued vehicles, damaging them and/or rendering them inoperable," and that he allegedly "went through as many as one department-issued vehicle per month."  *Id.* ¶ 113.  Plaintiffs also recount instances in which Jenkins assaulted a Baltimore resident, but incurred no departmental consequences, *id.* ¶ 117-20, and in which Jenkins fabricated evidence in order to incriminate an individual in 2008, *id.* ¶¶ 121-25.  One of Jenkins's former colleagues on the Gun Trace Task Force ("GTTF") testified at the trial of two other GTTF members that, "Jenkins was very reckless, you know.  I mean, he was just out of control, putting citizens at risk, you know, driving on the side of the street, going in people bumpers.  I just never saw anything like this . . . ."  *Id.* ¶ 128.

Plaintiffs allege that Willard, Knoerlein, and Fries each "held supervisory roles within the plainclothes units in which the Officers worked."  *Id.* ¶ 133.  Beginning in 2004, Fries supervised Jenkins when Jenkins served on a SET, and knew of the "widespread abuse[s]" officers in that SET committed.  *Id.* ¶ 134, 152.  Plaintiffs allege that Fries selected Jenkins to join VCIS, which Fries supervised in 2006, despite "knowledge of Jenkins's prior misconduct."  *Id.* ¶ 139.  Fries was also Gladstone's supervisor in VCIS starting in 2008, and upon information and belief, was his supervisor when Gladstone committed misconduct prior to 2010, as well as during the April 28, 2010 incident giving rise to this lawsuit.  *Id.* ¶¶ 140-41.  Plaintiffs further allege that Knoerlein

4

had "actual or constructive knowledge" of Jenkins's and Gladstone's prior instances of misconduct while supervising them, and that he supervised them during some of those instances, including the April 28, 2010 incident.  *Id.* ¶¶ 143, 145-56.  Willard also allegedly had "actual or constructive knowledge" of Jenkins's prior instances of misconduct before joining VCIS.  *Id.* ¶¶ 147-48.

Despite knowing that their subordinate VCIS officers were "committing widespread abuse[s]," Plaintiffs allege that Willard, Knoerlein, and Fries took no steps "to report or remedy illegal conduct," and that this failure to properly investigate demonstrated "a gross disregard for the constitutional rights of the public." *Id.* ¶¶ 154-55.  Plaintiffs also allege that Willard, Knoerlein, and Fries failed to properly train Jenkins and Gladstone, despite knowing about their history of misconduct, and also "encouraged plainclothes officers under their supervision . . . to violate the constitutional rights of Baltimore residents." *Id.* ¶¶ 156-57, 160.  Willard, Knoerlein, and Fries encouraged VCIS officers to commit "overtime fraud," and to conduct illegal searches "to get as many guns off the street by whatever means necessary." *Id.* ¶¶ 161-62.

Palmere, as a high-ranking, senior command-level officer in the BPD, is alleged to have had "the authority and responsibility to discipline officers he knew had engaged in misconduct." *Id.* ¶ 166.  Despite this, Plaintiffs allege that Palmere failed to take any actions to report or remedy illegal conduct. *Id.* ¶¶ 177-78, 182.  For example, in 2005, Palmere, while serving on an officer's trial board, voted to only give the officer a "reduced sentence" for his actions in engaging in an unlawful search of a home, and later lying and saying that he had a warrant to search the home. *Id.* ¶ 167.  With Palmere as head of VCIS, the unit saw "increased citizen complaints and widespread abuses," which included one incident that resulted in a $200,000 payout to the victim, and another in which three VCIS officers were charged with kidnapping two Baltimore City teenagers. *Id.* ¶ 169.  Plaintiffs also allege that Palmere "assisted and coached former GTTF officer

Jemell Rayam in the cover up of the fatal shooting of Shawn Cannady" in 2009.  *Id.* ¶ 176.  Jenkins was allegedly a "golden boy" and "prince" under Palmere, despite Palmere knowing of his previous instances of misconduct.  *Id.* ¶¶ 178-180.  Indeed, Palmere awarded Jenkins, and other BPD plainclothes officers, an achievement pin for their work in the plainclothes units.  *Id.* ¶ 181.

Plaintiffs further allege a number of other instances of police misconduct that occurred under the BPD's watch prior to 2010.  *E.g.*, *id.* ¶¶ 191-195.  However, Plaintiffs allege that the BPD "provided no meaningful oversight of," and doled out no meaningful disciplinary actions against, Jenkins, Gladstone, and Guinn.  *Id.* ¶¶ 199-200.  Further, "[d]espite knowing of the recurrent misconduct by its plainclothes officers, [the] BPD failed to establish reasonable and necessary systems to train, supervise, investigate, and hold accountable those officers or to take the necessary steps to eliminate [plainclothes] units' culture of corruption" and ensure that officers did not engage in further misconduct.  *Id.* ¶¶ 187, 204.  Indeed, former Commissioner Kevin Davis "admitted that the BPD 'absolutely' should have known about the conduct of the GTTF officers and stated that, 'the culture here contributes to it.'"  *Id.* ¶ 205.

Plaintiffs also allege that the BPD "did not institute any meaningful oversight of [its] specialized plainclothes units."  *Id.* ¶ 215; *see also id.* ¶ 226.  They allege that the BPD's Internal Affairs Division's ("IAD") procedures were deficient in a large number of respects, including, but not limited to: discouraging people from filing complaints; tolerating "excessive and chronic delays in resolving disciplinary complaints"; supervisors "misclassif[ying] serious complaints as minor ones" to avoid IAD involvement; failing to consider evidence contrary to an officer's report; and failing "to effectively discipline" those officers found to have engaged in misconduct.  *Id.* ¶ 228; *see also id.* ¶¶ 227, 229-231.  Plaintiffs allege that this failure to supervise and discipline officers properly, combined with the BPD's knowledge of the number of instances of officer

6

misconduct, allowed a custom of unconstitutional policing to develop in the BPD's plainclothes units, and that the BPD "condoned" it by "willfully ignoring it." *Id.* ¶¶ 250, 252-56.

### C.  The April 28, 2010 Incident

On April 28, 2010, Burley and Matthews were sitting in a vehicle parked in the 3800 block of Parkview Avenue in Baltimore City when Jenkins and a second officer, both in unmarked police vehicles, pulled behind Burley's vehicle in an attempt to box him in.  ECF 165-1 at 10; ECF 170 at 4.  Jenkins and Guinn approached Burley's vehicle with their guns drawn.  *Id.*  Both officers were in plain clothes.  *Id.*  The officers claim they identified themselves as police, although Burley and Matthews claim they did not.  ECF 165-1 at 10; ECF 170 at 4, 6.  Burley also testified that the officers were wearing masks.  ECF 170 at 4.  Believing they were about to be robbed, Burley fled in his vehicle, and sped down Parkview Avenue towards Belle Avenue at about 90-100 miles per hour.  *Id.*  According to Burley, the officers immediately chased him such that he could see them in his rearview mirror, *id.* at 4-5, whereas the officers' account suggests that they lost sight of Burley, began driving in the direction in which Burley drove to look for him, and only found him after hearing the ensuing crash.  ECF 165-1 at 11-12.

As Burley was fleeing, Davis and Cain were traveling in a vehicle heading eastbound on Gwynn Oak Avenue, towards Belle Avenue.  ECF 170 at 4-5.  Burley, still traveling at a high rate of speed, ran the stop sign controlling his direction of travel, and collided with Decedent's vehicle, on its driver's side door.  *Id.*  Decedent passed away just hours later, and Cain sustained severe physical injuries.  ECF 165-1 at 13.

Following the collision, and a subsequent foot chase to apprehend Burley and Matthews, Jenkins instructed Guinn to call another officer and ask him to bring the "'stuff' or 'shit' in his car," which referred to a stash of illegal drugs.  ECF 170 at 6-8.  Jenkins, with the help of other

officers, planted twenty-eight grams of heroin in Burley's vehicle, as a means of providing a lawful justification for the otherwise unlawful pursuit of Burley.  *Id.*  Another BPD officer, who was directed to search Burley's vehicle, found the heroin.  *Id.*  Jenkins thereafter authored a false probable cause statement in support of criminal charges against Burley and Matthews.  *Id.*  Plaintiffs allege that this incident was a result of the illegal conduct by BPD plainclothes units that the BPD "condoned."  ECF 112 ¶¶ 252-54.

As a result of the incident, and based upon the false evidence and statements given by the Officer Defendants, Burley pled guilty in Maryland state court to vehicular manslaughter, and received a ten-year prison sentence on August 10, 2011.  ECF 165-1 at 13.  Both Matthews and Burley also pled guilty to possession with intent to distribute heroin in this Court.  *Id.*  Burley received a fifteen-year prison sentence on August 18, 2011, to run concurrently with his state prison sentence.  *Id.*  On April 11, 2013, Shirley Johnson, Delores Davis, Gloria Davis, Mary Alice Cox, Leroy Davis, Decedent's Estate, Elbert Davis, Jr., Arthur Cain, Albert Cain, and the Use of Gail S. Davis filed suit against Burley in the Circuit Court for Baltimore City, Maryland.  *Johnson v. Burley*, No. 24-c-13-002083 (Cir. Ct. Balt. City Apr. 11, 2013), Docket Entry No. 1/0.  On January 29, 2014, the court entered a judgment in favor of Plaintiffs in the amount of $1,092,500, against Burley.  *Id.*, Docket Entry No. 18/0, 18/1.  The Agreed Verdict allocated $5,000 to the Estate of Elbert Davis, Sr. and $1,087,500 to the wrongful death beneficiaries.  ECF 170 at 19.

### D.  The Department of Justice Investigates the BPD Beginning in 2015, Eventually Leading to the Convictions of Jenkins and Seven Other BPD Officers

In April, 2015, then-Mayor Stephanie Rawlings-Blake asked the United States Department of Justice ("DOJ") to investigate the BPD's policies, patterns, and practices.  ECF 112 ¶ 208.  Out of that investigation came a report from the DOJ's Civil Rights Division ("the DOJ Report"), issued on August 10, 2016, detailing several instances of unconstitutional BPD police practices.

*Id.* ¶¶ 209-10; *see also* ECF 1-1 (the DOJ Report).   On January 12, 2017, the United States filed

a civil complaint against the Baltimore Police Department.  ECF 112 ¶ 211.  That same day, the

United States and the BPD entered a consent decree, providing for a full-scale review of the BPD's

practices, and calling for additional training of its officers.  *Id.* ¶ 212.

Just over one month later, on February 23, 2017, a federal grand jury indicted eight BPD

officers in connection with their actions as members of the GTTF.  *United States v. Gondo, et al.*,

Crim. No. 17-106-CCB (D. Md. Feb. 23, 2017).  The GTTF, a separate unit from VCIS, was

formed in 2007, "with the stated goal of tracking and curbing illegal gun sales and gun activity."

ECF 112 ¶ 185.  Among the GTTF officers indicted was Wayne Jenkins, who pled guilty to several

of the indicted offenses on January 5, 2018.  *United States v. Jenkins*, Crim. No. CCB-17-638,

ECF 5 (D. Md. Jan. 5, 2018) (Plea Agreement).  Pursuant to that plea, Jenkins admitted that he

> knowingly concealed, covered up[,] and falsified entries in an official Statement of
> Probable Cause in the District Court of Maryland for Baltimore City reflecting his
> actions, and actions of his fellow BPD officers, in relation to the seizure of heroin
> from Mr. Burley's vehicle on April 28, 2010, with the intent to impede, obstruct[,]
> and influence the investigation of the events which [led] to the fatal car crash on
> April 28, 2010, and Mr. Burley and Mr. Matthews' subsequent arrest and
> conviction.

ECF 112 ¶ 64; *Jenkins*, Crim. No. CCB-17-638, ECF 5 at 26.  As a result, Burley's and Matthews's

convictions in federal and state court, stemming from the April 28, 2010 incident, were vacated.

*United States v. Burley et al.*, Crim. No. RDB-11-074, ECF 118 (D. Md. Dec. 19, 2017).

Burley then sought to vacate the civil judgment rendered against him in January, 2014, but

the Circuit Court for Baltimore City denied his motion.  *See Johnson*, No. 24-c-13-002083 (Cir.

Ct. Balt. City Nov. 22, 2019), Docket Entry No. 32/0.  Burley noted an appeal, *id.*, Docket Entry

No. 33/0, and filed his own suit against the BPD in this Court, *see generally Burley v. BPD*, No.

SAG-18-1743 (D. Md. filed June 13, 2018).  Burley's suit in this Court settled in early December,

2020, and, shortly thereafter, he satisfied the civil judgment against him owed to the beneficiaries. *Id.* Around the same time, he voluntarily dismissed his appeal in the Maryland Court of Special Appeals. ECF 165-16 at 15.

### E. Plaintiffs' Instant Claims for Relief

In the Fourth Amended Complaint, Plaintiffs seek recovery of compensatory damages, punitive damages, and reasonable attorneys' fees based on seven claims for relief. Count I alleges that Jenkins, Guinn, Gladstone, and Willard deprived Davis and Cain of their Fourteenth Amendment right to due process, and "deprived the Decedent's children [of] the love and affection of their father," in violation of 42 U.S.C. § 1983. ECF 112 ¶¶ 264-70. Count II asserts that Palmere, Knoerlein, Fries, and Willard are liable under § 1983 for the same constitutional violations, under a supervisory liability theory. *Id.* ¶¶ 272-78. Count III alleges that the BPD is also liable under § 1983 for those constitutional violations, pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Id.* ¶¶ 279-89. Count IV, brought only by the Decedent's Children, asserts a wrongful death action against Palmere, Jenkins, Guinn, Willard, Knoerlein, Fries, and Gladstone (this claim was eventually dismissed in its entirety). *Id.* ¶¶ 290-97; ECF 125, 126. Count V is a survival action, brought only by the Davis Estate, for Davis's "conscious pain and suffering, mental anguish, pre-death fright," and other damages. ECF 112 ¶¶ 298-302. Count VI asserts that all Defendants, except the BPD, violated Decedent's and Cain's Due Process rights, as guaranteed by Article 24 of the Maryland Declaration of Rights, causing "Plaintiffs" damages. *Id.* ¶¶ 303-06. Finally, Count VII seeks to compel the BPD to indemnify the individual Defendants, upon a finding of their liability to Plaintiffs. *Id.* ¶¶ 307-12.

In January, 2021, Defendants moved to dismiss the Fourth Amended Complaint. ECF 118, 119. Their motions were granted in part and denied in part. ECF 125, 126. In May, 2021,

Defendants moved to bifurcate Plaintiffs' supervisory liability and *Monell*-type claims in Counts II, III, and VI from the claims against the individual Officer Defendants in Counts I and V, and to stay discovery on the supervisory liability and *Monell*-type claims.  ECF 133.  This Court granted that motion.  ECF 137.

The parties have proceeded through an initial phase of discovery on Plaintiffs' claims against the individual Officer Defendants.  Because Plaintiffs voluntarily dismissed the claims against Richard Willard and Keith Gladstone asserted in Counts I, V, and VI, the only remaining claims against the individual Officer Defendants—and thus the only claims relevant at this stage—are the Estates' claims against Jenkins and Guinn.[1]  ECF 170 at 2.

Pending now are Defendants' motions for summary judgment and their *Daubert* motions to exclude the testimony of Plaintiffs' proffered expert witness, Dennis Waller.  This Court will first resolve the *Daubert* motion before turning to the motion for summary judgment.

---

[1] Accordingly, the motions for summary judgment filed by the BPD and Palmere, ECF 166, and by Guinn, Gladstone, Willard, Knoerlein, and Fries, ECF 167, will be denied.  With respect to the motion filed by the BPD and Palmere, the remaining claims against those Defendants relate to Plaintiffs' supervisory liability and *Monell*-type claims, which have been bifurcated and stayed.  *See* ECF 170; *see also* ECF 137.  The arguments raised in their motion, therefore, are premature.  The same is true with respect to Defendants Willard, Knoerlein, and Fries, as the claims against them also relate to Plaintiffs' supervisory liability and *Monell*-type claims (and to the extent Plaintiffs brought claims against Willard and Gladstone individually, those claims have been voluntarily dismissed).  *Id.*  Guinn, however, also purports to join ECF 167, but for the reasons explained throughout this opinion, he is not entitled to summary judgment.

## II.   *DAUBERT* MOTION[2]

### A.  Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony.   A

qualified expert may give testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.   In essence, the trial court must ensure the proposed expert testimony "both

rests on a reliable foundation and is relevant to the task at hand."   *Daubert v. Merrell Dow Pharm.,*

*Inc.*, 509 U.S. 579, 597 (1993).   In *Daubert*, the Supreme Court provides five non-exhaustive

factors a court may weigh in making this assessment: (1) "whether a theory or technique . . . can

be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review

and publication," (3) "the known or potential rate of error," (4) "the existence and maintenance of

standards controlling the technique's operation," and (5) whether the technique or theory has

gained "general acceptance."   509 U.S. at 592–94; *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x

448, 452 (4th Cir. 2010).   However, ultimately, the inquiry is "a flexible one" and relevant factors

can vary with the needs of each case.   *Daubert*, 509 U.S. at 594.

---

[2] While there are three motions in limine on the docket, ECF 162, 163, 164, the motions filed by Defendants BPD, Palmere (ECF 164), Guinn, Gladstone, Willard, Knoerlein, and Fries (ECF 163) simply adopt Defendant Jenkins's motion.  Separately, Plaintiffs assert that Defendants' *Daubert* motion, which is styled as a motion in limine, is premature.  Plaintiffs offer no explanation for that assertion, though, and this Court finds no reason why it would be beneficial to wait to decide the motion.

For the proffered evidence to be sufficiently reliable it "must be derived using scientific or other valid methods" and not based on mere "belief or speculation." *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011) (first quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); then quoting *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005)). The court's analysis focuses on experts' methods, not their conclusions, but an expert opinion that relies on "assumptions which are speculative and not supported by the record," is inadmissible. *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). For the proffered opinion to be relevant, it "must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Casey*, 823 F. Supp. 2d at 340 (quoting *Daubert*, 509 U.S. at 591). Expert testimony "is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Anderson v. Home Depot U.S.A., Inc.*, No. GJH-2615, 2017 WL 2189508, at *4 (D. Md. May 16, 2017) (quoting *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)).

The proponent of the expert testimony bears the burden of establishing admissibility, or "coming forward with evidence from which the trial court could determine that the evidence is admissible under *Daubert*." *Id.* at *3 (quoting *Main St. Am. Grp. v. Sears, Roebuck, & Co.*, No. CIV JFM-08-3292, 2010 WL 956178, at *3 (D. Md. Mar. 11, 2010)); *see also Casey*, 823 F. Supp. 2d at 340; *Daubert*, 509 U.S. at 592 n. 10 (explaining admissibility must be established by a "preponderance of proof").

In determining the admissibility of expert testimony, the court considers two "guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).  On the one hand, Rule 702 was "intended to liberalize the introduction of relevant expert evidence," and the court need not ensure the expert's proposed testimony is "irrefutable or certainly correct." *Id.* (explaining that admissible expert testimony can still be vigorously tested before the jury by "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" (quoting *Daubert*, 509 U.S. at 596)).  On the other hand, "due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" *Id.* (quoting *Daubert*, 509 U.S. at 595).  The court must determine whether the disputed expert testimony "has greater potential to mislead than to enlighten." *Id.*  If so, the testimony should be excluded. *Id.*; *see also Casey*, 823 F. Supp. 2d at 340 (noting such testimony would be barred by Federal Rule of Evidence 403).

**B. Analysis**

Plaintiffs' police practices expert, Dennis Waller, proposes to testify to the following four opinions in this case:

- Opinion A: "Based on the testimony of Wayne Jenkins [deposition, October 5, 2021] regarding the arrests of Mr. Burley and Mr. Matthews, a trained, experienced police officer acting in a professional manner consistent with his training and the *Law Enforcement Code of Ethics* would not have objectively believed that there was reasonable suspicion to make a Terry stop of Mr. Burley and Mr. Matthews."  ECF 162-2 at 7-8 (emphasis and brackets in original).

- Opinion B: "Based upon the testimony of Ryan Guinn, a trained, experienced police officer acting in a professional manner consistent with his training and the *Law Enforcement Code of Ethics* would not have objectively believed that there was reasonable suspicion to believe criminal activity was going on or to make a Terry stop of Mr. Burley and Mr. Matthews." *Id.* at 10 (emphasis in original).

- Opinion C: "Based upon the testimony of Mr. Burley and Mr. Matthews, a trained experienced police officer acting in a professional manner consistent

with his training and the *Law Enforcement Code of Ethics* would <u>not</u> have objectively believed that there was reasonable suspicion to believe Mr. Burley and Mr. Matthews were involved in criminal activity or to make a <u>Terry</u> stop." *Id.* at 12 (emphasis in original).

- <u>Opinion D</u>: "Assuming as factual that the police did <u>not</u> identify themselves as police officers, based upon the alleged actions of Jenkins and Guinn [i.e., being in plainclothes and unmarked vehicles, not identifying themselves as police officers, wearing masks, and pointing firearms at the vehicle], it would have been objectively reasonable for Mr. Burley and Mr. Matthews to believe their lives were in danger and flee from the attackers." *Id.* at 13 (emphasis and brackets in original).

Defendants argue that each of these opinions should be excluded. With respect to Opinions A, B, and C, Defendants make three arguments in favor of exclusion. First, Defendants argue that Waller's opinions are not based on reliable principles, and, even if they are, those principles have not been reliably applied to form his conclusions. Second, they argue that Opinions A, B, and C are impermissible legal conclusions. And third, they argue that Waller's reliance on the DOJ Investigation into the BPD constitutes impermissible character or propensity evidence. Finally, with respect to Opinion D, Defendants argue that Waller's proposed testimony about Burley's and Matthews's states of mind is beyond the scope of his expertise, unreliable, and unhelpful to the jury.

### i. Opinions A, B, and C

At the outset, Defendants argue that Waller's methodology is unreliable, and that (reliable or not) it was not reliably applied to the facts of this case. Defendants primarily take issue with Waller's reliance on the Law Enforcement Code of Ethics in formulating his overarching opinion that "a trained experienced police officer acting in a professional manner" would not have believed there was reasonable suspicion to stop Burley and Matthews. *Id.* at 9-12. Defendants argue that the principles espoused in that code "are mere abstractions that *cannot* be applied reliably or with even a modicum of objectivity and certainty[,]" and that they "bear no relation to the ultimate

opinions that Mr. Waller reaches." ECF 162-1 at 4-5 (emphasis in original).  Defendants analogize Waller's reliance on the code of ethics to an expert in a medical malpractice case "relying solely upon the Hippocratic Oath" to opine on the standard of care in a medical procedure.  *Id.* at 5 n.2.

Defendants' argument, however, overstates the degree to which Waller's methodology relies on the Law Enforcement Code of Ethics.  While he cites that code in explaining his ultimate opinions, his methodology goes beyond simply analyzing the facts in light of the principles set forth in the code.  Waller's report clearly explains his four-step methodology, which is grounded primarily in his training and experience.  As Waller explains, he: (1) develops an understanding of the facts; (2) analyzes the actions of the officers; (3) compares [those actions] with standards of training and practice; and (4) defines and explains consistencies and/or inconsistencies.  ECF 162-2 at 2.  Waller also explains how he sets out to accomplish each of those four steps.  *Id.*  And Waller's report generally reflects his faithful application of this methodology by explaining the materials he reviewed, his understanding of the facts, and why those facts lead him to the opinions he offers.

While there is nothing scientific about Waller's methodology, there is also nothing unreliable about it.  "[I]t is well established that experts may base their opinions on experience." *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148-49 (1999).  Waller has extensive experience related to "police policy, procedure, and practice[.]"  ECF 162-2 at 1.  He has degrees in police administration and public administration; he has received over 3,700 hours of law enforcement training; he has served as a police officer, field training officer, detective, sergeant, lieutenant, department training officer, and chief; he has been certified as a police training instructor in several states; he was the director of a regional police training academy in North Carolina; he has been certified as an internal affairs investigator/supervisor; he has been trained as

an assessor for the commission on Accreditation for Law Enforcement Agencies; and he has trained hundreds of officers on *Terry* stops, reasonable suspicion, vehicle pursuits, and ethical conduct. *Id.* at 1-2. And this experience—not solely the Law Enforcement Code of Ethics—is what forms the foundation for his methodology and his ultimate opinions. *Id.* at 7. While Waller's testimony has certainly been challenged, Defendants cite no case in which his testimony has been excluded based on a flawed methodology. By contrast, several courts have upheld as reliable the same methodology Waller uses here. *See Damiani v. Allen*, No. 4:16-cv-53-RLY-DML, 2018 WL 4095080, at *5-7 (S.D. Ind. Aug. 28, 2018); *Estate of Robinson ex rel. Irwin v. City of Madison*, No. 15-cv-502-jdp, 2017 WL 564682, at *10 (W.D. Wisc. Feb. 13, 2017).

Defendants next argue that Waller's opinions are inadmissible because they draw impermissible legal conclusions, particularly about what does and does not constitute reasonable suspicion. ECF 162-1 at 6. Defendants argue this testimony would be "misleading and invade[] upon the province of the court as instructor on the law." *Id.* at 7.

Federal Rule of Evidence 702 permits expert testimony if, among other requirements, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[.]" Generally, the Fourth Circuit has held that "it does not help the jury for an expert to give testimony that states a legal standard or draws a legal conclusion by applying law to the facts because it supplies the jury with no information other than the witness's view of how the verdict should read[.]" *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011) (internal quotations omitted). However, where cases "involve highly technical legal issues" or "when the legal regime is complex and the judge determines that the witness' testimony would be helpful in explaining it to the jury, the testimony may be admitted." *Id.*

This is not a case where expert testimony is necessary to explain a "highly technical" legal regime. On the other hand, that does not mean Waller's testimony must be excluded in its entirety. "When an expert offers an opinion relevant to applying a legal standard such as probable cause, the expert's role is limited to describing sound professional standards and identifying departures from them." *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) (citation and quotation omitted). When analyzing a motion to exclude Waller's testimony in a similar case, another court found that "Mr. Waller may not testify regarding his definition of probable cause or whether he believes Defendants had probable cause to arrest Plaintiffs. That type of testimony constitutes legal opinions. He may, however, opine regarding the standards for evaluating whether probable cause exists and whether he believes Defendants followed those standards." *Hurt v. Vantlin*, No. 3:14-cv-00092, 2019 WL 8267074, at *10 (S.D. Ind. Sept. 26, 2019) (internal citations omitted). Similarly, here, Waller will not be permitted to testify about whether the Officer Defendants had reasonable suspicion to stop Burley and Matthews as a matter of constitutional law under the Fourth Amendment. More generally, he may not testify about whether he believes the officers' actions were reasonable. *Id.* at *11. He may, however, testify about how—based on his training and experience—police officers are trained to evaluate reasonable suspicion and whether, based on the facts here, the Officer Defendants followed those standards. Such testimony will assist the jury in understanding how police officers are trained and the standards they are expected to follow, but limiting Waller's testimony in this way will preserve the jury's ability to decide for itself whether the Officer Defendants, in fact, had reasonable suspicion to stop Burley and Matthews.[3]

---

[3] Defendants also argue that Waller's reference to the 2016 DOJ Investigation Report constitutes impermissible character or propensity evidence. ECF 162-1 at 7-8. With respect to the claims against Jenkins and Guinn individually, Waller may not testify that the DOJ's department-wide findings described in the report support his conclusions about the officers' actions in attempting to stop, and then chase, Burley and Matthews. The DOJ's findings about the BPD generally do

### ii. Opinion D

Waller's final proffered opinion—that based on the officers' testimony, Burley and Matthews were objectively reasonable to fear for their lives and flee from the officers—is improper and must be excluded for a multitude of reasons. First, evaluating the reasonableness or unreasonableness of psychological responses to allegedly unlawful police practices is well beyond Waller's expertise. Second, Waller's opinion about Burley's and Matthews's states of mind is both irrelevant and unhelpful—Burley and Matthews can testify for themselves about how they felt when Jenkins and the other officers approached Burley's car. Opinion D will, therefore, be excluded in its entirety. *See id.* at *11 ("Waller . . . may not testify regarding any individual's state of mind.").

## III. MOTIONS FOR SUMMARY JUDGMENT

Defendants' motions for summary judgment make three principal arguments: (1) that Plaintiffs' claims are time-barred; (2) that the Estate of Elbert Davis, Sr.'s claims are barred by *res judicata*; and (3) that Counts I, V, and VI must be dismissed because Plaintiffs cannot establish any causal connection between the Defendants' conduct and the car accident that killed Davis and injured Cain. This Court disagrees, and the motions for summary judgment will be denied.

---

not bear on whether the officers' actions *in this case* were improper. To the extent Plaintiffs believe that Jenkins and/or Guinn were not adequately trained, or that they engaged in unconstitutional police practices, due to the systemic failures within the BPD that are described in the DOJ report, they should elicit that testimony through Jenkins and/or Guinn themselves, not through Waller who is not an expert on the BPD. Tellingly, Plaintiffs' main retort to Defendants' argument is that Jenkins has made public statements that he was trained not to "let probable cause stand in the way of a good arrest." ECF 171 at 7. While that statement, if true, is emblematic of some of the systemic failures within the BPD that are discussed in the DOJ report, Plaintiffs may question Jenkins himself about those issues in the context of his own experience and training in the BPD (to the extent it is relevant and not objectionable on some other basis). But eliciting testimony from Waller about department-wide failures risks suggesting to the jury that because of those failures, Jenkins and Guinn must have acted improperly *in this case*.

### A. Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey*, 823 F. Supp. 2d at 348 (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010)

(unpublished)).  In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

### B.  Analysis

#### i.  Statute of Limitations

The parties agree that Maryland's three-year statute of limitations applies to Plaintiffs' § 1983 claims.  *See* 42 U.S.C. § 1988(a) (2018); Md. Code Ann., Cts. & Jud. Proc. § 5-101 (West 2019); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 187 (4th Cir. 1999) (noting the "well-settled" principle that § 1983 claims are governed by the forum state's personal injury statute of limitations).  The parties disagree, however, as to the relevant accrual date.

Importantly, while the statute of limitations for § 1983 claims is borrowed from state law, "the question of when a cause of action *accrues* under 42 U.S.C. § 1983 remains one of federal law."  *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc) (emphasis in original); *see Tommy Davis Constr., Inc. v. Cape Fear Pub. Util. Auth.*, 807 F.3d 62, 66-67 (4th Cir. 2015) (clarifying that this principle applies to all claims rooted in § 1983, including *Monell* actions against municipalities and other local government entities).  The "standard rule" is that a § 1983 action accrues when the plaintiff has "a complete and present cause of action" such that he "can file suit and obtain relief."  *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (quoting *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)).  The Fourth Circuit has since clarified that the "standard rule" is that a § 1983 claim accrues when "the plaintiff knows or has reason to know of his injury."  *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 389 (4th Cir. 2014) (citation omitted).  In other words, the standard

is inquiry notice: the "cause of action accrues either when the plaintiff has knowledge of his claim or when he is put on notice—e.g., by the knowledge of the fact of injury and who caused it—to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim." *Nasim*, 64 F.3d at 955.[4]

Maryland law on this point is largely identical, and therefore instructive.  It provides that any civil action must be filed "within three years from the date it accrues."  Md. Code Ann., Cts. & Jud. Proc. § 5-101.  Because section 5-101 leaves the word "accrues" undefined, Maryland courts use the discovery rule to determine accrual.  *Frederick Road Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 95 (2000) (citing *Hahn v. Claybrook*, 130 Md. 179, 186-87 (1917)); *see also Poffenberger v. Risser*, 290 Md. 631, 636 (1981) (expanding the discovery rule's application to all civil actions).  Under the discovery rule, a cause of action accrues "when a claimant gains knowledge sufficient to put him or her on inquiry notice." *Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 447 (2000).  A plaintiff is on "inquiry notice" if he "has 'knowledge of circumstances which would cause a reasonable person in the position of the plaintiff[] to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [tort].'" *Estate of Adams v. Continental Ins. Co.*, 233 Md. App. 1, 25 (2017) (quoting *Lumsden*, 358 Md. at 446).  The question of when a plaintiff had inquiry notice of his claim is typically one of fact for the jury, *O'Hara v. Kovens*, 305 Md. 280, 294-95 (1986), since it oftentimes "requires the balancing of factual issues and the assessment of the credibility of believability of the evidence[.]" *Frederick Road*, 360 Md. at 96.

---

[4] *Wallace* held that some § 1983 claims do not accrue upon inquiry notice.  549 U.S. at 388-90 (holding that a § 1983 claim for unconstitutional detention accrued once the plaintiff was falsely arrested); *see also McDonough v. Smith*, __ U.S. __, 139 S. Ct. 2149, 2161 (2019).  However, the parties here do not argue that a deviation from the standard rule of accrual is appropriate.

Here, Defendants argue that they are entitled to summary judgment "because the record evidence is clear that a reasonable inquiry into the April 28, 2010 incident would have revealed a colorable § 1983 claim before Jenkins['] 2017 indictment, and therefore, Plaintiffs' claims are time-barred." ECF 165-1 at 30.  Defendants base this argument on four key indicia of the viability of Plaintiffs' § 1983 claims in the immediate aftermath of the incident: (1) Burley, joined by Matthews, filed a motion to suppress in his criminal case, which stated that he "disputes much of Detective Jenkins' Statement of Probable Cause"; (2) there was media coverage and lawsuits questioning the propriety of policing practices within the BPD's plainclothes units before the April 28, 2010 incident; (3) "Jenkins was a named defendant in lawsuits alleging constitutional violations before the April 28, 2010 incident";[5] and (4) "all of the information concerning *how* the alleged pursuit was conducted was completely available prior to 2017."  ECF 176 at 4 (emphasis in original).

However, as this Court noted in its opinion on Defendants' motions to dismiss the Third Amended Complaint, Plaintiffs' lack of knowledge of the facts regarding the constitutionality of the stop of Burley and Matthews is "legally significant."  ECF 83 at 43.  Moreover, their lack of knowledge about the officers' post-stop conduct—including planting drugs on Burley and Matthews and falsifying a statement of probable cause to cover up the allegedly unconstitutional stop—is also "legally significant."  *Id.*  As this Court previously explained:

> Plaintiffs did have access to the names of the officers involved in the April, 2010 incident, and they had access to both Burley and Matthews, who could have attested to the false nature of the stop.  But in the summer of 2011, both Burley and Matthews pled guilty to the offenses they were charged with stemming from the April, 2010 incident.  For Burley, this meant guilty pleas in both federal and state court, with a total sentence of fifteen years in prison.  Reading these facts in a light

---

[5] Ironically, in points (2) and (3) Defendants argue that similar kinds of propensity evidence they (rightly) sought to prevent Waller from testifying about should have *supported* a § 1983 claim years ago.

most favorable to Plaintiffs, a reasonable lawyer advising Plaintiffs might justifiably take no further action to investigate claims of police misconduct causing the April, 2010 accident, even had Burley and Matthews continued to make such claims or profess their actual innocence at that time.  It is reasonable to infer that, in April, 2010, any inquiry into the Officer Defendants' liability . . . would not have revealed a colorable § 1983 claim.

ECF 83 at 44.  The same is true now, and Defendants have not put forward any facts that were developed in discovery that alter that conclusion, whereas the evidence adduced by Plaintiffs supports their contention that the material facts supporting their § 1983 claims were not available to them in the years immediately following the incident.  The only new fact on which Defendants rely is Gail Davis's 2014 testimony that she advocated bringing a § 1983 claim in the immediate aftermath of the April, 2010 incident based on her belief that "[t]he high speed chase itself was wrong."  ECF 165-1 at 31.  But a high-speed chase, on its own, is generally not "conscience-shocking" police behavior, and this fact alone, therefore, is not evidence that a reasonable investigation by the Plaintiffs would have revealed a viable § 1983 claim.  Instead, Plaintiffs have put forth sufficient facts that, when construed in the light most favorable to them as non-movants, demonstrate that the "conscience-shocking" facts had been concealed by the Defendants.

In sum, the viability of Plaintiffs' § 1983 claims was markedly different before the federal investigation into the GTTF revealed Defendants' misconduct in this case than it was afterward. Before that investigation, a fictitious statement of probable cause, corroborated by the "discovery" of planted drugs and two fraudulently induced guilty pleas to drug charges, all supported the belief that there was nothing unusual about the Defendants' conduct during this incident.  In other words, before 2017, it seemed (to everyone except Burley and Matthews) that Defendants were conducting legitimate police work on April 28, 2010, even if, as Gail Davis testified in 2014, she believed "[t]he high speed chase . . . was wrong[.]"  ECF 176 at 5.  By contrast, if Plaintiffs' version of events proves correct, the federal investigation into the GTTF revealed that the April,

2010 incident involved no police work at all, but rather was an attempted robbery by individuals who happened to be employed as police officers and had access to the tools and resources to conceal their crimes.  And none of what Defendants point to could have armed Plaintiffs with that knowledge before 2017.  Burley hardly would have been the first criminal defendant to proclaim his innocence, file a motion to suppress challenging a statement of probable cause, and then plead guilty after the motion was denied.  And even if there were reports of misconduct by plainclothes units within the BPD, or by Jenkins himself, those reports clearly did not reveal Defendants' criminal conduct during this particular incident.  Accordingly, Defendants have not met their burden to show that Plaintiffs' § 1983 claims accrued in the immediate aftermath of the April, 2010 incident, and their motion for summary judgment is denied insofar as it argues that Plaintiffs' § 1983 claims are time-barred.

### ii. *Res Judicata*

Defendants argue that the Estate of Elbert Davis, Sr.'s claims are precluded because they arise from the same set of facts that were litigated and decided in the 2013 suit against Burley in the Circuit Court for Baltimore City.  As an initial matter, Defendants appear to have put forth evidence that the Estate of Elbert Davis, Sr. was, in fact, a party to the state suit against Burley even though Plaintiffs previously disputed that claim.  Even assuming the Estate was a party to the state lawsuit, though, its claims are not barred by *res judicata* because it could not have brought those claims in the previous lawsuit.  As explained above, Defendants have not provided any evidence that could support a finding that a reasonable investigation by the Estate would have uncovered the facts required to bring the claims it pursues here.

"Res judicata, also known as claim preclusion, bars a party from relitigating a claim that was decided or could have been decided in an original suit." *Laurel Sand & Gravel, Inc. v. Wilson*,

519 F.3d 156, 161 (4th Cir. 2008).  Maryland law governs the preclusive effect of a Maryland state court judgment.  *Id.* at 162.  "Under Maryland law, the elements of res judicata are: (1) that the parties in the present litigation are the same or in privity with the parties in the earlier dispute; (2) that the claim presented in the current action is identical to the one determined in the prior adjudication; and (3) that there has been a final judgment on the merits."  *Id.*  However, the test for adjudicating "whether the causes of action are identical for claim preclusion purposes is whether the claim presented in the new litigation 'arises out of the same transaction or series of transactions as the claim resolved by the prior judgment.'"  *Pittston Co. v. United States*, 199 F.3d 694, 704 (4th Cir. 1999) (quoting *Harnett v. Billman*, 800 F.2d 1308, 1313 (4th Cir. 1986)).  "Newly articulated claims based on the same [transactional] nucleus of facts may still be subject to a res judicata finding if the claims could have been brought in the earlier action."  *Laurel Sand & Gravel*, 519 F.3d at 162 (quoting *Tahoe Sierra Pres. Council, Inc. v. Tahoe Regional Planning Agency*, 322 F.3d 1064, 1078 (9th Cir. 2003)).  "On the other hand, res judicata does not bar a claim that could not have been brought in the earlier litigation."  *Hebbeler v. First Mariner Bank*, No. ELH-17-3641, 2020 WL 1033586, at *11 (D. Md. Mar. 2, 2020).  Notably, lack of knowledge of the claim does not prevent the application of *res judicata*.  *Id.* ("The controlling issue is whether the claim existed at the time of the prior suit, not whether plaintiff had actual knowledge of the claim at that time.").  However, "[a]n exception to the general principle that lack of knowledge will not avoid the application of res judicata rules is found in cases where fraud, concealment, or misrepresentation have caused the plaintiff to fail to include a claim in a former action."  *Id.* (quoting *Harnett*, 800 F.2d at 1313).

As explained above, the Estate could not have brought viable claims for the constitutional harms they allege here in the 2013 suit against Burley because the facts that make those claims

viable now had been concealed by the Defendants' criminal conduct.  This lawsuit is not simply a reiteration of the suit against Burley under a different legal theory, as Defendants suggest.  Rather, Plaintiffs here rely on alleged facts that, if true, reveal an entirely different understanding of who was at fault for prompting the chase and subsequent car crash.  The principles of *res judicata*, therefore, do not bar the Estate of Elbert Davis, Sr.'s claims.  *See Harnett*, 800 F.2d at 1313.

### iii.  Causation

Defendants argue that Plaintiffs cannot establish causation for two reasons.  First, they argue that "Plaintiffs have adduced no evidence to support the claim that the initial stop was both the actual and legal cause of the accident."  ECF 165-1 at 39.  In support of this argument, Defendants argue that Plaintiffs cannot account for the fact that Burley testified that he would have fled whether the men with guns approaching his car had identified themselves as police or not.  Moreover, they argue that Plaintiffs have abandoned any theory that the pursuit itself violated Burley's and Matthews's constitutional rights.  Second, and relatedly, Defendants argue that there is no evidence of *pre*-accident misconduct by the Officer Defendants that could establish a causal connection to Plaintiffs' alleged harm.

As Defendants point out, § 1983 requires a plaintiff to show an "affirmative causal link" between the alleged constitutional violation and the alleged harm.  *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).  This standard is "analogous to proximate cause.  In other words, [the defendant] is liable for the 'natural and foreseeable consequences of his actions.'"  *Id.* at 800 (quoting *Slakan v. Porter*, 737 F.2d 368, 376 (4th Cir. 1984)).

Contrary to Defendants' arguments, Plaintiffs have put forth sufficient evidence to withstand summary judgment.  As Plaintiffs explain:

> Plaintiffs have produced testimony reflecting that Mr. Jenkins and Mr. Guinn had
> no basis to stop Mr. Burley and Mr. Matthews and only stopped them because they

were 'sitting there black.'  Despite this, Jenkins and Guinn attempted to 'box them in' and jumped out of an unmarked car, with no emergency lights, dressed in plain clothes with no police markings, wearing masks, screamed and pointed a gun at them causing them to flee the scene. . . . Mr. Burley and Mr. Matthews testified that they fled at a high rate of speed and that Mr. Jenkins and Mr. Guinn were pursuing them until the crash.

ECF 170 at 30.  If proven, those facts could allow a reasonable jury to find that Plaintiffs' alleged harm was a "natural and foreseeable consequence" of the officers' alleged misconduct in stopping and pursuing Burley and Matthews.  Despite Defendants' argument, that causal link would not necessarily be destroyed if a jury credits Burley's testimony that he would have fled whether or not the officers identified themselves as police because the officers' alleged misconduct is not limited to failing to identify themselves.  Finally, as described above, Plaintiffs' proffered evidence stretches far beyond the alleged post-accident misconduct of planting drugs in Burley's car and falsifying a statement of probable cause against Burley and Matthews.  Plaintiffs do not rely on that post-accident misconduct to meet their burden of showing causation.  Rather, they appear to rely on those facts simply to shed light on the Defendants' intentions throughout the encounter and, as described above, to demonstrate Defendants' efforts to conceal their alleged wrongdoing.

*       *       *

Because Defendants have not met their burden to show that Plaintiffs claims are time-barred or precluded, and because there is a genuine dispute of material fact about whether Plaintiffs can demonstrate causation, Defendants' motions for summary judgment will be denied.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions in limine, ECF 162, 163, 164, are GRANTED in part and DENIED in part.  Defendants' motions for summary judgment, ECF 165, 166, 167, are DENIED.  A separate order follows.

Dated: June 21, 2022

_____ /s/
Stephanie A. Gallagher
United States District Judge
